SEAGATE TECHNOLOGY, INC. AND CONSOLIDATED SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11660–90.　　　Filed February 8, 1994.

*Joel V. Williamson, William A. Schmalzl, Joseph R. Goeke, John Bleveans, Thomas C. Durham, Roger J. Jones, M. Ellen Robb, Clisson S. Rexford,* and *Scott M. Stewart,* for petitioner.

*William E. Bonano, John O. Kent, Christopher J. Croudace, Christopher J. Faiferlick,* and *Paul G. Robeck,* for respondent.

## CONTENTS

| | Page |
|---|---|
| STATEMENT OF ISSUES | 156 |
| I. GENERAL FINDINGS OF FACT | 157 |
| A. Background in General | 157 |
| B. The Industry in General | 158 |

C. Seagate Scotts Valley ....................................................................... 159
D. Seagate Singapore ........................................................................... 160

II. ISSUE 1: WHETHER RESPONDENT'S REALLOCATIONS OF GROSS INCOME UNDER SECTION 482 ARE ARBITRARY, CAPRICIOUS, AND UNREASONABLE ......................................... 161

A. FINDINGS OF FACT .................................................................... 161
   1. The Notices of Deficiency .............................................................. 161
   2. Respondent's Expert Reports ...................................................... 162
B. OPINION ...................................................................................... 163
   1. The Parties' Positions ................................................................... 163
   2. Section 482 in General ................................................................. 163

III. ISSUE 2: WHETHER RESPONDENT SHOULD BEAR THE BURDEN OF PROOF FOR ANY OF THE ISSUES INVOLVED IN THE INSTANT CASE .................................................................... 165

A. FINDINGS OF FACT .................................................................... 165
   1. The Notices of Deficiency .............................................................. 165
   2. Respondent's Concessions ............................................................ 167
   3. Respondent's Experts ................................................................... 167
B. OPINION ...................................................................................... 168
   1. The Parties' Positions ................................................................... 168
   2. The Court's Holding as to the Burden of Proof ........................ 169

IV. ISSUE 3: WHETHER SEAGATE SCOTTS VALLEY PAID SEAGATE SINGAPORE ARM'S-LENGTH PRICES FOR COMPONENT PARTS ......................................................................... 172

A. FINDINGS OF FACT .................................................................... 172
   1. In General ...................................................................................... 172
   2. Intercompany Transactions ......................................................... 172
   3. Component Parts Manufacturing ................................................ 173
   4. Respondent's Notices of Deficiency ............................................ 176
   5. Petitioner's Experts ...................................................................... 176
      a. Daniel P. Broadhurst ................................................................ 176
      b. Gary E. Holdren ....................................................................... 177
      c. Clark J. Chandler ..................................................................... 177
   6. Respondent's Experts ................................................................... 181
      a. Thomas Horst ............................................................................ 181
      b. Grant M. Clowery ..................................................................... 182
      c. Steven M. Zemsky ..................................................................... 184
   7. Other Third Party Transactions ................................................. 184
B. OPINION ...................................................................................... 185
   1. Ultimate Findings of Fact ............................................................ 185
   2. The Methods .................................................................................. 185
      a. The Comparable Uncontrolled Price (CUP) Method ............. 186
         i. The CUP Method in General .............................................. 186
         ii. The Parties' Positions on the CUP Method and the Court's Holding as to Its Application .................................. 187
      b. The Cost-Plus Method ............................................................... 188
         i. The Cost-Plus Method in General ...................................... 188

ii. The Parties' Positions on the Cost-Plus Method as Applied by Dr. Horst and the Court's Ruling as to That Method ................................................................................. 189

iii. The Parties' Positions on Applying the Cost-Plus Method Using the Bull Peripheriques Sale and the Court's Holding as to That Method ..................................... 193

iv. The Parties' Position on Applying the Cost-Plus Method Using Dr. Chandler's Approaches and the Court's Holding as to That Method ............................................ 194

c. The Court's Holding as to the Arm's-Length Transfer Price for Component Parts Sold to Seagate Scotts Valley ............. 195

V. ISSUE 4: WHETHER SEAGATE SCOTTS VALLEY PAID SEAGATE SINGAPORE AN ARM'S-LENGTH PRICE FOR COMPLETED DISK DRIVES SEAGATE SINGAPORE PRODUCED AND SOLD TO SEAGATE SCOTTS VALLEY ................................ 196

A. FINDINGS OF FACT .................................................................... 196

1. Disk Drive Manufacturing and Sales ......................................... 196

2. Respondent's Notices of Deficiency ............................................ 201

3. Petitioner's Experts ..................................................................... 203

a. Mr. Holdren .......................................................................... 203

b. Mr. Broadhurst ..................................................................... 213

4. Respondent's Experts ................................................................... 217

a. Dr. Clowery ........................................................................... 217

b. Dr. Frisch .............................................................................. 220

B. OPINION ....................................................................................... 225

1. Ultimate Findings of Fact ........................................................... 225

2. Analysis of Completed Disk Drive Issue .................................... 225

a. The CUP Method .................................................................. 226

i. Petitioner's Position ............................................................ 226

ii. Respondent's Position ......................................................... 227

iii. The Court's Holding as to the CUP Method ..................... 228

b. The Resale Price Method ...................................................... 231

i. Respondent's Resale Price Method ..................................... 233

ii. The Court's Holding as to Respondent's Resale Price Method ................................................................................. 235

iii. Petitioner's Resale Price Method ....................................... 236

iv. The Court's Holding as to Petitioner's Resale Price Method ................................................................................. 238

c. The Court's Holding as to the Arm's-Length Transfer Prices for the Disk Drives ..................................................... 238

d. The Price Allowance and Allowance for Seagate Singapore's Marketing Activities Allowed by Respondent in the Notices of Deficiency ............................................................. 240

i. The Price Allowance ............................................................ 240

ii. The "Offset" for Seagate Singapore's Marketing Activities ..................................................................................... 241

VI. ISSUES 5 AND 6: WHETHER SEAGATE SINGAPORE PAID SEAGATE SCOTTS VALLEY ARM'S-LENGTH ROYALTIES FOR THE USE OF CERTAIN INTANGIBLES AND WHETHER THE ROYALTY FEE SEAGATE SINGAPORE PAID SEAGATE SCOTTS VALLEY FOR DISK DRIVES COVERED UNDER A SECTION 367 PRIVATE LETTER RULING APPLIES TO ALL SUCH DISK DRIVES SHIPPED TO THE UNITED STATES, REGARDLESS OF WHERE TITLE PASSED

VI. ISSUES 5 AND 6: ... 241

A. FINDINGS OF FACT ................................................. 242
  1. General Background Information ............................................. 242
  2. Seagate Scotts Valley and Seagate Singapore Agreements ..... 243
    a. The Property Transfer Agreement ........................................ 243
    b. The Royalty Agreement ..................................................... 245
    c. The Marketing Agreement .................................................. 246
  3. The Ruling Request and Private Letter Ruling ........................ 247
    a. The Request ..................................................................... 247
    b. The Private Letter Ruling ................................................... 248
  4. Royalties Paid ................................................................... 249
  5. Third Party Licensing Agreements ....................................... 249
    a. Co. R and Co. S ............................................................... 249
    b. Texas Instruments, Inc. .................................................... 250
    c. Honeywell Bull ................................................................ 251
    d. TEAC Corp ...................................................................... 251
    e. Co. K .............................................................................. 252
    f. Co. L .............................................................................. 252
    g. Co. M ............................................................................. 253
    h. IBM ............................................................................... 253
    i. Co. N ............................................................................. 253
    j. Co. B and Co. C Agreement ............................................... 254
    k. LaPine Technology Corp. and Kyocera Corp. Agreements ... 255
      i. The Research and Development Agreement ........................ 256
      ii. The Trading Agreement ................................................... 256
      iii. The Technology Transfer and Manufacturing Agreement ...................................................................... 257
    l. Co. B and Co. F Agreement ................................................ 258
    m. Co. P and Co. Q Agreement ............................................... 259
    n. Co. D and Co. E Agreement ............................................... 259
    o. Co. G and Cos. H and J Agreement ..................................... 260
  6. Respondent's Notices of Deficiency ...................................... 261
  7. The Experts' Positions ....................................................... 262
    a. Petitioner's Experts ......................................................... 262
      i. Dr. Chandler ................................................................. 262
      ii. James Patterson ............................................................ 263
      iii. Zoltan M. Mihaly .......................................................... 264
      iv. Paul M. Enlow .............................................................. 265
      v. Mr. Holdren ................................................................. 265
      vi. Mr. Broadhurst ............................................................ 266
    b. Respondent's Experts ....................................................... 266
      i. Dr. Horst ..................................................................... 266

ii. Anthony LaPine ................................................................. 268
iii. Mark R. Sherwood ............................................................ 270
iv. Harold J. McLaughlin ........................................................ 271
v. George E. Frost ................................................................. 271
B. OPINION ............................................................................. 273
1. Analysis of Arm's-Length Royalties for Use of Intangibles ..... 273
a. The Regulations in General ..................................................... 273
b. The Parties' Positions ............................................................ 274
i. Respondent's Position ............................................................ 274
ii. Petitioner's Position ............................................................. 275
c. The Court's Holding as to the Arm's-Length Royalty Rate .. 278
d. The Offset for the Marketing Commissions Paid by
Seagate Singapore to Seagate Scotts Valley .......................... 282
2. Analysis of Scope of Ruling ...................................................... 284

VII. ISSUE 7: WHETHER THE PROCUREMENT SERVICES
FEES SEAGATE SINGAPORE PAID SEAGATE SCOTTS VAL-
LEY WERE ARM'S LENGTH ............................................................ 289

A. FINDINGS OF FACT ................................................................. 290
1. Background ............................................................................. 290
a. The Services Agreement .......................................................... 290
b. Procurement Services Performed by Seagate Scotts Valley
for Seagate Singapore .............................................................. 291
c. Seagate Singapore's Procurement Activities .......................... 292
d. Solarise Enterprises, Inc .......................................................... 293
2. Respondent's Notices of Deficiency .......................................... 294
3. The Experts' Positions ............................................................. 295
a. Petitioner's Expert—Dr. Chandler ......................................... 295
b. Respondent's Experts ............................................................. 296
i. Martin Ehrlich ....................................................................... 296
ii. Dr. Clowery ........................................................................... 297
B. OPINION ............................................................................... 298
1. The Burden of Proof ................................................................ 298
2. The Services Regulations ......................................................... 299
3. The Parties' Positions ............................................................. 301
a. Petitioner's Position ................................................................ 301
b. Respondent's Position ............................................................. 303
c. The Court's Holding as to the Arm's-Length Procurement
Services Fee ............................................................................ 303

VIII. ISSUE 8: WHETHER THE CONSIDERATION SEAGATE
SINGAPORE PAID SEAGATE SCOTTS VALLEY PURSUANT
TO A COST-SHARING AGREEMENT WAS ARM'S LENGTH ..... 305

A. FINDINGS OF FACT ................................................................. 305
1. Background ............................................................................. 305
2. The Research and Development Cost-Sharing Agreement ...... 306
3. Payments Under the Cost-Sharing Agreement ........................ 306
4. The Experts' Opinions ............................................................. 307
a. Petitioner's Expert—Dr. Chandler ......................................... 307
b. Respondent's Experts ............................................................. 309

      i. Dr. Horst ............................................................................ 309

      ii. Dr. Clowery ...................................................................... 309

      iii. Dr. Chandler's Critique of Dr. Horst's and Dr.
      Clowery's Method ............................................................... 310

  B. OPINION ............................................................................. 311

    1. The Cost-Sharing Regulations ..................................... 311

    2. The Parties' Positions ................................................... 311

      a. Petitioner's Position ................................................... 311

      b. Respondent's Position ................................................ 312

    3. The Court's Holding as to the Arm's-Length Share of the
    Research and Development Costs ................................... 312

IX. ISSUE 9: WHETHER SEAGATE SCOTTS VALLEY IS ENTI-
TLED TO OFFSETS FOR WARRANTY PAYMENTS SEAGATE
SINGAPORE PAID TO SEAGATE SCOTTS VALLEY ................... 314

  A. FINDINGS OF FACT ........................................................... 314

    1. Background .................................................................... 314

    2. Respondent's Notices of Deficiency ............................. 315

  B. OPINION ............................................................................. 315

    1. The Parties' Positions ................................................... 315

      a. Petitioner's Position ................................................... 315

      b. Respondent's Position ................................................ 316

    2. The Court's Holding as to the Warranty Offset .......... 316

X. PROCEDURAL MATTERS ......................................................... 317

  A. Petitioner's Motion To Exclude Part IV of Dr. Clowery's Report   317

    1. Background .................................................................... 317

    2. Ruling on Exclusion of Part IV of Dr. Clowery's Report .......... 320

  B. Petitioner's Motion To Exclude Certain Documents ................... 321

WELLS, *Judge:* Respondent determined deficiencies in petitioner's consolidated corporate Federal income tax as shown by the following chart:

| *TYE* | *Deficiency* |
|---|---|
| June 30, 1981 | $85,826 |
| June 30, 1983 | 51,510 |
| June 30, 1984 | 23,483,054 |
| June 30, 1985 | 73,420 |
| June 30, 1986 | 12,801,009 |
| June 30, 1987 | 75,785,217 |

All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise indicated.

STATEMENT OF ISSUES

In the instant case, we are asked to decide several distinct transfer pricing issues arising out of adjustments determined by respondent under section 482. Following concessions by the parties, the issues for decision are as follows:

1. Whether respondent's reallocations of gross income under section 482 for the years in issue are arbitrary, capricious, or unreasonable;

2. whether respondent should bear the burden of proof for any of the issues involved in the instant case;

3. whether petitioner Seagate Technology, Inc. (hereinafter referred to as Seagate Scotts Valley), paid Seagate Technology Singapore, Pte. Ltd. (Seagate Singapore), a wholly owned subsidiary of Seagate Scotts Valley, arm's-length prices for component parts;

4. whether Seagate Scotts Valley paid Seagate Singapore arm's-length prices for completed disk drives;

5. whether Seagate Singapore paid Seagate Scotts Valley arm's-length royalties for the use of certain intangibles;

6. whether the royalty fee Seagate Singapore paid Seagate Scotts Valley for disk drives covered under a section 367 private letter ruling applies to all such disk drives shipped to the United States, regardless of where title passed;

7. whether the procurement services fees Seagate Singapore paid Seagate Scotts Valley were arm's length;

8. whether the consideration Seagate Singapore paid Seagate Scotts Valley pursuant to a cost-sharing agreement was arm's length; and

9. whether Seagate Scotts Valley is entitled to offsets for warranty payments Seagate Singapore paid to Seagate Scotts Valley.

Because the various discrete issues involved in the instant case are quite complex, for convenience and clarity, we have divided our opinion into separate segments. The first segment sets forth general facts applicable to all of the issues. Each of the segments following our general findings sets forth our findings of fact and opinion as to a separate discrete issue set forth above, except that issues 5 and 6 are combined into one segment.

## I. GENERAL FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. We incorporate the stipulated facts herein by reference.

### A. *Background in General*

Seagate Scotts Valley is a corporation organized under the laws of California with its principal offices in Scotts Valley, California. Seagate Scotts Valley maintains its books and records on an accrual basis and filed its Federal tax returns for the years ended June 30, 1981, 1982, 1983, 1984, 1985, 1986, and 1987 (the years in issue), accordingly.

Seagate Scotts Valley's stock is publicly traded on the New York Stock Exchange. Seagate Scotts Valley is the parent corporation of the affiliated group of corporations described below.

Seagate Singapore was organized under the laws of the Republic of Singapore (Singapore) in July 1982, and has its principal office in Singapore. Seagate Singapore assembles and manufactures disk drives and disk drive components.

Seagate Technology (Thailand), Ltd. (Seagate Thailand), was incorporated in Thailand on or about October 7, 1983, to assemble disk drive components, including E-blocks and head assemblies.

Seagate Technology GmbH (Seagate Germany) was incorporated in Germany on or about February 10, 1984, primarily to market disk drives to Seagate Scotts Valley's European-based customers.

Seagate Technology International (Seagate Cayman Islands) was incorporated in the Cayman Islands on or about May 14, 1984, but was inactive during the years in issue.

Seagate Technology Scotland, Ltd. (Seagate Scotland), was incorporated in Scotland on or about January 22, 1985, to service, test, and repair Seagate Scotts Valley's disk drives and related components.

Seagate Technology Japan, Ltd. (Seagate Japan), was incorporated in Japan on or about March 1985, to procure materials on behalf of Seagate Scotts Valley's manufacturing facilities.

Seagate Magnetics (SeaMag), formerly known as Grenex, Inc., was acquired by Seagate Scotts Valley during 1985. SeaMag is a U.S. manufacturer of disks used in disk drives.

### B. *The Industry in General*

Computers use auxiliary memory systems, such as disk drives, to record, store, and retrieve information because their semiconductor memories generally cannot store all of the information needed for the computer's applications. The floppy disk drive and the hard disk drive are the two main types of disk drives. The amount of information that a hard disk can store is measured in megabytes (1 million bytes). The higher the number of megabytes that a hard disk can store, the greater is its storage capacity. The hard disk drive industry constantly produces products with greater capacity. The disk drive industry is characterized by intense competition and declining prices.

Major components of a hard disk drive include the disk, which stores the information; the heads, which read and write the information on the disk; the spindle motor, which rotates the disk; the circuit boards, which control the mechanical operation of the drive; the actuator system, which positions the heads over the disks; the stepper or voice coil motor, which moves the actuator system; and the circuit boards, which serve as an interface for the transfer of information between the disk drive and the central processing unit of the computer.

During the 1960s, the International Business Machines Corp. (IBM) produced a hard disk drive that could store 30 megabytes of information on a removable hard disk and 30 megabytes of information on a fixed hard disk, which became known as a "Winchester drive" (referring to the Winchester 30–30 rifle) because it used two disks which each held 30 megabytes of information. The term "Winchester drive" is now sometimes used to refer to most types of hard disk drives.

Manufacturers of hard disk drives for personal computers design their disk drives so that the hard disk drive has the same form factor (e.g., exterior dimensions) as the floppy disk drive in the computer. The most common form factor for per-

sonal computers is the 5.25-inch full height and the 5.25-inch half height.

IBM compatible computer systems are designed to accommodate industry standards. As a result of industry standardization, manufacturers of computer systems are able to use disk drives from a number of manufacturers in any given computer system. Original equipment manufacturers (OEM's) sometimes purchase disk drives from more than one vendor simultaneously. IBM, for example, purchases disk drives for its XT personal computer from Seagate Scotts Valley and Miniscribe Corp. simultaneously.

## C. *Seagate Scotts Valley*

Seagate Scotts Valley designs, develops, manufactures, and markets a line of Winchester technology magnetic hard disk drives for use in computer systems. Seagate Scotts Valley is one of the world's leading manufacturers of hard disk drives. The most common application for Seagate Scotts Valley's products is in personal computer systems. Disk drives sold by Seagate Scotts Valley can be used in various IBM compatible computer systems.

Seagate Scotts Valley introduced its first disk drive, the ST506, during July 1980. The ST506 is the first 5.25-inch hard disk drive. It has a five-megabyte formatted capacity. Seagate Scotts Valley develops, designs, manufactures, and markets the ST506 disk drive. Seagate Scotts Valley continues to design and develop new disk drives with higher capacity and faster access time.

Seagate Scotts Valley sells 15 models of hard disk drives, including the ST212, ST225, and ST412. The ST225 is Seagate Scotts Valley's biggest seller.

In addition to disk drive system development and manufacture, Seagate Scotts Valley also develops and manufactures disk drive components.

The design drawings for Seagate Scotts Valley's disk drives and for the components of the disk drives that are made to Seagate Scotts Valley's specifications, are proprietary. Seagate Singapore acquired some of such proprietary information from Seagate Scotts Valley through property transfers during 1983 and 1984 and as a result of a cost-sharing agreement.

Other companies sell hard disk drives of a similar size and capacity that compete with the disk drives Seagate Scotts Valley sells, except during Seagate Scotts Valley's fiscal year ended June 30, 1981. Some OEM's, such as IBM, also manufacture disk drives for their own uses.

## D. *Seagate Singapore*

Seagate Scotts Valley conducted all of its manufacturing activities in Scotts Valley, California, and Watsonville, California, prior to the time Seagate Singapore was formed.

During July 1982, David T. Mitchell (Mr. Mitchell), a cofounder of Shugart Technology, Seagate Scotts Valley's predecessor company,[1] and at the time Seagate Scotts Valley's vice president of operations, traveled to Hong Kong and Singapore to locate prospective sites for an offshore purchasing office. After discussions with the Economic Development Board of Singapore and Sing Cheong Tien (Mr. Tien), Mr. Mitchell concluded that some component manufacturing also could be performed in Singapore. Seagate Singapore was incorporated on July 30, 1982, for the purpose of performing such manufacturing.

Mr. Mitchell hired Mr. Tien to organize and oversee all of Seagate Singapore's operations. Mr. Tien assembled his core managerial staff from contacts he had established and developed while in Singapore.

On August 12, 1983, the Economic Development Board approved Seagate Singapore's application for certain investment incentives, including exemption from Singapore taxation, and granted tax relief to Seagate Singapore for 10 years commencing from October 1, 1982.

During October 1983, Seagate Scotts Valley began moving some of its disk drive manufacturing operations to Seagate Singapore to take advantage of Singapore's large, qualified labor supply. Seagate Scotts Valley's management believed that the transfer of disk drive manufacturing to Singapore would help Seagate Scotts Valley remain competitive in the disk drive market by reducing product costs and would help it capture a share of the growing market for disk drives in East Asia. As Seagate Singapore was a wholly owned

---

[1] Hereinafter, references to Seagate Scotts Valley will include references to Shugart Technology, if appropriate.

subsidiary of Seagate Scotts Valley, significant decisions of Seagate Singapore required Seagate Scotts Valley's approval.

Seagate Singapore's disk drive manufacturing operations grew rapidly, selling the following volume of disk drives:

| Year | Volume |
|------|--------|
| 1984 | 125,919 |
| 1985 | 568,753 |
| 1986 | 1,397,823 |
| 1987 | 3,413,463 |

Starting with approximately 50 employees in November 1982, by 1987, Seagate Singapore grew into the second largest employer in Singapore, employing 8,067 people. By attracting qualified workers at wages that were at the lower end of wages prevailing in Singapore, Seagate Singapore's management was able to control labor costs.·

## II. ISSUE 1

Whether respondent's reallocations of gross income under section 482 are arbitrary, capricious, and unreasonable.

### A. FINDINGS OF FACT

1. *The Notices of Deficiency*

In the notices of deficiency, respondent reallocated income from Seagate Singapore to Seagate Scotts Valley in the following amounts:

| Period ended | Sec. 482 reallocation |
|--------------|-----------------------|
| 6/30/83 | $3,962,000 |
| 6/30/84 | 20,963,000 |
| 6/30/85 | 30,320,000 |
| 6/30/86 | 78,353,000 |
| 6/30/87 | 151,798,000 |
| Total | 285,396,000 |

## 2. *Respondent's Expert Reports*

As reflected in respondent's expert reports introduced at trial, the total adjustments are as follows:

| Period ended | Sec. 482 reallocation |
|---|---|
| 6/30/83 | $1,710,547 |
| 6/30/84 | 7,923,957 |
| 6/30/85 | [1] 30,405,674 |
| 6/30/86 | 67,019,354 |
| 6/30/87 | [2] 64,324,329 |
| Total | 171,383,861 |

[1] As indicated by respondent's expert reports, an increased deficiency is reflected for the 1985 fiscal year. Respondent, however, does not seek an increase in deficiency for that year. Rather, in an attempt to avoid petitioner's argument that respondent has the burden of proof for 1985 because of the $85,674 increase in the net sec. 482 adjustment, respondent has conceded $85,700 of the 1985 $24,909,503 resale margin adjustment (see *infra* Issue 4), resulting in a revised resale margin adjustment of $24,823,803 and no increase in the total sec. 482 adjustment for any year in issue. After respondent's concession, the total sec. 482 reallocation for 1985 is $30,319,974.

[2] We have corrected a 1-dollar math error reflected on the expert report summarizing all of respondent's revised adjustments.

The adjustments in the reports of respondent's experts relate to reallocations for the resale margin that Seagate Scotts Valley allegedly should have earned at arm's length for distributing Seagate Singapore-produced disk drives; reallocations for the royalty income that Seagate Scotts Valley should have earned at arm's length for designing, transferring, and significantly contributing to the manufacturing of products developed from disk drive technology, developing a customer base for Seagate Singapore, and for the use by Seagate Singapore of Seagate Scotts Valley's name and corporate reputation; reallocations for the sharing of costs between Seagate Singapore and Seagate Scotts Valley relating to the development of disk drive technology after January 1, 1985; reallocations for procurement fees Seagate Singapore should have paid at arm's length to Seagate Scotts Valley to compensate Seagate Scotts Valley for, among other functions, qualifying vendors, performing first article inspection, acquiring materials, inventorying materials, and selling the materials to Seagate Singapore; and reallocations from

Seagate Singapore to Seagate Scotts Valley relating to printed circuit board and E-block assembly.

### B. OPINION

### 1. *The Parties' Positions*

Petitioner contends that its transactions with Seagate Singapore were conducted at arm's length. Petitioner offered evidence at trial, including expert testimony, to support its position that respondent's adjustments are arbitrary, capricious, or unreasonable.

On the other hand, respondent argues that the adjustments contained in the notice of deficiency are not arbitrary, capricious, or unreasonable. At trial, respondent also offered evidence, including expert testimony, in support of the Government's position.

### 2. *Section 482 in General*

Section 482[2] gives respondent broad authority to allocate income, deductions, credits, or allowances between commonly controlled organizations, trades, or businesses if respondent determines that the reallocation is necessary to prevent the evasion of taxes or clearly to reflect the income of the controlled entities. The purpose of section 482 is to prevent the artificial shifting of the net incomes of controlled taxpayers by placing controlled taxpayers on a parity with uncontrolled, unrelated taxpayers. *Sundstrand Corp. v. Commissioner*, 96 T.C. 226, 352–353 (1991); see also *Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525, 581 (1989), affd. 933 F.2d 1084 (2d Cir. 1991); *Edwards v. Commissioner*, 67 T.C. 224, 230 (1976); sec. 1.482–1(b)(1), Income Tax Regs.

The income tax regulations set forth an arm's-length standard to determine whether reallocations between controlled entities are necessary. To make such a determination,

---

[2] Sec. 482 provides as follows:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Sec. 482 was subsequently amended by sec. 1231(e)(1) of the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085, 2562–2563, which does not affect the instant case.

the regulations attempt to identify the "true taxable income" of each entity based on the taxable income which would have resulted had the entities been uncontrolled parties dealing at arm's length. See *Sundstrand Corp. v. Commissioner, supra* at 353; sec. 1.482–1(b)(1), Income Tax Regs.

The Commissioner's determination as set forth in a notice of deficiency is presumptively correct. The taxpayer has the burden of disproving that determination. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933). Absent a showing of abuse of discretion by the Commissioner, the Commissioner's section 482 determination must be sustained. *Bausch & Lomb, Inc. v. Commissioner, supra* at 582. To succeed, therefore, a taxpayer first must show that the Commissioner's section 482 reallocations are arbitrary, capricious, or unreasonable. *Sundstrand Corp. v. Commissioner, supra; Eli Lilly & Co. v. Commissioner,* 84 T.C. 996, 1131 (1985), affd. in part, revd. in part, and remanded 856 F.2d 855 (7th Cir. 1988). In deciding whether the Commissioner's determination is reasonable, the Court focuses on the reasonableness of the result, not on the details of the methodology used. *Bausch & Lomb, Inc. v. Commissioner, supra;* see also *Eli Lilly & Co. v. United States,* 178 Ct. Cl. 666, 676, 372 F.2d 990, 997 (1967).

In addition to proving that the deficiencies set forth in the notice of deficiency are arbitrary, capricious, or unreasonable, the taxpayer has the burden of proving satisfaction of the arm's-length standard. See *Eli Lilly & Co. v. Commissioner,* 856 F.2d at 860; *Sundstrand Corp. v. Commissioner, supra* at 354.

If the Commissioner proposes a reallocation under section 482 with respect to an item or transaction, the taxpayer may claim a setoff with respect to another item or transaction between the same parties in the same year if the taxpayer can show that the reallocation with respect to that item or transaction is appropriate. *Sundstrand Corp. v. Commissioner, supra;* sec. 1.482–1(d)(3), Income Tax Regs.; Rev. Proc. 70–8, 1970–1 C.B. 434.

In the instant case, respondent's reallocations at least must be reasonable attempts to reflect arm's-length transactions between Seagate Scotts Valley and Seagate Singapore. See *Achiro v. Commissioner,* 77 T.C. 881, 900 (1981). For the reasons set forth *infra,* we conclude that respondent's reallocations are arbitrary, capricious, and unreasonable.

III. ISSUE 2

Whether respondent should bear the burden of proof for any of the issues involved in the instant case.

A. FINDINGS OF FACT

### 1. *The Notices of Deficiency*

The Form 4549–B (Income Tax Examination Changes) attached to the notice of deficiency for Seagate Scotts Valley's fiscal year ended June 30, 1986, shows an adjustment titled "section 482 adjustment" for that year in the amount of $78,353,000. In the Explanation of Items attached to the notice of deficiency for the fiscal year ended June 30, 1986, respondent states in pertinent part the following relating to the section 482 reallocations:

1.a.N. (A) It is determined that * * * [Seagate Scotts Valley] transferred parts and components to * * * [Seagate Singapore] for use in the assembly of disk drives at less than arms's length prices. Accordingly, under I.R.C. Section 482, gross income in the amount * * * [of $6,833,000 is allocated to Seagate Scotts Valley from Seagate Singapore].

The above amount was computed as shown on the attached schedule A. In the alternative, should the above determination not be upheld, it is determined that * * * [Seagate Scotts Valley] performed services for, or on behalf of, Seagate Singapore in procuring, processing, storing, and transferring parts and components for, or on behalf of, Seagate Singapore. It is further determined under I.R.C. section 482 that $6,833,000 is an arm's-length charge for such services.

In the further alternative, should the above determinations not be upheld, it is determined under I.R.C. section 482 that an amount equal to the costs or deductions incurred during the 1986 fiscal year for the above services is allocated to * * * [Seagate Scotts Valley] from Seagate Singapore.

(B) It is determined that you have failed to substantiate adequately the existence of the following facts, among others, offered in support of your contention that * * * [Seagate Scotts Valley] and Seagate Singapore were operating at arm's length during the fiscal year 1986:

(1) That patents, sales contracts and all of the other items of intangible property described in the undated document entitled "Property Transfer Agreement" were transferred to Seagate Singapore from * * * [Seagate Scotts Valley]. And further, if such intangible property was transferred, that it was transferred as of September 30, 1983, as alleged in the undated document entitled "Property Transfer Agreement";

(2) That the undated document entitled "Research and Development Cost-sharing Agreement" is bona fide under the standards of Treas. Regulation Section 1.482–2(d)(4). And further, if the Research and Development

Cost-sharing Agreement is bona fide, that Seagate Singapore was granted the right to sell products either directly, or indirectly through * * * [Seagate Scotts Valley], into the geographic area allocated to * * * [Seagate Scotts Valley].

(3) That during the fiscal year 1986 Seagate Singapore should be treated as having engaged in sales outside of the United States for purposes of the February 27, 1985 Section 367 Ruling or for purposes of analyzing functions, risks and intangibles under I.R.C. section 482; and

(4) That expenses relating to manufacturing, purchasing, quality assurance, warranty, general and administrative, research and development, marketing and sales were shared by * * * [Seagate Scotts Valley] and Seagate Singapore on an arm's-length basis.

Accordingly, considering the functions performed, intangibles used and developed, services received and risks incurred, * * * [$71,520,000 is allocated under section 482 to Seagate Scotts Valley from Seagate Singapore as shown on attached schedules B–1 through B–4].

(C) In the alternative, should the determinations in paragraphs (B)(1) and (B)(3) above relating to the absence of adequate substantiation as to the transfer of manufacturing intangibles and as to sales outside of the United States not be upheld, it is determined that the allocation adjustment amount shown in paragraph (B) above is reduced by * * * [$6,511,000 as shown on attached schedule C].

The allocations in the preceding paragraphs are based upon an analysis of respective functions performed, intangibles used and developed, services performed and received and risks incurred. Further, as an independent basis for the determination, an analysis of comparative profit, expenses incurred and financial returns of both * * * [Seagate Scotts Valley] and Seagate Singapore was performed.

The applicable section of the Form 4549–B and coinciding pertinent explanatory paragraphs contained in the Explanation of Items attached to the notice of deficiency for the fiscal years ended 1983, 1984, 1985, and 1987, are worded substantially the same except for the dates and amounts.

The Schedules A and B–1 attached to the explanation of items for the notices of deficiency for the years in issue show the calculation for the total section 482 adjustments for each year in issue as follows (000's omitted):

|  | *Period ending* | | | | |
| --- | --- | --- | --- | --- | --- |
|  | *6/30/83* | *6/30/84* | *6/30/85* | *6/30/86* | *6/30/87* |
| Schedule A adjustments: | | | | | |
| Parts and components sales | - - - | $519 | $3,370 | $6,833 | $8,655 |
| Schedule B adjustments: | | | | | |
| Components or subassembly adjustment | $3,962 | 11,941 | 4,069 | 8,067 | 1,537 |
| Marketing services and intangibles adjustment | - - - | 9,947 | 31,749 | 81,787 | 187,603 |
| Manufacturing services and | | | | | |

| | | | Period ending | | |
|---|---|---|---|---|---|
| | *6/30/83* | *6/30/84* | *6/30/85* | *6/30/86* | *6/30/87* |
| intangibles adjustment | - - - | 6,827 | 245 | 23,981 | 97,652 |
| Total offsets[1] | - - - | (8,032) | (8,119) | (40,561) | (139,470) |
| Singapore marketing allocation | - - - | (239) | (994) | (1,754) | (4,179) |
| Net Schedule B adjust-ments | 3,962 | 20,444 | 26,950 | 71,520 | 143,143 |
| Net total Schedules A & B adjustments | 3,962 | 20,963 | 30,320 | 78,353 | 151,798 |

[1] Marketing commissions, cost-sharing payments, royalty fees, and warranty fees Seagate Singapore paid to Seagate Scotts Valley plus (or minus for 1985) a price allowance determined by respondent.

## 2. *Respondent's Concessions*

Before trial, respondent conceded the marketing services reallocation encompassed within the marketing services and intangibles adjustments detailed above. The marketing services reallocation represents the arm's-length charge respondent calculated for marketing and sales support services Seagate Scotts Valley provided to Seagate Singapore for third party sales made by Seagate Singapore. As a result of conceding the marketing services reallocation, respondent also eliminated an offset which had been allowed in the notices of deficiency for marketing commissions Seagate Singapore paid to Seagate Scotts Valley.

## 3. *Respondent's Experts*

A breakdown of the section 482 reallocations as concluded by respondent's experts is as follows:

| | | | Period ending | | |
|---|---|---|---|---|---|
| *Adjustment* | *6/30/83* | *6/30/84* | *6/30/85* | *6/30/86* | *6/30/87* |
| Resale margin | - - - | ($76,564) | [1] $24,909,503 | $41,638,637 | $16,109,585 |
| Royalty | - - - | 2,007,956 | 3,019,382 | 10,807,922 | 24,508,731 |
| Cost-sharing | - - - | - - - | (3,221,569) | 6,243,898 | 20,100,438 |
| Procurement services | - - - | 526,176 | 4,026,906 | 3,547,517 | 4,406,835 |
| Components margin | $1,710,547 | 5,466,389 | 1,671,452 | 4,781,380 | (801,260) |
| Total | 1,710,547 | 7,923,957 | 30,405,674 | 67,019,354 | [2] 64,324,329 |

[1] Respondent has conceded $85,700 of the resale margin adjustment resulting in a revised resale margin adjustment of $24,823,803, see *supra.*
[2] A 1–dollar math error in this column in the applicable expert's report has been corrected.

The net increases and decreases in the section 482 adjustments as summarized by one of respondent's experts, and as revised to reflect respondent's concession for the 1985 resale margin adjustment, from the section 482 adjustments as detailed in the notices of deficiency are as follows:

| | | | Period ending | | |
|---|---|---|---|---|---|
| Adjustment | 6/30/83 | 6/30/84 | 6/30/85 | 6/30/86 | 6/30/87 |
| Schedule A adjustments: | | | | | |
| Per experts | - - - | $526,176 | $4,026,906 | $3,547,517 | $4,406,835 |
| Per notices | - - - | 519,000 | 3,370,000 | 6,833,000 | 8,655,000 |
| Difference | - - - | 7,176 | 656,906 | (3,285,483) | (4,248,165) |
| Schedule B adjustments: | | | | | |
| Per experts, as revised | 1,710,547 | 7,397,781 | 26,293,068 | 63,471,837 | 59,917,494 |
| Per notices | 3,962,000 | 20,444,000 | 26,950,000 | 71,520,000 | 143,143,000 |
| Difference | (2,251,453) | (13,106,219) | (656,932) | (8,048,163) | (83,225,506) |
| (Decrease) | (2,251,453) | (13,039,043) | (26) | (11,333,646) | (87,473,671) |

## B. OPINION

### 1. *The Parties' Positions*

Petitioner contends that the burden of proof should shift to respondent because, at trial, respondent proposed specific adjustment amounts for each issue that were substantially different from the specific amounts for such issues detailed in the notices of deficiency; denied offsets allowed in the notices; and ignored respondent's own determination that the adjustment amounts should be reduced by certain amounts described in the notices of deficiency as reductions in the event respondent's position on the validity of the section 367 private letter ruling did not prevail. Accordingly, petitioner posits, in effect, that respondent has abandoned the notices of deficiency and, as a result, respondent should bear the burden of proof for the entire case. Petitioner argues alternatively that, at a minimum, respondent should bear the burden of proof as to each specific adjustment which has been increased for any year whether or not the net deficiency has been decreased for that year.

Respondent counters that the notices of deficiency contain an aggregate, not separate, section 482 reallocation for each year. Respondent contends that, under Rule 142(a), the burden of proof is on respondent only as to "increases in deficiency". According to respondent, as a result of the Govern-

ment's concession for the 1985 year, see *supra,* there is no increased deficiency for any year in the instant case; accordingly, respondent should not be required to bear the burden of proof for any issue.

## 2. *The Court's Holding as to the Burden of Proof*

Generally, petitioner bears the burden of proof. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933). Respondent, however, bears the burden of proof as to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a). A new position taken by respondent is not necessarily a "new matter" if it merely clarifies or develops respondent's original determination without requiring the presentation of different evidence, being inconsistent with respondent's original determination, or increasing the amount of the deficiency. *Achiro v. Commissioner,* 77 T.C. 881, 889–891 (1981); see also *Yamaha Motor Corp., U.S.A. v. Commissioner,* T.C. Memo. 1992–110; *Stewart v. Commissioner,* T.C. Memo. 1982–209, affd. 714 F.2d 977 (9th Cir. 1983).

Although petitioner contends that respondent has increased the deficiency within the meaning of Rule 142, petitioner has presented no calculations which establish that the *deficiency* for any year in issue has increased.[3] Respondent, furthermore, has not asserted any claim for an increase in deficiency by amended answer or otherwise for any year in issue. See sec. 6214(a). Petitioner's arguments regarding burden of proof focus on changes in the amounts of individual items which respondent details in Schedules A and B of the Explanation of Items attached to the notices of deficiency. Petitioner's position is premised on the theory that each item described in Schedules A and B of the Explanation of Items is a separate, independent section 482 adjustment and that, because respondent's trial position results in

---

[3] The term "deficiency" is defined in sec. 6211(a) as:

the amount by which the tax imposed by subtitle A or B, or chapter 41, 42, 43, or 44, exceeds the excess of—

    (1) the sum of

      (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

      (B) the amounts previously assessed (or collected without assessment) as a deficiency, over—

    (2) the amount of rebates, as defined in subsection (b)(2), made.

changes to the dollar amounts of such separately detailed reallocations, respondent must bear the burden of proof for the entire case. We do not agree.

For purposes of deciding the taxable income which Seagate Scotts Valley and Seagate Singapore derived from the design, manufacture, and sale of disk drives and component parts, we believe that the transfer prices for the disk drives and component parts sold, the royalty rates for the intangibles transferred, and the value of the services rendered, must be accorded independent consideration. See *Bausch & Lomb, Inc. v. Commissioner,* 933 F.2d 1084, 1088 (2d Cir. 1991), affg. 92 T.C. 525 (1989). That is not to say, however, that, for purposes of deciding who has the burden of proof, under the circumstances present in the instant case, respondent's methodology did not result in one aggregate section 482 adjustment. To the contrary, we conclude that respondent did make only one aggregate section 482 adjustment in the instant case.[4]

All of the items in dispute relate to the business relationship between Seagate Scotts Valley and Seagate Singapore pertaining to the design, manufacture, and sale of disk drives or component parts for disk drives. Moreover, respondent's methodologies in computing arm's-length transfer prices, royalty rates, and procurement fees relating to the disk drives and component parts are interconnected. For example, the method used in the notices of deficiency for calculating the total value of manufacturing intangibles, which we discuss *infra,* computed the value of manufacturing intangibles as a residual. Consequently, the amounts for manufacturing intangibles set forth in the notices of deficiency depend upon the level of the other section 482 adjustments. From our review of the record as a whole, in determining the aggregate section 482 adjustment for each year in issue, we believe that respondent considered each individual reallocation as merely a part of the whole.

Although respondent's trial position revises the amounts of the separately detailed reallocations, the record contains no

---

[4] In the notices of deficiency, respondent based the sec. 482 reallocations on the underlying theory that the transactions between Seagate Scotts Valley and Seagate Singapore were not conducted on an arm's-length basis. Respondent has not abandoned such underlying theory, but has changed the methods used to calculate the separately detailed reallocations which, in the aggregate, comprise the aggregate sec. 482 adjustment for each year in issue.

evidence of an increase in deficiency for any year in issue. Changes to the dollar amounts of the individual reallocations do not result in a net increase in the section 482 reallocations. Rather, respondent's concessions relating to some of the individual section 482 reallocations result in a net decrease in the aggregate section 482 adjustment for each year. Consequently, petitioner has not shown an increase in deficiency for any year for which respondent must bear the burden of proof.

Rule 142(a) states that, absent the assertion of an affirmative defense or an increase in deficiency, the burden of proof for the issues involved in the instant case is on respondent only if respondent introduces a "new matter". Petitioner argues that respondent's concessions as to individual reallocations set forth in the notices of deficiency alter the original deficiencies and, consequently, respondent has introduced a new matter for which respondent must bear the burden of proof. See *Achiro v. Commissioner, supra* at 890. We have found no case holding that a change in the dollar amount of a separately detailed reallocation specified in the notice of deficiency, by itself, shifts the burden of proof to respondent. Rather, numerous cases have held to the contrary. See *Yamaha Motor Corp., U.S.A. v. Commissioner,* T.C. Memo. 1992–110; *Forte v. Commissioner,* T.C. Memo. 1991–36; *National Oil Co. v. Commissioner,* T.C. Memo. 1986–596; cf. *McSpadden v. Commissioner,* 50 T.C. 478, 492–493 (1968); *Cally v. Commissioner,* T.C. Memo. 1983–203; *Stewart v. Commissioner,* T.C. Memo. 1982–209, affd. 714 F.2d 977 (9th Cir. 1983); *Dees v. Commissioner,* T.C. Memo. 1962–153.

Similarly, we do not conclude that petitioner has been unfairly prejudiced by concessions respondent made in the light of information respondent obtained during preparation for trial. See *National Oil Co. v. Commissioner,* T.C. Memo. 1986–596. Indeed, to the extent of a reduction in a separately detailed section 482 reallocation, petitioner is relieved of the burden of proving that respondent's determination as to those excess amounts was erroneous. See *Gobins v. Commissioner,* 18 T.C. 1159, 1168–1169 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954); *Kim v. Commissioner,* T.C. Memo. 1991–500.

Accordingly, we hold that respondent does not bear the burden of proof for matters in issue in the instant case merely because respondent made revisions at trial to the separately detailed section 482 reallocations contained in the notices of deficiency. Whether respondent's change in position as to a specific separately detailed item for a year in issue represents the assertion of a new matter for that item, will be addressed, if appropriate, separately in the applicable segment below along with the resulting effect such a change has, if any, on the burden of proof.

## IV. ISSUE 3

Whether Seagate Scotts Valley paid Seagate Singapore arm's-length prices for component parts.

### A. FINDINGS OF FACT

#### 1. *In General*

Prior to 1982, Seagate Scotts Valley manufactured disk drives and certain component parts for disk drives, such as E-blocks, solely in the United States. During 1982, Seagate Scotts Valley formed Seagate Singapore to manufacture E-blocks and printed circuit boards (PCB's) for Seagate Scotts Valley's use in the manufacture of disk drives.

Prior to forming Seagate Singapore, Seagate Scotts Valley employed third parties to incorporate integrated circuits on PCB's that Seagate Scotts Valley then used in its disk drives. With respect to other disk drive component parts, such as motors, Seagate Scotts Valley purchased the completed component parts from vendors who independently purchased all the materials needed to manufacture the component parts.

#### 2. *Intercompany Transactions*

Seagate Singapore began selling component parts for disk drives to Seagate Scotts Valley in the taxable year ended June 30, 1983, and began selling disk drives to Seagate Scotts Valley in the taxable year ended June 30, 1984.

Initially, Seagate Scotts Valley used its standard cost of manufacturing the component parts or completed disk drives in the United States as the transfer price of the completed

disk drives and component parts Seagate Singapore sold to Seagate Scotts Valley. Sometime later, Seagate Scotts Valley changed the transfer price to the standard cost of manufacturing the component part or disk drive in Singapore plus 25 percent of those costs. Seagate Singapore included an estimate for scrap and obsolescence costs in the costs that were marked up as part of the cost plus 25-percent transfer pricing methodology. The prices Seagate Singapore charged Seagate Scotts Valley for component parts and disk drives were not adjusted for variations between actual costs and standard costs.

Under both the initial transfer price system and the revised transfer price system, Seagate Scotts Valley occasionally reviewed the standard costs of manufacturing component parts and disk drives, and adjusted the transfer prices if the standard costs had changed. Seagate Scotts Valley sometimes retroactively reduced the transfer prices Seagate Singapore charged Seagate Scotts Valley to reflect lower standard costs or to correct errors. Seagate Scotts Valley did not reduce the transfer prices for Seagate Singapore-produced disk drives or component parts in response to reductions in the prices Seagate Scotts Valley charged third parties for the disk drives.

### 3. *Component Parts Manufacturing*

During all of the years in issue, Seagate Singapore sold component parts, most of which were printed circuit boards (PCB's), E-blocks, or head gimbel assemblies (HGA's).

Seagate Scotts Valley designed the circuit board layout of the raw PCB's Seagate Singapore used in its PCB assembly process. Seagate Scotts Valley also developed the ROM chips that Seagate Singapore "stuffed" into the circuit boards.

Initially, Seagate Singapore's operations consisted of assembling E-blocks and testing PCB's assembled for Seagate Singapore by local subcontractors. Seagate Singapore also put PCB materials into kits for the local subcontractors. Seagate Singapore began assembling PCB's at its own PCB facility sometime during 1984.

Seagate Singapore began shipping 500 PCB's per day during 1983. By 1987, Seagate Singapore's PCB operation employed nearly 1,800 people, including nearly 300 engi-

neers, and produced 22,000 PCB's per day in four separate buildings housing approximately 100,000 square feet. Seagate Singapore eventually became the largest manufacturer in Singapore of PCB's for computer peripheral devices.

Seagate Singapore purchased from third parties some of the materials it used to manufacture component parts. At times, Seagate Singapore subcontracted to local subcontractors PCB assembly work which, for various reasons, Seagate Singapore could not handle at its PCB facilities. The PCB's Seagate Singapore subcontracted out generally were established, simpler boards. The local PCB subcontractors were smaller and performed less sophisticated operations than Seagate Singapore.

Seagate Singapore consigned materials to the PCB subcontractors. It paid the subcontractors a fixed per-board rate which was based on the subcontractors' labor costs plus margin. During 1982 through 1985, Seagate Singapore paid per-board rates ranging between $6 and $8. During 1986 and 1987, Seagate Singapore paid per-board rates ranging between $5 and $6. The subcontractors generally marked up their labor costs between 8 and 10 percent.

During or near October 1983, Seagate Singapore began purchasing E-block assemblies from Seagate Thailand. During early 1984, Seagate Thailand also began assembling HGA's for Seagate Singapore. During January 1985, Seagate Singapore contracted with an unrelated company to assemble HGA subassemblies in the Philippines. Seagate Singapore consigned all direct materials to that subcontractor. Seagate Singapore agreed, among other things, to reimburse the HGA subcontractor for its labor costs at specified rates. Seagate Thailand and Seagate Singapore jointly provided support functions for the Philippine subcontractor.

On June 10, 1986, Seagate Singapore entered into an assembly contract agreement with an unrelated party for the assembly in South Korea of HGA's for certain disk drive models manufactured by Seagate Singapore. Seagate Singapore supplied the materials to that subcontractor.

Seagate Singapore incurred the costs of financing its purchases of materials used in manufacturing component parts. When Seagate Scotts Valley purchased materials for Seagate Singapore, Seagate Scotts Valley incurred the cost of financing until Seagate Singapore paid for the materials.

Although Seagate Singapore sold most of the component parts it manufactured to Seagate Scotts Valley, it also sold some component parts to unrelated parties in the fiscal years ended June 30, 1985, 1986, and 1987. Those sales represented less than 0.5 percent of Seagate Singapore's component parts sales in 1985 and 1986 and less than 4 percent of such sales in 1987. Seagate Singapore also used some of the component parts internally for Seagate Singapore-produced disk drives.

Seagate Singapore made gross sales of component parts to Seagate Scotts Valley in approximately the following amounts:

| Period ended | Amount |
|---|---|
| June 30, 1983 | $26,000,000 |
| June 30, 1984 | 77,000,000 |
| June 30, 1985 | 31,000,000 |
| June 30, 1986 | 40,000,000 |
| June 30, 1987 | 26,000,000 |

Seagate Singapore's gross profit as a percentage of sales of component parts and its gross profit as a percentage of cost of sales of component parts were approximately as follows:

| Period ended | Gross profit as a percent of sales | Gross profit as a percent of cost of sales |
|---|---|---|
| June 30, 1983 | 17.6% | 21.39% |
| June 30, 1984 | 18.4 | 22.57 |
| June 30, 1985 | 16.6 | 19.86 |
| June 30, 1986 | 22.0 | 28.33 |
| June 30, 1987 | 8.7 | 9.51 |

During its fiscal year ended 1985, Seagate Scotts Valley entered into an agreement with Bull Peripheriques, an unrelated party, for the sale of certain subassemblies at a unit price of U.S. $87.40, for a yearly quantity of 10,000 to 20,000 units. On July 24, 1984, Seagate Singapore sold to Bull Peripheriques 480 each of parts 20217–001 and 20221–001, which together apparently formed the subassembly. About the same time, Seagate Scotts Valley was considering a proposal to license Bull Peripheriques for the ST212 and ST225 disk drives.

## 4. *Respondent's Notices of Deficiency*

Respondent determined in the notices of deficiency that the reasonable arm's-length compensation for the component parts Seagate Singapore sold to Seagate Scotts Valley was the value added by Seagate Singapore in its assembly of the component parts (manufacturing overhead, labor, and general and administrative (G&A)) costs, facilities, etc., for 1983, 1984, and 1985; manufacturing overhead and labor for 1986 and 1987) plus a fee equal to 15 percent of the total value added, computed as follows:

| Year | Total value added | 15-percent fee | Reasonable arm's-length compensation |
|------|-------------------|----------------|--------------------------------------|
| 1983 | $2,106,000 | $316,000 | $2,422,000 |
| 1984 | 10,401,000 | 1,560,000 | 11,961,000 |
| 1985 | 6,481,000 | 972,000 | 7,453,000 |
| 1986 | 5,113,000 | 767,000 | 5,880,000 |
| 1987 | 3,902,000 | 585,000 | 4,487,000 |

## 5. *Petitioner's Experts* ·

### a. *Daniel P. Broadhurst*

Mr. Broadhurst detailed Seagate Singapore's component parts sales to Bull Peripheriques. Based on his review of Seagate Singapore's books and records, Mr. Broadhurst calculated the following regarding component parts sales to Bull Peripheriques:

| Component | Invoice date | Invoice units | Sales amount | Average standard price | Cost |
|-----------|--------------|---------------|--------------|------------------------|------|
| 20217–001 | 7/24/84 | 480 | $7,008 | $14.60 | $8.30 |
| 20221–001 | 7/24/84 | 480 | 34,944 | 72.80 | 42.00 |
| Total | | 960 | 41,952 | 87.40 | 50.30 |

Mr. Broadhurst noted in his report that fiscal year 1985 was the only year in which Seagate Singapore sold such component parts to Bull Peripheriques.

## b. *Gary E. Holdren*

Mr. Holdren calculated weighted average sales prices of component parts sold by Seagate Singapore to Seagate Scotts Valley. He calculated average net sales prices for component parts 20217–001 and 20221–001 as follows:

|  | Component 20217–001 | | Component 20221–001 | | |
|---|---|---|---|---|---|
| Period ending | Net sales units | Average net sales price | Net sales units | Average net sales price | Total average net sales price |
| 6/30/84 | 509,996 | $15.05 | 428,875 | $50.92 | $65.97 |
| 6/30/85 | 34,902 | 11.38 | 10,798 | 51.54 | 62.92 |
| 6/30/86 | 2,630 | 10.38 | 2,138 | 52.81 | 63.19 |
| 6/30/87 | 1,650 | 10.38 | 1,223 | 52.50 | 62.88 |

## c. *Clark J. Chandler*

Dr. Chandler evaluated whether respondent's notice approach was appropriate and gave his opinion of what a rational procedure would be for determining a reasonable income for Seagate Singapore from the sale of component parts to Seagate Scotts Valley. Dr. Chandler concluded that respondent treated Seagate Singapore as a consignment manufacturer in calculating the section 482 reallocation for component parts and that respondent's approach was not reasonable. He stated that from its inception Seagate Singapore operated as a turnkey supplier[5] of component parts and that respondent's notice method fails to provide Seagate Singapore with an adequate return for the risks it incurred in taking title to materials and acting as a manufacturer of disk drive component parts.

Dr. Chandler stated that adequate data on arm's-length comparables for the component parts produced by Seagate Singapore is not available because the component parts were used largely by Seagate Scotts Valley itself. He concluded further that the resale approach could not be used for similar reasons. Consequently, Dr. Chandler concluded that Seagate Singapore's profits had to be evaluated largely in relation to

---

[5] Dr. Chandler stated that, during the early 1980s, a number of U.S. electronics and related firms sourced components from Far East vendors basically under either a consignment or a turnkey arrangement. Dr. Chandler defined such a turnkey arrangement as one in which the foreign suppliers purchased and took title to materials; consequently, the U.S. purchaser bought products as opposed to services. Under the consignment arrangement, the U.S. purchaser kept title to the materials used and consigned them to its Far East suppliers; consequently, the U.S. purchaser basically bought labor and factory services.

its costs even though he believed that this approach would not be very precise in the instant case because profit margins varied widely within the industry both from year to year and among different companies.

Dr. Chandler concluded that material costs should not be excluded from the cost base because Seagate Singapore: (1) Took title to the materials it purchased from Seagate Scotts Valley; (2) purchased substantial amounts of materials directly from unrelated third parties; (3) incurred risks of material loss due to purchase price and scrap variances; and (4) was established in large part to provide Seagate Scotts Valley with effective access to low cost Far East sources of materials. Given the inclusion of materials in the cost base, he concluded that Seagate Singapore's own profits on its sales of completed disk drives to unrelated third parties was perhaps the most obvious source for arm's-length comparable transactions to determine whether a section 482 reallocation was required for the sales of component parts to Seagate Scotts Valley. He acknowledged, however, that there is no guarantee that the margins for component parts and completed disk drives will be the same.

Using data on Seagate Singapore's earnings from the sale of completed disk drives to unrelated third parties set forth in a report prepared by Erwin C. Chou, an Internal Revenue Service economist, Dr. Chandler estimated Seagate Singapore's gross and operating profits for component parts sales. For Seagate Scotts Valley's fiscal years ended 1984 through 1987, Dr. Chandler derived a cost-plus markup by dividing Seagate Singapore's gross income (sales less cost of goods sold including returns and allowances) by its cost of goods sold. For Seagate Scotts Valley's fiscal year ended 1983 he used Seagate Scotts Valley's consolidated statement because there were no Seagate Singapore disk drive sales during that period. Then Dr. Chandler applied that markup to Seagate Singapore's total cost of goods sold for component parts, excluding G&A costs, to derive a gross profit for component parts sales. Next, he deducted G&A costs from that gross profit to derive an operating profit on component parts sales.

Dr. Chandler concluded that, under his method, Seagate Singapore's gross profit on sales of disk drives to unrelated parties was higher than the gross profit Seagate Singapore received on sales of component parts to Seagate Scotts Val-

ley, and, therefore, no adjustment would be required with respect to the transfer price of component parts. Dr. Chandler acknowledged, however, that certain weaknesses exist in the use of Seagate Singapore's gross profit on the sale of completed disk drives as an arm's-length benchmark for component parts sales, such as the fact that: (1) The production of component parts requires a somewhat different technology; (2) the margins generated on Seagate Scotts Valley's third party sales may be affected by product mix and, therefore, may not be representative of the margins realized by component parts producers; and (3) to the extent there are section 482 issues related to the valuation of intangibles, the assignment of purchasing costs, etc., such intercompany transactions may "taint" the margins developed from Seagate Singapore's third party sales of completed disk drives.

As an alternative, Dr. Chandler used Seagate Scotts Valley's overall operating income, divided by its consolidated cost of goods sold, as a measure of Seagate Singapore's gross profit. Dr. Chandler used Seagate Scotts Valley's operating income rather than its gross profit because Seagate Scotts Valley's gross profit has to cover research and development (R&D) and marketing costs that Seagate Singapore did not incur with respect to component parts and because Seagate Scotts Valley's consolidated G&A costs were substantially higher than Seagate Singapore's G&A costs. Dr. Chandler conceded, however, that there are legitimate concerns in using Seagate Scotts Valley's overall operating income as an appropriate arm's-length benchmark because it is based in large part on sales of completed disk drives and affected by Seagate Scotts Valley's profits from both its U.S. and Singapore operations. Nonetheless, he concluded that Seagate Scotts Valley's results should serve as a proxy for using a successful Singapore firm as an arm's-length benchmark because Seagate Scotts Valley's consolidated operating income: (1) Is based on dealings with unrelated parties and, therefore, would be unaffected by section 482 issues; (2) is linked to Seagate Scotts Valley's specific performance in the disk drive market and, therefore, places the same competitive pressures on Seagate Singapore's component parts operations as they exist on Seagate Scotts Valley's completed disk drive operations; and (3) averaged 13 percent of sales over the 1983–87 period and, therefore, falls within the range of

profits for "high-tech electronics" reported in a study which provided some of the support for respondent's adjustment, see *infra* Steven M. Zemsky.

Under his alternative method, Dr. Chandler divided Seagate Scotts Valley's operating income by its cost of sales. The resulting markups ranged from a high of 26.4 percent in 1987 to a low of -6.3 percent in 1985. Then, he calculated Seagate Singapore's gross profits by multiplying its cost of sales for component parts by the markup percentage for each year. Next, he calculated operating income by deducting G&A expenses from gross profits. Finally, he calculated the total estimated adjustment by subtracting Seagate Singapore's operating income, as calculated above, from Seagate Singapore's reported income. Adoption of Dr. Chandler's alternate approach would lead to the following adjustment for each year:

| Period ending | Estimated adjustment |
|---|---|
| 6/30/83 | $330,000 |
| 6/30/84 | 888,000 |
| 6/30/85 | 6,745,000 |
| 6/30/86 | 5,473,000 |
| 6/30/87 | (4,762,000) |
| Total | 8,674,000 |

Dr. Chandler discusses the transaction with Bull Peripheriques in 1984 in one paragraph of his report. He states that the contract price, which was well above the controlled sales price for the same component parts, represents a price for component parts to an unrelated party which was to make the same use of the component parts as Seagate Scotts Valley. Dr. Chandler concluded that, although the actual volume of units shipped under the contract was small, the contract price for the component parts shipped was consistent with the established transfer price received by Seagate Singapore for component parts. Dr. Chandler does not state unequivocally, however, that the Bull Peripheriques transaction could serve as a comparable to the controlled sales of component parts.

In the course of preparing his report, Dr. Chandler traveled to Hong Kong and Singapore. There, he talked to a number of local PCB assemblers. Those PCB assemblers indicated

that their markup on labor and overhead costs during the years in issue generally ranged between 10 and 20 percent; the markup on materials generally was somewhat lower.

## 6. *Respondent's Experts*

### a. *Thomas Horst*

Dr. Horst concluded that, as evidence of prices Seagate Scotts Valley paid unrelated third parties for component parts comparable to the component parts at issue was not available, the cost-plus method is the only practical method to estimate their arm's-length prices. From his research, Dr. Horst concluded that Flextronics, Inc. (Flextronics), which provides turnkey contract manufacturing services to OEM's, had operations which were the most similar to Seagate Singapore's component parts manufacturing activities for the years in issue.

Flextronics manufactured and sold PCB's to manufacturers of disk drives, computer printers, medical equipment, telecommunications equipment, and others. Sales to disk drive manufacturers accounted for 31.1 percent of Flextronics' sales. Flextronics reported on a Securities and Exchange Commission (SEC) Form S–1, Registration Statement Under the Securities Act of 1933, filed in August 1987 with the SEC that, historically, substantially all of its net income was derived from operations in Singapore and Hong Kong. It used the facilities located in those countries to provide turnkey manufacturing services to its Asian customers and high volume manufacturing capacity for its domestic customers. Flextronics further indicated on its Form S–1 that the majority of its revenues was generated by its "turnkey" manufacturing services. Flextronics described its turnkey manufacturing as consisting of a package of services for the manufacture, in accordance with customer specifications, of PCB assemblies, subsystems, or complete electronic systems, including component procurement, assembly, and postassembly testing.

Using information contained in the Form S–1, Dr. Horst divided Flextronics' income from its operations in Asia (Flextronics-Asia) by the total sales of Flextronics-Asia for the fiscal years ended March 31, 1985, 1986, and 1987, to arrive at a weighted average operating profit margin for

Flextronics-Asia of 10.8 percent. Using a formula, he then converted that percentage to a margin on total cost of 12.1 percent. Dr. Horst concluded that, operating at arm's length, Seagate Singapore would have earned an operating profit margin equal to 12.1 percent of its total costs for its component parts manufacturing activities. He then applied that margin on total cost to Seagate Singapore's "fully burdened cost" of component parts sales as calculated by Grant M. Clowery (see *infra*) to arrive at Dr. Horst's estimate of a reasonable arm's-length charge for the component parts.

Some of Flextronics-Asia's sales relate to intercompany transactions.

b. *Grant M. Clowery*

Dr. Clowery provided detailed analyses of the profit and loss reported by Seagate Scotts Valley and Seagate Singapore and considered whether the results of the analyses reflect comparable accounting treatment of similar items. The results of Dr. Clowery's analyses served as the basis against which benchmarks established for companies identified as comparables were compared by respondent's expert economists, Dr. Horst (see *supra*) and Daniel J. Frisch (see *infra*).

Dr. Clowery reviewed individual income statements of Seagate Scotts Valley and Seagate Singapore for their fiscal years 1984 through 1987 to calculate the elements of the various accounts; for example, sales, cost of goods sold (cost of sales), selling, and G&A. He first developed a side-by-side comparison of Seagate Scotts Valley's consolidated income statements. Then, Dr. Clowery made certain adjustments to some of those elements that he concluded consistent accounting treatment required him to make to calculate gross profit and operating profit for Seagate Scotts Valley and Seagate Singapore in the same manner. After he developed comparable income statements based on transactions as recorded by Seagate Scotts Valley, Dr. Clowery considered additional adjustments that could be made to reflect alternative arrangements.

For the sales of component parts, Dr. Clowery calculated adjustments to the cost of goods sold to compute a "fully burdened" cost of goods sold against which Dr. Horst applied his estimated arm's-length markup. In calculating the "fully burdened" cost of goods sold, Dr. Clowery first used Seagate

Scotts Valley's product line income statements based on monthly reports of operating results furnished by Seagate Scotts Valley to determine the percentage of Seagate Singapore sales of component parts to total Seagate Singapore sales. Seagate Singapore separately reported intercompany sales and sales to third parties. At respondent's request, Dr. Clowery further allocated the third parties' sales to the destinations to which the goods were shipped (i.e., local distributors, U.S. destinations, and foreign destinations).

Next, he obtained cost of goods sold data from the product line income statements and, in the case of third party sales, he further allocated the sales to the three destinations described above based on the percentage of sales to each. Dr. Clowery then multiplied Seagate Singapore's total allocated selling and general and administrative (SG&A) expenses by the appropriate percentage to determine the amount of SG&A expenses attributable to Seagate Singapore's component parts sales to Seagate Scotts Valley. Finally, he added that result to Seagate Singapore's cost of goods sold, including materials, to arrive at the "fully burdened" cost of goods sold.

Seagate Singapore's net component parts sales, cost of goods sold (COGS), and gross profit (GP) as reported on Seagate Scotts Valley's income statements for the years in issue, as calculated by Dr. Clowery, are as follows:

| Component parts | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Net sales | $25,580,000 | $77,038,000 | $30,859,000 | $40,016,000 | $26,342,000 |
| COGS | 21,072,000 | 62,853,000 | 25,746,000 | 31,182,000 | 24,055, 000 |
| GP | 4,508,000 | 14,185,000 | 5,113,000 | 8,834,000 | 2,287,000 |
| GP/COGS | 21.39% | 22.57% | 19.86% | 28.33% | 9.51% |

Seagate Singapore's net component parts sales, "fully burdened" cost of goods sold (FBCOGS), and gross profit after adjustments made by Dr. Clowery for the years in issue are as follows:

| Component parts | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Net sales | $25,580,000 | $77,038,000 | $30,859,000 | $40,016,000 | $26,342,000 |
| FBCOGS | 21,293,000 | 63,846,219 | 26,037,064 | 31,431,419 | 24,213,434 |
| GP | 4,287,000 | 13,191,781 | 4,821,936 | 8,584,581 | 2,128,566 |
| GP/FBCOGS | 20.13% | 20.66% | 18.52% | 27.31% | 8.79% |

Dr. Clowery then multiplied his derived "fully burdened" cost of goods sold by the 12.1-percent markup determined by

Dr. Horst to obtain the estimated arm's-length gross profit for Seagate Singapore for the years in issue. To derive the increase (decrease) in Seagate Singapore's net income resulting from the proposed revisions in Seagate Singapore's gross profit from component parts sales, Dr. Clowery subtracted the gross profit he calculated based on a 12.1-percent markup from the gross profit he calculated based on a "fully burdened" cost of goods sold, as follows:

| Component parts | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| GP on FBCOGS | $4,287,000 | $13,191,781 | $4,821,936 | $8,584,581 | $2,128,566 |
| 12.1% of FBCOGS | 2,576,453 | 7,725,392 | 3,150,485 | 3,803,202 | 2,929,826 |
| Increase (decrease) | 1,710,547 | 5,466,389 | 1,671,451 | 4,781,379 | (801,260) |

### c. Steven M. Zemsky

During May and June 1984 Mr. Zemsky traveled to Singapore, Malaysia, Hong Kong, Taiwan, and South Korea. During that trip he and others visited and interviewed a number of local Asian assemblers involved in the electronics industry, including PCB assemblers. Based on his interviews, Mr. Zemsky concluded that from 1982 through at least the summer of 1984 the Asian subcontractors involved in PCB assembly work earned 4- to 6-percent net profit on sales. Mr. Zemsky further concluded that, on average, firms supplying only assembly services on a consignment basis marked up their labor costs by 10 percent. In semiconductors and other high-tech products industries (e.g., monitors, printers, keyboards, PCB's (manufacturing or multi-layered), telephones), however, net profits tended to range between 10 and 20 percent of sales.

### 7. Other Third Party Transactions

During April 1986, Seagate Scotts Valley entered into a spare parts purchasing agreement with an OEM customer. Pursuant to that agreement, Seagate Scotts Valley agreed to sell to the OEM customer described parts, assemblies, and subassemblies, including PCB's, for various disk drive models sold by Seagate Scotts Valley. Seagate Scotts Valley gave the OEM customer a 40-percent discount from the list prices of the described spare parts. Additionally, the agreement provided that if the OEM customer canceled any purchase orders issued pursuant to the agreement, for spare parts to be deliv-

ered within 60 days of the effective date of the cancellation, the OEM customer would pay Seagate Scotts Valley for the reasonable and direct material and labor costs incurred for such parts, plus a reasonable profit not to exceed 10 percent on such material and labor costs.

Seagate Scotts Valley offered other customers discounts on purchases of spare parts, generally based on the value per purchase order, in amounts ranging up to 40 percent.

## B. OPINION

### 1. *Ultimate Findings of Fact*

In the notices of deficiency, respondent did not follow the cost-plus method described in section 1.482–2(e)(4), Income Tax Regs. Under the method respondent used to determine the reallocations relating to the sale of the component parts in issue, respondent treated Seagate Singapore as a consignment manufacturer and allowed a markup on costs based on the lower risks faced by consignment manufacturers. Respondent also did not include Seagate Singapore's materials costs in the costs to which the markup was added.

Seagate Singapore is not merely a consignment manufacturer of component parts. Seagate Singapore is entitled to be compensated for the increased risks and responsibilities it assumed during the years in issue. Respondent's reallocations for the component parts pricing issue are arbitrary and excessive.

### 2. *The Methods*

The regulations under section 482 provide that when one controlled entity sells tangible property to another controlled entity at other than an arm's-length price, respondent is authorized to make appropriate reallocations between the seller and the buyer to reflect an arm's-length price for the sale. An arm's-length price is the price an unrelated party would have paid under the same circumstances for the same property involved in the controlled sale. An arm's-length price normally involves a profit to the seller. Sec. 1.482–2(e)(1)(i), Income Tax Regs.

The regulations specify three methods, in order of priority, which must be used to determine an arm's-length price for the sale of tangible property: The comparable-uncontrolled-

price method (CUP); the resale-price method; and the cost-plus method. Sec. 1.482–2(e)(1)(ii), Income Tax Regs. Where none of these three methods can reasonably be applied under the facts and circumstances of a particular case, the regulations authorize use of any other appropriate method, or variations of such methods, for determining an arm's-length price. Sec. 1.482–2(e)(1)(iii), Income Tax Regs.

Neither party has proposed that the resale price method should apply to the sale of the component parts under the circumstances of the instant case. We agree that the record does not support application of that method. Consequently, we will not discuss it.

Both parties have presented expert testimony in support of their positions. We weigh expert testimony in light of the expert's qualifications as well as all the other credible evidence in the record. *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 217 (1990). We are not bound by the opinion of any expert witness, and we will accept or reject that expert testimony when, in our best judgment, based on the record, it is appropriate to do so. *Id.; Chiu v. Commissioner,* 84 T.C. 722, 734 (1985). While we may choose to accept the opinion of one expert in its entirety, *Buffalo Tool & Die Manufacturing Co. v. Commissioner,* 74 T.C. 441, 452 (1980), we may also be selective in the use of any portion of that opinion, *Parker v. Commissioner,* 86 T.C. 547, 562 (1986).

### a. *The Comparable Uncontrolled Price (CUP) Method*

#### i. *The CUP Method in General*

Under the CUP method, the arm's-length price of a controlled sale is equal to the price paid in comparable uncontrolled sales. Sec. 1.482–2(e)(2)(i), Income Tax Regs. Uncontrolled sales for purposes of the CUP method include: (1) Sales made by the taxpayer to an unrelated party; (2) purchases made by the taxpayer from unrelated parties; and (3) sales made between two unrelated parties. Sec. 1.482–2(e)(2)(ii), Income Tax Regs. Controlled and uncontrolled sales are deemed comparable if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales, or if such properties and circumstances are so nearly identical that any differences either have no effect on

price, or can be measured and eliminated by making a reasonable number of adjustments to the price of the uncontrolled sales. Some of the differences which may affect the price of property are differences in quality of the product, terms of sale, intangible property associated with the sale, time of sale, the level of the market, and the geographic market in which the sale takes place. Sec. 1.482–2(e)(2)(ii), Income Tax Regs; see also *Bausch & Lomb, Inc. v. Commissioner,* 92 T.C. 525, 585–586 (1989), affd. 933 F.2d 1084 (2d Cir. 1991).

ii. *The Parties' Positions on the CUP Method and the Court's Holding as to Its Application*

Petitioner contends that Seagate Singapore charged Seagate Scotts Valley arm's-length prices for the component parts. Petitioner contends that the transaction with Bull Peripheriques supports its position that the intercompany transfer prices were arm's length. Petitioner contends that the prices for the two component parts sold to Bull Peripheriques during 1984 were arms's length and, under the CUP method, should be used to determine the transfer price for its intercompany sales of component parts.

Dr. Horst criticizes the use of the 1984 Bull Peripheriques transaction as a comparable to Seagate Singapore's sales of component parts to Seagate Scotts Valley. He agrees that the property sold to Bull Peripheriques meets the physical identity of property requirement of section 1.482–2(e)(2), Income Tax Regs., but he finds reliance on that transaction unconvincing in light of the insignificant volume of sales involved in the Bull Peripheriques transaction[6] and the uncertainty as to whether the other economic circumstances relating to those sales were similar or sufficiently similar to the sales of component parts to Seagate Scotts Valley.

Dr. Horst's criticism of the Bull Peripheriques transaction as a reliable comparison is bolstered by Dr. Chandler's conclusion that adequate data on arm's-length comparables for Seagate Singapore's component parts sales is not available. Dr. Chandler only makes an oblique reference in one

---

[6] Dr. Horst calculated that the sale to Bull Periperiques represented two one-hundredths of 1 percent of all of the sales to unrelated parties.

paragraph of his lengthy report to the Bull Peripheriques transaction.

For controlled sales of many different products or many separate sales of the same product, the regulations under section 482 recognize that it may be impractical to ascertain an arm's-length price for each product or sale. In such circumstances, the regulations permit the application of the appropriate pricing method to product lines or other groupings. Sec. 1.482–2(e)(1), Income Tax Regs.' In the instant case, however, petitioner presented no evidence to establish that the sales prices for the component parts involved in the Bull Peripheriques transaction were representative of the sales prices of all of the component parts sold during the years in issue.

Moreover, petitioner did not establish that the circumstances involved in the transaction with Bull Peripheriques, representing a minuscule portion of the total third party sales of component parts, were sufficiently similar to the circumstances involved in the controlled sales of component parts. We find it noteworthy that petitioner failed to point to any specific uncontrolled sales of component parts other than one sale of 480 subassemblies to a company which Seagate Scotts Valley was considering as a licensee. Sec. 1.482–2(e)(2)(ii), Income Tax Regs. Consequently, we conclude that the Bull Peripheriques transaction is not a comparable transaction to the uncontrolled sales of component parts.

b. *The Cost-Plus Method*

i. *The Cost-Plus Method in General*

Under the cost-plus method, an arm's-length price is determined by adding to the seller's cost of producing the property involved in the controlled sale the gross profit percentage (expressed as a percentage of cost) earned on the uncontrolled sale or sales of property most similar to the controlled sales in question. Sec. 1.482–2(e)(4)(i), (iii), Income Tax Regs. The cost of producing the property involved in the controlled sale, and the costs which enter into the computation of the gross profit percentage, must be computed in a consistent manner in accordance with sound accounting practices for allocating or apportioning costs, which neither favors nor

burdens controlled sales in comparison with uncontrolled sales. Sec. 1.482–2(e)(4)(ii), Income Tax Regs.

If possible, gross profit percentages should be derived from uncontrolled sales made by the seller involved in the controlled sales because similar characteristics are more likely to be found among sales by the same seller than among sales made by other sellers. Sec. 1.482–2(e)(4)(iv), Income Tax Regs. In the event that the most similar sale or sales from which the appropriate gross profit percentage is derived differ in any material respect from the controlled sales (i.e., differences which have a definite and reasonably ascertainable effect on price), the arm's-length price must be adjusted to reflect the differences to the extent the differences would warrant an adjustment of price in uncontrolled transactions. Sec. 1.482–2(e)(4)(v), Income Tax Regs.

Section 1.482–2(e)(4)(iii), Income Tax Regs., designates the following characteristics as the most important in analyzing the similarity of the uncontrolled sale or sales:

(a) The type of property involved in the sales. For example: machine tools, men's furnishings, small household appliances.

(b) The functions performed by the seller with respect to the property sold. For example: contract manufacturing, product assembly, selling activity, processing, servicing, delivering.

(c) The effect of any intangible property used by the seller in connection with the property sold. For example: patents, trademarks, trade names.

(d) The geographic market in which the functions are performed by the seller.

In general, the similarity to be sought relates to the probable effect upon the margin of gross profit of any differences in such characteristics between the uncontrolled sales and the controlled sale. Thus, close physical similarity of the property involved in the sales compared is not required under the cost plus method since a lack of close physical similarity is not necessarily indicative of dissimilar profit margins. * * *

ii. *The Parties' Positions on the Cost-Plus Method as Applied by Dr. Horst and the Court's Ruling as to That Method*

Respondent argues that a reasonable arm's-length compensation for the component parts Seagate Singapore sold to Seagate Scotts Valley is the 12.1-percent markup on materials, labor, and overhead applied by Dr. Horst to Seagate Singapore's "fully burdened" cost of goods sold as derived by Dr. Clowery. Respondent contends that 12.1 percent is a

reasonable markup because of the limited risks faced by Seagate Singapore and the low technological processes involved in manufacturing and assembling the component parts. Respondent finds further support for Dr. Horst's recommended markup because Seagate Singapore's PCB subcontractors charged Seagate Singapore an 8- to 10-percent cost-plus margin for the same types of PCB's that Seagate Singapore was assembling; Asian PCB subcontractors generally marked up their labor and overhead costs between 10 and 20 percent and materials somewhat less; Asian PCB assemblers during a portion of the years in issue generally earned between 4- and 6-percent net profit on sales; and the cancellation clause in the April 1986 spare parts purchasing agreement between Seagate Scotts Valley and a certain OEM customer provided that the OEM customer would pay Seagate Scotts Valley a cancellation fee which included a reasonable profit, not to exceed 10 percent.

Petitioner contends that the gross profit percentage advanced by respondent would compensate Seagate Singapore only on the basis of a contract manufacturer. Petitioner argues that such percentage is inadequate to compensate Seagate Singapore for all the risks and responsibilities it incurred in manufacturing and assembling the component parts. Petitioner contends further that Dr. Horst's analysis contains significant factual and methodological flaws and that his conclusions regarding Seagate Singapore's transfer prices for component parts are therefore without merit. Additionally, petitioner contends that Flextronics-Asia's financial data, when properly analyzed, actually supports the arm's-length nature of Seagate Singapore's charges to Seagate Scotts Valley for component parts.

Petitioner contends that Dr. Horst failed to consider anything but minimal information concerning Flextronics. As a result, petitioner argues, Dr. Horst did not know about significant aspects of Flextronics' activities which relate directly to his analysis, such as whether Flextronics' costs and profit margins associated with its manufacture of PCB's for disk drive manufacturers were the same as the costs and profit margins associated with its manufacture of PCB's for other industry segments, or which industry segment's PCB's were manufactured in Asia and which were manufactured in the United States. Petitioner contends it was therefore

impossible for Dr. Horst to determine whether the margins earned by Flextronics-Asia are comparable to those earned by Seagate Singapore.

Petitioner argues that Dr. Horst's calculations for Flextronics-Asia include both controlled and uncontrolled sales and, as a result, Dr. Horst's methodology does not comply with section 1.482–2(e)(4), Income Tax Regs., which requires that the comparable gross profit percentage be computed on the basis of uncontrolled sales.

Additionally, petitioner contends that Dr. Horst's method is an operating profit markup based on fully loaded costs (i.e., net sales, less cost of sales, less SG&A expenses) that does not comply with the cost-plus method described in section 1.482–2(e)(4), Income Tax Regs., which is based on a gross profit markup on cost of sales. According to petitioner, Dr. Horst's method both radically distorts the appropriate markup percentage and is mathematically flawed.

Finally, petitioner argues that if the cost-plus method described in section 1.482–2(e)(4), Income Tax Regs., is applied to the financial data relating only to Flextronics-Asia's uncontrolled sales, the result would support the arm's-length nature of Seagate Singapore's transfer prices. According to petitioner, if Flextronics-Asia's overall gross margin for 1985, 1986, and 1987 is calculated using Dr. Clowery's methodology of allocating SG&A expenses, based on the financial data reflected on Flextronics' SEC filings, Flextronics-Asia's gross margin would be 18.8 percent. Petitioner then posits that, if Dr. Horst's conversion formula is used, Flextronics-Asia's markup on total cost would be 23.2 percent. Petitioner contends that comparing those results to Seagate Singapore's overall gross margin on component parts sales during such period (which petitioner calculates to be 17.48 percent) and Seagate Singapore's markup on costs (calculated to be 21.18 percent) shows that Seagate Singapore earned lower margins and marked up its costs less on its sales of component parts to Seagate Scotts Valley than Flextronics did on its sales to third parties.

We agree that Dr. Horst does not apply the cost-plus method described in section 1.482–2(e)(4), Income Tax Regs. Because we conclude that Dr. Horst's methodology is flawed, we also must reject as unreasonable his recommended transfer prices for the component parts.

Under section 1.482–2(e)(4), Income Tax Regs., the appropriate gross profit percentage (expressed as a percentage of the cost of producing the property involved in the uncontrolled sale) is computed for the seller or another party on an uncontrolled sale of property which is most similar to the controlled sale in question. The cost of producing the property involved in the controlled sale is then multiplied by the appropriate gross profit percentage to ascertain the markup to the cost of producing that property which the controlled seller would have earned had the controlled sale been at arm's length. The cost of producing the property involved in the controlled sale plus that markup is the arm's-length price of the property involved in the controlled sale. Sec. 1.482–2(e)(4), Income Tax Regs.

The Form S–1 for Flextronics, which Dr. Horst used to compute his approximated gross profit percentage, provided operating income information, but not gross profit data, by geographic segments. Dr. Horst, therefore, used the operating income data for Flextronics' Asian operations to compute an operating income percentage for Flextronics-Asia. He then converted the operating income percentage to a gross profit percentage through the use of a mathematical formula. Dr. Horst's methodology, therefore, clearly does not meet the description of the cost-plus method set forth in section 1.482–2(e)(4), Income Tax Regs., but is a variation of the cost-plus method. Under the regulations, a variation of one of the three specified transfer pricing methods is a fourth method which can be applied, if appropriate, when none of the three specified methods reasonably can be applied under the facts and circumstances. Sec. 1.482–2(e)(1)(iii), Income Tax Regs. The record in the instant case, however, does not support the method applied by Dr. Horst.

Based on the SEC filings for Flextronics in the record, we agree that Flextronics-Asia's uncontrolled sales of PCB's and other computer peripheral equipment appear sufficiently similar to the controlled sales of component parts by Seagate Singapore. Unfortunately, the financial information available for Flextronics-Asia is not sufficient to derive the appropriate gross profit percentage of Flextronics-Asia's uncontrolled sales. The available data does not include gross profit information for uncontrolled sales. We do not agree with petitioner that such information can be ascertained by applying

Dr. Clowery's allocation formula because we do not find that there is a reasonable basis in the record to conclude what percentage of SG&A expenses relate solely to Flextronics-Asia's operations. Moreover, it is not clear from Flextronics' Form S-1 whether the operating income reported on that form includes income from its controlled sales as well as its uncontrolled sales. In determining the appropriate gross profit percentage, only sales of property from similar, uncontrolled sales may be considered. Sec. 1.482–2(e)(4)(iv), Income Tax Regs. Consequently, we are unable to determine an appropriate gross profit percentage from the available information. As a result, we must reject as unreasonable the transfer prices for component parts proposed by Dr. Horst.

### iii. *The Parties' Positions on Applying the Cost-Plus Method Using the Bull Peripheriques Sale and the Court's Holding as to That Method*

Petitioner contends that the sale to Bull Peripheriques of 480 subassemblies provides a basis for concluding that the intercompany sales of component parts were at arm's length under the cost-plus method. According to petitioner, based on Mr. Broadhurst's report, the sale to Bull Peripheriques establishes that Seagate Singapore earned gross profit percentages of 43 percent and 42 percent on sales of component parts to unrelated parties. Petitioner contends that Seagate Singapore earned gross profit percentages of only between 9.5 percent and 28.4 percent on intercompany sales of component parts and no adjustment to the transfer prices for component parts is therefore required.

Respondent counters that the gross profit percentage Seagate Singapore earned on the Peripheriques sale cannot be computed on the basis of the information contained in Mr. Broadhurst's report. Respondent contends that petitioner has not established Seagate Singapore's actual cost of producing the component parts and that, therefore, no basis exists in the record for determining an appropriate gross profit percentage. We agree.

The record does not establish Seagate Singapore's actual gross profit percentages earned during the years in issue separately from the sales of component parts to unrelated third parties and to Seagate Scotts Valley. To compute the gross profit percentage Seagate Singapore earned on the sale

to Bull Peripheriques, petitioner subtracted Seagate Singapore's standard costs for the parts from the average sales price and divided the result by the average sales price. Petitioner did not establish that the standard cost for the parts approximated the actual cost of producing the parts. Moreover, petitioner did not establish that the gross profit percentage it calculated for the Bull Peripheriques sale is representative of the gross profit percentages Seagate Singapore earned on its other third party component parts sales. Consequently, we conclude that petitioner has not shown through the 1984 Bull Peripheriques transaction that the transfer prices for Seagate Singapore's controlled sales to Seagate Scotts Valley were at arm's length.

### iv. *The Parties' Position on Applying the Cost-Plus Method Using Dr. Chandler's Approaches and the Court's Holding as to That Method*

Additionally, petitioner contends that Dr. Chandler's methodology of using the cost-plus markup on Seagate Scotts Valley's third party disk drive sales as the cost-plus markup on Seagate Singapore's component parts sales to Seagate Scotts Valley establishes that no adjustment is required with respect to the transfer price of the component parts. For the reasons Dr. Chandler cites in his own report, we reject Dr. Chandler's methodology.

Petitioner has presented no evidence to establish that Seagate Scotts Valley's markup on disk drive sales approximates an arm's-length markup for component part sales. We are convinced, moreover, that, because of their complexity, the risks involved in the sale of disk drives is much greater than the risks involved in the sale of the component parts in issue. Consequently, we would expect that a manufacturer operating at arm's length could expect to earn a greater return on the sale of disk drives than on the sale of component parts. Consequently, we conclude that petitioner has not shown that Seagate Scotts Valley's markup on disk drive sales is an appropriate markup for Seagate Singapore's component part sales.

Dr. Chandler also proposed an alternate approach, using Seagate Scott Valley's overall operating income divided by Seagate Scotts Valley's consolidated cost of goods sold to

determine Seagate Singapore's gross profit. On brief, petitioner does not urge the adoption of that alternate approach.

Dr. Chandler's alternate approach does not apply the cost-plus method described in section 1.482–2(e)(4), Income Tax Regs. For the reasons Dr. Chandler cites in his own report, we find Dr. Chandler's alternative approach also unreliable for the purpose of deciding the transfer prices for the component parts.

Consequently, petitioner has failed to establish through its proposed cost-plus methodologies that the transfer prices for the component parts were arm's-length charges.

c. *The Court's Holding as to the Arm's-Length Transfer Price for Component Parts Sold to Seagate Scotts Valley*

We have considered the other arguments raised by the parties and find them unpersuasive. As discussed *supra,* we have concluded that petitioner and respondent have failed to establish reasonable transfer prices for the component parts Seagate Singapore sold to Seagate Scotts Valley under the CUP or cost-plus methodologies advanced by their experts. We further conclude that the record does not contain sufficient information from which we can derive a reasonable transfer price under the CUP, resale price, or cost-plus methods as described in section 1.482–2(e)(2), (3), and (4), Income Tax Regs.

We agree with both Dr. Chandler and Dr. Horst that under the circumstances of the instant case the cost-plus method is the most appropriate method to establish a reasonable transfer price for the component parts in issue. Unfortunately, the record does not provide sufficient evidence to establish an appropriate gross profit percentage under the method described in section 1.482–2(e)(4), Income Tax Regs. Consequently, we make our best estimate of the appropriate transfer prices for the component parts on the basis of the available record. *Sundstrand Corp. v. Commissioner,* 96 T.C. 226, 375 (1991).

We think that Seagate Singapore was more than a consignment contractor and, thus, it should be compensated for its greater risks and responsibilities. The record establishes that many Asian subcontractors marked up their labor and overhead costs between 10 and 20 percent, while they marked up their materials costs somewhat less. Furthermore, local PCB

assemblers to whom Seagate Singapore subcontracted some of its PCB assembly work marked up their labor and overhead costs between 8 and 10 percent. We believe that, because of the greater responsibilities and risks undertaken by Seagate Singapore in the manufacture and assembly of the component parts, if Seagate Singapore had been operating at arm's length, it would have sought a markup at the high end of the range earned by Asian subcontractors.

Petitioner argues that the prices Seagate Singapore charges Seagate Scotts Valley for component parts (that is, the standard cost of manufacturing the component part in Singapore, plus 25 percent of those costs) are arm's length. On the other hand, respondent argues that Seagate Singapore's "fully burdened" cost of goods sold for the component parts, plus a 12.1-percent markup on materials, labor, and overhead, are the arm's-length prices for the component parts. For the reasons discussed *infra* (Issue 4), we reject Dr. Clowery's calculation of Seagate Singapore's "fully burdened" cost of goods sold for the component parts. Respondent does not otherwise challenge Seagate Singapore's costs of materials, labor, and overhead for the component parts. As stated above, we believe that Seagate Singapore, due to the greater risks it undertook, would have sought a markup at the high end of the range earned by Asian subcontractors. Consequently, we hold that the reasonable transfer price for the component parts is Seagate Singapore's materials, labor, and overhead costs, plus 20 percent. We apply the 20-percent rate to the cost of materials, as well as the costs of labor and overhead, to provide for the greater risks undertaken by Seagate Singapore than the risks undertaken by Asian subcontractors.

## V. ISSUE 4

Whether Seagate Scotts Valley paid Seagate Singapore an arm's-length price for completed disk drives Seagate Singapore produced and sold to Seagate Scotts Valley.

### A. FINDINGS OF FACT

#### 1. *Disk Drive Manufacturing and Sales*

In the disk drive industry, Seagate Scotts Valley was not considered to be a technology leader. Rather than relying on

proprietary, leading edge technology, Seagate Scotts Valley's corporate strategy was to expand the disk drive market as much as possible and then to compete in that market by manufacturing and selling the least expensive, best quality, and most reliable disk drives available. Seagate Scotts Valley assisted in market expansion by offering information regarding manufacturing standards to all other manufacturers. Seagate Scotts Valley felt that to succeed, it needed to market a high quality product which it could sell at a low price.

During 1983, Seagate Scotts Valley's management decided that Seagate Singapore should manufacture completed disk drives as well as component parts. Seagate Singapore began selling completed disk drives to Seagate Scotts Valley during the fiscal year ended June 30, 1984. Volume production of disk drives began at Seagate Singapore during the second half of that fiscal year. Seagate Scotts Valley was Seagate Singapore's largest disk drive customer overall. The rapid growth in the manufacture of disk drives by Seagate Singapore required the expansion of Seagate Singapore's employee force in Singapore.

Fierce competition in the low-end disk drive market eroded Seagate Scotts Valley's market share for disk drives, causing manufacturers, distributors, and value-added resellers (VAR's) to compete for the same customers. Prices for disk drives generally declined very rapidly. Seagate Scotts Valley's prices for disk drives could vary as to the customer involved or the volume of disk drives ordered. Some of the OEM's demanded that the prices charged to them be the same as or lower than the prices Seagate Scotts Valley charged to other similarly situated customers for similar or lesser quantities of products of like quality. In at least one instance, for a time, the structure of Seagate Scotts Valley's prices for the ST4051 disk drive models it sold to a division of a large OEM customer reimbursed the OEM customer for its collaboration in the development of that disk drive model.

Some of Seagate Scotts Valley's customers placed severe pricing pressures on Seagate Scotts Valley. For example, during June 1984, IBM demanded an immediate decrease in its purchase price for the ST412 disk drive.

Seagate Singapore generally sold the same disk drive models to third parties and Seagate Scotts Valley. Seagate Singapore's sales of disk drives to Seagate Scotts Valley and to

third parties customarily were f.o.b. Seagate Singapore. When Seagate Singapore sold disk drives to Seagate Scotts Valley, Seagate Scotts Valley usually was responsible for freight, insurance, and duty charges. When Seagate Singapore sold disk drives to a third party, the third party also generally was responsible for freight, insurance, and duty charges.

During April 1985, Seagate Scotts Valley entered into an industrial distributorship agreement with Co. T,[7] West Germany, giving Co. T the nonexclusive right to purchase as an industrial OEM distributor the ST506, ST412, ST212, ST225, ST125, ST4026, ST4038, and ST4051 disk drive models, and additional products as later added, for resale, lease, or other disposition, within West Germany. The agreement provided, among other things, for Seagate Scotts Valley to repurchase, within limits, obsolete products or parts at their original price, less any credits, and to replace upgraded products. The agreement gave Co. T the right to establish its resale prices for the products it purchased from Seagate Scotts Valley. Shipments were f.o.b. factory and payments were due net 60 days from date of invoice. The agreement provided for Seagate Scotts Valley to cofund, with prior approval, Co. T's advertising, promotion, and trade show expenses relating to Seagate Scotts Valley's products.

During October 1986, Seagate Scotts Valley entered into an international distributor agreement with Co. U, West Germany, giving Co. U the nonexclusive right to distribute all of Seagate Scotts Valley's products within West Germany and West Berlin. The distributor agreement Seagate Scotts Valley entered into with Co. U is substantially the same as, but not identical to, the distributor agreement with Co. T.

During March 1987, Seagate Scotts Valley entered into an international distributor agreement with Co. V, West Germany, giving Co. V the nonexclusive right to distribute the ST225 and ST4038 disk drive models, and additional products as later added, in West Germany and West Berlin. The agreement is substantially the same as, although not identical to, the agreements with Co. T and Co. U. Prices, how-

---

[7] Certain documents filed in the instant case are under a protective order to prevent the disclosure of trade secrets or other sensitive information. We have used assumed names here and elsewhere in the opinion to protect the identity of third parties whose trade secrets or other sensitive information remain under seal.

ever, for Seagate Scotts Valley's products were quoted f.o.b. Amsterdam, duty unpaid. Additionally, the agreement with Co. V was amended during 1987 to provide, in the event of a price decrease, a credit, within limits, of the difference between the old and new prices for Seagate Scotts Valley's products still in Co. V's inventory.

During June 1984, Seagate Scotts Valley entered into an industrial distributorship agreement with Co. W, California, and some of its divisions, giving Co. W the nonexclusive right to purchase as an industrial OEM distributor the ST212, ST412, ST419, and ST425 disk drive models, and additional products as later added, for resale, lease, or other disposition, to others in the United States and Puerto Rico. Co. X, a division of Co. W, is a large distributor of computer peripheral equipment and other electronics. Co. X resold Seagate Scotts Valley's disk drives to small OEM's, systems integrators, and retailers. The agreement with Co. W provided, among other things, for Seagate Scotts Valley to repurchase, under certain conditions, at Co. W's option, excess inventory and gave Co. W credit against purchases of new products for slow moving inventory returned to Seagate Scotts Valley by Co. W. The agreement gave Co. W a discount for early payment of its account. The agreement authorized Co. W to use Seagate Scotts Valley's trademarks, trade names, and logos in connection with the sale of Seagate Scotts Valley's products. The agreement quoted prices at decreasing levels, inversely to increasing quantities of products ordered. The lowest price was quoted for quantities ranging from 1000 to 2500 units. A 20-percent distributor gross margin was projected for prices quoted for the highest volume ordered. Other provisions of the distributor agreement with Co. W are similar to the distributor agreements with Co. T, Co. U, and Co. V. Sometime later, Co. W terminated the distributorship relationship with Seagate Scotts Valley, apparently because Co. X could not obtain its desired gross margin percentage from the resale of Seagate Scotts Valley's products. The record does not establish the actual gross profit percentages that Co. X earned on the resale of disk drives or similar products.

Seagate Scotts Valley also entered into other distributorship agreements with other domestic and international companies which are similar, although not identical, to the distributor agreements with Co. T, Co. U, Co. V, and Co. W.

Some of the distributor agreements with the international companies quote prices f.o.b. Amsterdam. Seagate Scotts Valley opened a stocking and distribution facility in Amsterdam sometime during the years in issue.

During some of the years in issue, Co. A purchased and resold Seagate Scotts Valley's disk drives to OEM's and dealers, including independent dealers, regional distributors, VAR's, and large retail outlets located throughout the world. Seagate Scotts Valley's disk drives made up a significant portion of Co. A's inventory purchases for 1987. In addition to Seagate Scotts Valley's disk drives, Co. A sold other hard disk drives, hard disk drive subsystems, accessories, and peripherals. At some point, Co. A changed its business from retailer to high-volume distributor of its own products. To gain entry and market share in the highly competitive environment into which it had embarked, Co. A sold its own products during some of the years in issue at a lower gross margin than customary. The consolidated financial statements of Co. A's Form 10–K, annual report filed under section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended June 30, 1987, include the accounts of Co. A Pte. Ltd. (Singapore), a wholly owned offshore assembly facility located in Singapore. The Form 10–K indicates Co. A's gross profit percentages, as a percentage of sales, for 1985, 1986, and 1987, were 8.8 percent, 10.9 percent, and 9.5 percent, respectively.

As a general matter, at least for years after 1986, Seagate Scotts Valley informed its new distributors that they should plan on experiencing gross margins of 10 percent or below.

Effective July 1, 1986, Seagate Scotts Valley entered into a sales representative agreement with an independent contractor (the representative) engaged in the business of soliciting orders from customers for the sale of certain products, giving the representative the nonexclusive right to solicit orders in specified States and parts of Canada for all of Seagate Scotts Valley's products. The agreement provided for Seagate Scotts Valley to compensate the representative for

OEM customer orders on a commission basis, ranging as follows:

| Commission rate | Net sales within the territory during each fiscal year |
|---|---|
| 5% | $0 to $500,000 |
| $25,000 plus 4% of net sales billed over $500,000 | $500,001 to $999,999.99 |
| $45,000 plus 3% of net sales billed over $1,000,000 | $1,000,000 to $1,499,999.99 |
| $60,000 plus 2% of net sales over $1,500,000 | $1,500,000 plus |

For services the representative rendered with respect to Seagate Scotts Valley's authorized distributors, the agreement provided for Seagate Scotts Valley to compensate the representative on the basis of a commission of 5 percent of the net sales of the products made by those distributors for delivery within the representative's territory.

Seagate Scotts Valley resold the disk drives it purchased from Seagate Singapore to third parties. Seagate Scotts Valley warranted the products it sold for periods of 12 to 18 months regardless of the place they were manufactured.

Seagate Scotts Valley paid for all advertising. Seagate Singapore provided some subsidy to its Asian distributors to assist them in advertising Seagate Scotts Valley's products.

At times, Seagate Scotts Valley's distributors in Europe and Asia encountered competition from resellers who purchased disk drives from Seagate Scotts Valley and then resold them abroad, sometimes at prices lower than the prices Seagate Scotts Valley's distributors charged for the same disk drives.

Distributors in Asia generally took much smaller order quantities than U.S. distributors.

The personal computer market in Europe during the mid-1980s was less developed and less mature than such market in the United States at that time.

## 2. *Respondent's Notices of Deficiency*

In the notices of deficiency, respondent determined that a reasonable transfer price for the disk drives Seagate Singapore sold to Seagate Scotts Valley was a discount of 20 percent of the resale price of the disk drive sales marketed and

contracted by Seagate Scotts Valley. Additionally, to account for any nominal marketing activities by Seagate Singapore and any costs incurred by Seagate Singapore in making disk drive sales, respondent, in effect, allowed Seagate Scotts Valley an offset equal to 1 percent of Seagate Singapore's direct disk drive sales.

At the time respondent's agents computed the transfer price reallocation for the disk drives in issue, the agents concluded that they did not have sufficient information to determine the resale price Seagate Scotts Valley received from unrelated third parties for the disk drives produced by Seagate Singapore. In order to determine the reasonable value of Seagate Scotts Valley's services in marketing the subject disk drives, therefore, Dr. Chou, the Internal Revenue Service economist assigned to the audit of Seagate Scotts Valley's tax returns, used Seagate Singapore's sales revenue for disk drives, adjusted as explained *infra,* in an attempt to approximate Seagate Scott Valley's actual resale price.

In calculating the reasonable value of Seagate Scotts Valley's marketing services, Dr. Chou first increased (reduced for 1985) the sales revenue Seagate Singapore received on intercompany sales of disk drives by a "price allowance".[8] The sales revenue Seagate Singapore earned from intercompany transactions, Dr. Chou's price allowances, and the derived adjusted intercompany sales revenue from disk drive sales, as reflected in the notices of deficiency, are as follows:

| Year | Intercompany disk drive sales | Price adjustment | Adjusted intercompany disk drive sales |
|------|------|------|------|
| 1984 | $19,700,000 | $6,161,000 | $25,861,000 |
| 1985 | 61,786,000 | (2,401,000) | 59,385,000 |
| 1986 | 216,707,000 | 16,862,000 | 233,569,000 |
| 1987 | 433,340,000 | 86,804,000 | 520,144,000 |

Dr. Chou then added the adjusted intercompany disk drive sales revenue to the revenue from third party sales to cal-

---

[8] The price allowance apparently was used to estimate the gross income Seagate Singapore would have realized on intercompany sales if it had received the same gross markup on intercompany sales that it had received on its sales to unrelated third parties.

culate Seagate Singapore's "adjusted sales" for the applicable year.

Next, Dr. Chou multiplied the "adjusted sales" for the disk drives by the 20-percent discount he had determined to be the reasonable transfer price for the disk drives Seagate Scotts Valley purchased from Seagate Singapore. He classified the result as the "value of marketing", all of which respondent then reallocated to Seagate Scotts Valley under section 482 as reasonable compensation for the marketing services which Seagate Scotts Valley rendered to Seagate Singapore during the years in issue.

The transfer price reallocations in the notices of deficiency for Seagate Singapore-produced disk drives Seagate Scotts Valley sold are as follows:

| Year | Total adjusted sales [1] | 20-percent discount |
|------|--------------------------|---------------------|
| 1984 | $49,735,000 | $9,947,000 |
| 1985 | 158,745,000 | 31,749,000 |
| 1986 | 408,933,000 | 81,787,000 |
| 1987 | 938,013,000 | 187,603,000 |

[1] The sales amounts pertain to Seagate Singapore's production and sales of disk drives only; the sales of component parts are not included in the totals. We note that the dollar value of sales used in the notices of deficiency does not agree with the dollar value of sales calculated by petitioner's expert.

The calculations of the offset respondent, in effect, allowed Seagate Scotts Valley for Seagate Singapore's direct marketing activities are as follows:

| Year | Total direct sales [1] | 1 percent of total direct sales |
|------|------------------------|---------------------------------|
| 1984 | $23,874,000 | $239,000 |
| 1985 | 99,360,000 | 994,000 |
| 1986 | 175,364,000 | 1,754,000 |
| 1987 | 417,869,000 | 4,179,000 |

[1] We note that, except for 1984, the dollar value of direct sales used in the notices of deficiency does not agree with the dollar value of direct sales calculated by petitioner's expert.

### 3. Petitioner's Experts

#### a. Mr. Holdren

Mr. Holdren prepared a comparable uncontrolled pricing study for the fiscal years 1984 through 1987, in which he

compared the prices and terms of sale, per disk drive model, of disk drives Seagate Singapore sold to unrelated third parties to the prices and terms of sale, per disk drive model, of disk drives Seagate Singapore sold to Seagate Scotts Valley.

Mr. Holdren analyzed Seagate Singapore's monthly intercompany sales summaries and unrelated customer sales databases to determine Seagate Singapore's weighted average net sales prices for disk drives, by disk drive model number, to Seagate Scotts Valley and to unrelated customers. He also tested statistical samples of Seagate Singapore's related and unrelated third party sales invoices against its sales summaries and sales databases, and reconciled Seagate Singapore's sales summaries and sales database to Seagate Singapore's financial statements and to Seagate Scott Valley's consolidated workpapers and financial statements.

Based on his analysis, Mr. Holdren concluded that Seagate Singapore's intercompany and third party disk drive net sales and Seagate Scotts Valley's disk drive net sales were as follows:

*Seagate Singapore*

|      | Intercompany | | Third party | | Total Seagate Singapore | |
| --- | --- | --- | --- | --- | --- | --- |
| Year | Units | Net sales | Units | Net sales | Units | Net sales |
| 1984 | 65,665 | $19,699,500 | 60,254 | $23,874,420 | 125,919 | $43,573,920 |
| 1985 | 209,914 | 61,739,590 | 358,839 | 98,078,286 | 568,753 | 159,817,876 |
| 1986 | 889,432 | 217,726,028 | 508,391 | 172,888,607 | 1,397,823 | 390,614,635 |
| 1987 | 2,010,126 | 433,863,775 | 1,403,337 | 417,563,610 | 3,413,463 | 851,427,385 |

*Seagate Scotts Valley*

| Year | Units | Net sales |
| --- | --- | --- |
| 1984 | 704,222 | $314,261,022 |
| 1985 | 270,711 | 111,750,445 |
| 1986 | 955,842 | 296,717,724 |
| 1987 | 1,888,409 | 535,792,821 |

Mr. Holdren concluded that it was not necessary to adjust Seagate Singapore's average uncontrolled sales prices for differences in freight terms, bad debts, payment terms, geographic market, volume pricing, or level of market to make the uncontrolled sales prices comparable to Seagate Singapore's average controlled sales prices. He concluded that no relevant differences existed between Seagate Singapore's uncontrolled sales and its controlled sales with respect

to freight terms or bad debts. He further concluded that Seagate Scotts Valley received favorable payment terms relative to Seagate Singapore's unrelated customers and, consequently, the differences in payment terms did not explain the existing price differential between controlled and uncontrolled prices. Seagate Singapore sold disk drives to all regions of the world. Mr. Holdren concluded that no CUP adjustment was required for differences in geographic markets because differences in prices to various geographic markets did not explain the existing price differential. He further concluded that no CUP adjustments were required for volume pricing or level of market because the nature of the differences in those two items between the controlled and the uncontrolled sales did not explain the existing price differential. Mr. Holdren explained that the reason he concluded that no CUP adjustment was needed for level of market was that he observed prices which showed no instances where OEM customers consistently paid a significantly lower price; in some cases, distributors paid prices as low as or lower than the OEM customers.

Mr. Holdren concluded that the difference in warranty terms between intercompany sales and third party sales was the only difference in circumstances that required an adjustment to Seagate Singapore's average uncontrolled sales prices. To adjust for the differences in warranty terms, Mr. Holdren decreased the average uncontrolled sales prices by amounts ranging from $4 to $11.38, depending upon the disk drive model.

Mr. Holdren calculated the following average prices for intercompany sales and the adjusted average prices for third party sales for the following disk drive models:

### 1984

| | Intercompany | Third party | | |
|---|---|---|---|---|
| Model | Average price | Unadjusted average price | Warranty adjustment | Adjusted average price |
| ST412 | $300 | $396.23 | $4 | $392.23 |

### 1985

| | Intercompany | Third party | | |
|---|---|---|---|---|
| Model | Average price | Unadjusted average price | Warranty adjustment | Adjusted average price |
| ST212 | $294.07 | $263.39 | $4 | $259.39 |

|         | Intercompany  |                              | Third party             |                           |
| ------- | ------------- | ---------------------------- | ----------------------- | ------------------------- |
| Model   | Average price | Unadjusted<br>average price  | Warranty<br>adjustment  | Adjusted<br>average price |
| ST225   | 300.00        | 329.96                       | 4                       | 325.96                    |
| ST4026  | 500.00        | 653.92                       | 4                       | 649.92                    |
| ST412   | 279.38        | 270.40                       | 4                       | 266.40                    |

### 1986

|         | Intercompany  |                              | Third party             |                           |
| ------- | ------------- | ---------------------------- | ----------------------- | ------------------------- |
| Model   | Average price | Unadjusted<br>average price  | Warranty<br>adjustment  | Adjusted<br>average price |
| ST212   | $214.42       | $237.98                      | $4.00                   | $233.98                   |
| ST213   | 190.18        | 213.91                       | 4.00                    | 209.91                    |
| ST225   | 234.17        | 271.35                       | 4.31                    | 267.04                    |
| ST238   | 297.80        | 268.81                       | 5.00                    | 263.81                    |
| ST4026  | 390.44        | 398.04                       | 4.91                    | 393.13                    |
| ST4038  | 416.32        | 496.60                       | 6.78                    | 489.82                    |
| ST412   | 235.00        | 226.14                       | 4.00                    | 222.14                    |

### 1987

|          | Intercompany  |                              | Third party             |                           |
| -------- | ------------- | ---------------------------- | ----------------------- | ------------------------- |
| Model    | Average price | Unadjusted<br>average price  | Warranty<br>adjustment  | Adjusted<br>average price |
| ST213    | $152.05       | $200.30                      | $4.00                   | $196.30                   |
| ST225    | 174.83        | 228.09                       | 4.00                    | 224.09                    |
| ST225I   | 199.30        | 231.44                       | 4.76                    | 226.68                    |
| ST225N   | 247.90        | 332.07                       | 4.13                    | 327.94                    |
| ST238    | 177.31        | 227.05                       | 4.14                    | 222.91                    |
| ST251    | 328.24        | 447.91                       | 5.84                    | 442.07                    |
| ST251N   | 366.10        | 515.00                       | 7.00                    | 508.00                    |
| ST4026   | 344.45        | 393.69                       | 7.00                    | 386.69                    |
| ST4038   | 361.31        | 411.64                       | 7.00                    | 404.64                    |
| ST4051   | 426.29        | 543.94                       | 7.00                    | 536.94                    |
| ST4053   | 384.32        | 418.17                       | 7.00                    | 411.17                    |
| ST4096   | 589.10        | 723.54                       | 11.38                   | 712.16                    |
| ST412    | 235.00        | 100.00                       | 4.00                    | 96.00                     |

For selected third party customers, Mr. Holdren's report reflects the following average net sales prices paid to Seagate Singapore for the following disk drive models (including the highest and the lowest average net sales price paid by customers for each disk drive model Mr. Holdren listed):

### 1984

**ST412**

| Third party customer | Net sales<br>units | Average net<br>sales price |
| -------------------- | ------------------ | -------------------------- |
| IBM (Australia)      | 1,152              | $410.76                    |
| IBM (Scotland)       | 18,688             | 343.83                     |

*ST412*

| Third party customer | Net sales units | Average net sales price |
|---|---|---|
| IBM Boca | 40,320 | 420.00 |
| Wang (Scotland) | 94 | 440.00 |

## 1985

*ST212*

| Third party customer | Net sales units | Average net sales price |
|---|---|---|
| Carion Industrial Corp. | 2,086 | $219.43 |
| Corion Industrial Corp. | 136 | 326.91 |
| Dynatech Singapore Pte, Ltd. | 5 | 450.00 |
| Ing.C.Olivetti & C, Spa | 2,020 | 270.00 |
| Laser Computer, Ltd. | 1,477 | 274.27 |
| MCAB | 168 | 265.00 |
| NCR Germany | 3,460 | 260.92 |
| Powermatic Data Systems | 851 | 240.24 |
| Ras America Co., Ltd. | 1 | 290.00 |
| Ras America Co., Ltd. | 497 | 267.06 |

*ST225*

*Third party customer*

| | | |
|---|---|---|
| Co. T | 76 | 350.00 |
| B.V. Diode | 45 | 450.00 |
| Carion Industrial Corp. | 1,021 | 333.75 |
| Co. U | 104 | 553.85 |
| Ing.C.Olivetti & C, Spa | 8,000 | 305.00 |
| Jans Computer Cpe., Ltd. | 2 | 520.00 |
| Katsuta Seiki Co., Ltd. | 10 | 504.00 |
| Laser Computer, Ltd. | 818 | 366.14 |
| Manhattan Skyline, Ltd. | 1,170 | 350.00 |
| MCAB | 120 | 350.00 |
| Pamir Pvt., Ltd. | 10 | 365.00 |
| Teleinstrument A/S | 214 | 350.00 |
| Teleinstrument AB | 48 | 350.00 |
| Tokyo Juki Ind Co., Ltd. | 2 | 395.00 |

*ST412*

*Third party customer*

| | | |
|---|---|---|
| Australian Protection Ind. | 2 | 400.00 |
| Carion Industrial Corp. | 100 | 219.80 |

*ST412*

*Third party customer*

| | | |
|---|---|---|
| Corion Industrial Corp. | 5 | 360.00 |
| Hi-Rel (Singapore) Pte, Ltd. | 7 | 500.00 |
| IBM Scot | 90,859 | 245.88 |
| IBM Singapore Pte, Ltd. | 6,144 | 235.00 |
| IBM Singapore Pte, Ltd. | 201,768 | 282.44 |
| IBM-Aust | 5,312 | 250.00 |
| Ras America Co., Ltd. | 1 | 290.00 |
| Ras America Co., Ltd. | 2 | 265.00 |
| Sakata Singapore Pte, Ltd. | 11 | 368.18 |
| Wang Laboratories, Inc. | 6,144 | 295.00 |
| Wang Laboratories, Inc. (Taiwan) | 8,928 | 201.83 |
| Wang Laboratories, Ltd. | 7,488 | 341.28 |

*1986*

*ST212*

| Third party customer | Net sales units | Average net sales price |
|---|---|---|
| Australian Protection Ind. | 25 | $280.00 |
| Carion Industrial Corp. | 4,416 | 219.09 |
| Laser Computer, Ltd. | 1,530 | 224.75 |
| MCAB | 354 | 230.68 |
| NCR Germany | 3,350 | 258.00 |
| Powermatic Data Systems | 984 | 216.75 |
| RAS America Co., Ltd. | 570 | 239.47 |

*ST213*

*Third party customer*

| | | |
|---|---|---|
| Gold Star Co., Ltd. | 2 | 310.00 |
| Matsushita Electric (Japan) | 1 | 200.00 |

*ST225*

*Third party customer*

| | | |
|---|---|---|
| Co. T | 5,400 | 261.89 |
| Carion Industrial Corp. | 19,574 | 266.11 |
| Co. U | 40 | 302.00 |
| Ing.C.Olivetti & C, Spa | 28,465 | 263.73 |
| Laser Computer, Ltd. | 5,450 | 272.23 |
| Manhattan Skyline, Ltd. | 1,380 | 303.04 |
| Matsushita Electric (Japan) | 1 | 246.00 |
| MCAB | 564 | 298.94 |
| Mitsuba Corp. | 150 | 1,334.67 |
| Pamir Pvt., Ltd. | 15 | 365.00 |

*ST225*

*Third party customer*

| | | |
|---|---|---|
| RAS America Co., Ltd. | 152 | 324.61 |
| Teleinstrument A/S | 1,268 | 283.96 |
| Teleinstrument AB | 1,176 | 267.31 |

*ST238*

*Third party customer*

| | | |
|---|---|---|
| Co. T | 6 | 260.00 |
| Trigem Computer, Inc. | 3 | 510.00 |

*ST4026*

*Third party customer*

| | | |
|---|---|---|
| Gold Star Co., Ltd. | 2 | 590.00 |
| IBM Boca | 59,318 | 395.00 |

*ST4038*

*Third party customer*

| | | |
|---|---|---|
| IBM-Aust | 2,112 | 425.00 |
| South Continental Devices | 3 | 653.00 |

*ST412*

*Third party customer*

| | | |
|---|---|---|
| Carion Industrial Corp. | 2 | 220.00 |
| Diode Belgium | 122 | 295.00 |
| IBM Scot | 3,840 | 225.00 |
| IBM-Aust | 960 | 235.00 |
| IBM-Italy | 288 | 235.00 |
| Lucky Gold Star, Int'L | 575 | 190.00 |
| Wang Laboratories, Inc. (Taiwan) | 1,270 | 250.00 |

## *1987*

*ST213*

| *Third party customer* | Net sales units | Average net sales price |
|---|---|---|
| Lucky Gold Star, Int'L | 361 | $190.00 |
| Tongyang Nylon Co., Ltd. | 50 | 230.00 |

*ST225*

*Third party customer*

| | | |
|---|---:|---:|
| Co. V | 2,880 | 211.00 |
| Co. T | 14,620 | 229.83 |
| Apple Computer, Inc. | 5,140 | 341.50 |
| Carion Industrial Corp. | 5,383 | 249.22 |
| Co. U | 4,020 | 217.07 |
| Ing.C.Olivetti & C, Spa | 3,000 | 260.00 |
| Matsushita Electric (Japan) | 637 | 237.92 |
| Powermatic Data Systems | 24,630 | 224.87 |
| Teleinstrument A/S | 2,656 | 222.56 |
| Teleinstrument AB | 3,420 | 231.07 |

*ST2251*

*Third party customer*

| | | |
|---|---:|---:|
| IBM Boca | 221,363 | 233.21 |
| IBM Scot | 136,708 | 228.54 |

*ST225N*

*Third party customer*

| | | |
|---|---:|---:|
| Lucky Gold Star, Int'L | 1 | 360.00 |
| Siscomp S.A. | 16 | 282.00 |

*ST238*

*Third party customer*

| | | |
|---|---:|---:|
| Co. V | 120 | 214.50 |
| Co. T | 1,500 | 225.34 |
| Co. U | 600 | 214.50 |
| Mitsui & Co., Ltd. (Tokyo) | 5 | 340.00 |
| STSG (Japan) | 26 | 161.58 |

*ST251*

*Third party customer*

| | | |
|---|---:|---:|
| Co. V | 360 | 361.00 |
| Co. T | 1,320 | 415.99 |
| Chang Myung Corp. | 12 | 548.33 |
| Co. U | 570 | 412.05 |

### ST251

*Third party customer*

| | | |
|---|---|---|
| Computel Marketing (S) PL | 2 | 495.00 |
| Lucky Gold Star, Int'L | 1 | 595.00 |

### ST4026

*Third party customer*

| | | |
|---|---|---|
| Computer 2000 | 30 | 456.00 |
| IBM Boca | 9,429 | 389.50 |
| ILT | 64 | 385.00 |

### ST4038

*Third party customer*

| | | |
|---|---|---|
| Co. T | 1,172 | 450.19 |
| Computer 2000 | 30 | 642.67 |
| Co. U | 672 | 448.43 |
| IBM Boca | 190,535 | 405.34 |
| IBM Japan | 50 | 387.50 |

### ST4051

*Third party customer*

| | | |
|---|---|---|
| Gold Star Telecomm Co., Ltd. | 2 | 625.00 |
| Teleinstrument AB | 160 | 457.50 |

### ST4053

*Third party customer*

| | | |
|---|---|---|
| IBM Boca | 1,550 | 415.00 |
| Maxcom | 64 | 495.00 |

### ST4096

*Third party customer*

| | | |
|---|---|---|
| IBM Rochester | 16 | 545.00 |
| Qnix Co., Ltd. | 10 | 1,086.00 |

### ST412

*Third party customer*

| | | |
|---|---|---|
| Seagate employees | 4 | 100.00 |

All sales of the ST412 disk drive model detailed in Mr. Holdren's report for the fiscal years ended 1984 and 1987 are listed above. For the fiscal year ended 1984, sales of only the ST412 disk drive model are detailed in Mr. Holdren's report.

Mr. Holdren concluded that, if Seagate Scotts Valley had purchased disk drives from Seagate Singapore at the average sales prices Seagate Singapore charged its unrelated customers for each model, as adjusted for the difference in warranty terms, Seagate Scotts Valley would have paid Seagate Singapore $6,056,283, $24,930,275, and $109,930,918 more for fiscal years ended 1984, 1986, and 1987, respectively, and $2,729,026 less for fiscal year ended 1985, for an aggregate decrease in income for Seagate Scotts Valley of $138,188,450.[9] Mr. Holdren concluded further that, if his analysis had been made on a quarterly basis rather than an annual basis, the aggregate price differential decrease would be $153,344,701.

Additionally, Mr. Holdren compared the average sales prices Seagate Singapore charged its three highest volume unrelated customers to the average sales prices it charged Seagate Scotts Valley. He concluded that Seagate Scott's Valley purchased disk drives from Seagate Singapore at lower prices relative to the average sales prices to the three highest volume unrelated customers, as adjusted for the warranty differences, in the aggregate amount of $131,334,485.

Mr. Holdren further compared the average sales prices Seagate Singapore charged its unrelated distributors to the average sales prices it charged Seagate Scotts Valley. He concluded that Seagate Scotts Valley purchased disk drives from Seagate Singapore at lower prices relative to the average sales prices charged to the unrelated distributors, as adjusted for warranty differences, in the aggregate amount of $143,814,204.

Mr. Holdren concluded that, for each disk drive model, the average sales price charged to all unrelated customers of that model, as adjusted for warranty differences, represents the

---

[9] Although Mr. Holdren did not so calculate, his report reveals that, had Seagate Scotts Valley purchased each disk drive model from Seagate Singapore at the lowest average sales price Seagate Singapore charged an unrelated customer for that model (as adjusted for the difference in warranty terms), Seagate Scotts Valley would have paid Seagate Singapore $2,615,437, $3,620,366, and $52,522,171 more for fiscal year ended 1984, 1986, and 1987, respectively, and $11,524,314 less for fiscal year ended 1985, for an aggregate decrease in income for Seagate Scotts Valley of $47,233,657.

most reasonable price for his comparable uncontrolled price (CUP) analysis.

b. *Mr. Broadhurst*

Mr. Broadhurst prepared models analyzing disk drive profitability for the disk drives Seagate Singapore and Seagate Scotts Valley produced and sold to unrelated third parties and the disk drives Seagate Singapore produced and sold to Seagate Scotts Valley. He analyzed the disk drive models for which Mr. Holdren identified adequate cost-related information using a variation of the resale price method.

First, for each disk drive model included, Mr. Broadhurst computed Seagate Singapore's and Seagate Scott Valley's gross margins per unit by subtracting the average unit cost of each model from the average unit sales price of that model, as reflected in Mr. Holdren's report. Next, for each such disk drive model analyzed, he computed Seagate Singapore's and Seagate Scotts Valley's gross margin percentages per unit by dividing the calculated gross margin per unit by the average unit sales price. Mr. Broadhurst summarized average material, labor, overhead, and total unit costs (the average unit cost) by disk drive model from existing cost accounting information for Seagate Singapore and Seagate Scotts Valley. He adjusted Seagate Singapore's overhead costs on intercompany sales to remove the per-unit intercompany warranty cost.

Mr. Broadhurst computed the following gross margin percentages based on sales for the following disk drives produced by Seagate Singapore and Seagate Scotts Valley:

### 1984

| Model | Seagate Singapore gross margin percentage | | Seagate Scotts Valley gross margin percentage | |
|---|---|---|---|---|
| | Intercompany | Third party | Intercompany | Third party |
| ST212 | - - - | - - - | N/A | 14.69% |
| ST412 | 18.25% | 37.09% | N/A | 38.11 |
| ST419 | - - - | - - - | N/A | 35.48 |
| ST425 | - - - | - - - | N/A | 30.31 |

## 1985

| Model | Seagate Singapore gross margin percentage | | Seagate Scotts Valley gross margin percentage | |
| | Intercompany | Third party | Intercompany | Third party |
|-------|--------------|-------------|--------------|-------------|
| ST212 | 22.07% | 11.48% | N/A | (9.14%) |
| ST225 | 32.38 | 37.31 | N/A | 16.46 |
| ST4026 | 28.56 | 44.77 | N/A | 28.57 |
| ST412 | 25.10 | 21.13 | - - - | N/A |

## 1986

| Model | Seagate Singapore gross margin percentage | | Seagate Scotts Valley gross margin percentage [1] | |
| | Intercompany | Third party | Intercompany | Third party |
|-------|--------------|-------------|--------------|-------------|
| ST212 | 4.90% | 12.63% | - - - | - - - |
| ST213 | 21.93 | 28.72 | - - - | - - - |
| ST225 | 23.77 | 32.63 | - - - | - - - |
| ST238 | 40.28 | 31.97 | - - - | - - - |
| ST4026 | 19.86 | 20.16 | - - - | - - - |
| ST4026A | - - - | 21.12 | - - - | - - - |
| ST4038 | 16.51 | 28.64 | - - - | - - - |
| ST412 | 19.10 | 14.16 | - - - | - - - |

## 1987

| Model | Seagate Singapore gross margin percentage | | Seagate Scotts Valley gross margin percentage [1] | |
| | Intercompany | Third party | Intercompany | Third party |
|-------|--------------|-------------|--------------|-------------|
| ST213 | 21.72% | 38.58% | - - - | - - - |
| ST225 | 20.33 | 37.18 | - - - | - - - |
| ST225I | 25.22 | 33.55 | - - - | - - - |
| ST225N | 15.00 | 35.30 | - - - | - - - |
| ST238 | 22.72 | 37.83 | - - - | - - - |
| ST251 | 16.10 | 37.21 | - - - | - - - |
| ST251N | 15.73 | 38.73 | - - - | - - - |
| ST4026 | 15.24 | .06 | - - - | - - - |
| ST4026A | - - - | 29.14 | - - - | - - - |
| ST4038 | 20.09 | 28.16 | - - - | - - - |
| ST4051 | 20.56 | 36.46 | - - - | - - - |
| ST4053 | 3.37 | 9.52 | - - - | - - - |
| ST4096 | 10.88 | 25.86 | - - - | - - - |

|  | Seagate Singapore gross margin percentage | | Seagate Scotts Valley gross margin percentage [1] | |
| Model | Intercompany | Third party | Intercompany | Third party |
| ST412 | [1] | - - - | - - - | - - - |

[1] Information not contained in Mr. Broadhurst's report.

Mr. Broadhurst also computed, on a per-drive basis for the disk drives Seagate Scotts Valley purchased from Seagate Singapore, pro forma transfer prices that Seagate Scotts Valley would need to achieve gross margins of 5 percent, 10 percent, 15 percent, and 20 percent. Mr. Broadhurst used the companies' sales data bases for the computation. Mr. Broadhurst listed only disk drive models with both intercompany (controlled) and third party sales in the same fiscal year. He obtained a summary of the comparable Seagate Singapore to Seagate Scotts Valley intercompany and Seagate Scotts Valley resale transactions, by disk drive model, for all disk drive models sold by Seagate Scotts Valley to trade customers and purchased from Seagate Singapore. He then computed Seagate Scotts Valley's actual gross margin resale percentages for the disk drive models as the difference between the Seagate Singapore average intercompany sale price and the Seagate Scotts Valley average third party sale price for the disk drive model divided by the Seagate Scotts Valley average third party sale price for the disk drive model. Next, Mr. Broadhurst computed Seagate Scotts Valley's pro forma gross margin resale percentages per disk drive model by multiplying 1 minus the pro forma gross margin percentage (5 percent, 10 percent, 15 percent, or 20 percent) by the Seagate Scotts Valley average sale price for that disk drive model. For example, 1 minus 5 percent or 95 percent times Seagate Scotts Valley's average sale price equals the gross margin of 5 percent.

As computed by Mr. Broadhurst, the actual resale gross margin percentages realized by Seagate Scotts Valley on disk drives purchased from Seagate Singapore are as follows:

## 1984

| Model | Average controlled price | Average third party price | Actual Scotts Valley gross margin percent |
|---|---|---|---|
| ST412 | $300 | $446.08 | 32.75% |

## 1985

| Model | Average controlled price | Average third party price | Actual Scotts Valley gross margin percent |
|---|---|---|---|
| ST212 | $294.07 | $315.68 | 6.85% |
| ST225 | 300.00 | 367.40 | 18.35 |
| ST4026 | 500.00 | 675.49 | 25.98 |
| ST406 | 300.00 | 332.39 | 9.74 |
| ST412 | 279.38 | 360.30 | 22.46 |

## 1986

| Model | Average controlled price | Average third party price | Actual Scotts Valley gross margin percent |
|---|---|---|---|
| ST212 | $214.42 | $225.68 | 4.99% |
| ST213 | 190.18 | 220.27 | 13.66 |
| ST225 | 234.17 | 272.46 | 14.05 |
| ST238 | 297.80 | 268.21 | (11.03) |
| ST4026 | 390.44 | 521.22 | 25.09 |
| ST4038 | 416.32 | 524.71 | 20.66 |
| ST412 | 235.00 | 225.48 | (4.22) |

## 1987

| Model | Average controlled price | Average third party price | Actual Scotts Valley gross margin percent |
|---|---|---|---|
| ST213 | $152.05 | $204.89 | 25.79% |
| ST225 | 174.83 | 233.18 | 25.02 |
| ST225I | 199.30 | 251.06 | 20.62 |
| ST225N | 247.90 | 311.41 | 20.39 |
| ST238 | 177.31 | 234.06 | 24.25 |
| ST251 | 328.24 | 423.93 | 22.57 |
| ST251N | 366.10 | 498.72 | 26.59 |
| ST277N | 400.51 | 558.68 | 28.31 |
| ST4026 | 344.45 | 400.40 | 13.97 |
| ST4038 | 361.31 | 455.88 | 20.74 |
| ST4051 | 426.29 | 545.49 | 21.85 |
| ST4053 | 384.32 | 537.82 | 28.54 |

| Model | Average controlled price | Average third party price | Actual Scotts Valley gross margin percent |
|---|---|---|---|
| ST4096 | 589.10 | 767.50 | 23.24 |
| ST412 | 235.00 | 236.65 | .70 |

## 4. Respondent's Experts

### a. Dr. Clowery

For purposes of the transfer pricing issue relating to disk drive sales, Dr. Clowery calculated Seagate Scotts Valley's gross profit earned on sales of the disk drives during the years in issue, applying consistent accounting treatment of similar items. Dr. Clowery calculated gross profit by subtracting "allocated" cost of sales from net sales (total sales revenue less returns and allowances, volume price breaks, and other adjustments).

Dr. Clowery applied his understanding of consistent accounting treatment, based on transactions as recorded by Seagate Scotts Valley, to calculate the gross profit for Seagate Scotts Valley for the years in issue, in accordance with those income statements. Then, he considered further adjustments which he could make to those results to calculate alternative gross profit amounts for Seagate Scotts Valley.

First, Dr. Clowery calculated Seagate Scotts Valley's gross profit according to Seagate Scotts Valley's income statements, which he allocated to disk drives manufactured by Seagate Scotts Valley and by Seagate Singapore and sold by Seagate Scotts Valley. Dr. Clowery used Seagate Scotts Valley's monthly sales journal entries in the general ledger to identify the following units and dollar values of sales by Seagate Scotts Valley of disk drives manufactured by both Seagate Scotts Valley and Seagate Singapore: [10]

---

[10] We note that the amounts calculated by Dr. Clowery do not agree with the amounts calculated by Mr. Holdren, see *supra*. We make no conclusion as to the accuracy of either expert's numbers since the amounts are not relevant to our holding because we do not use a gross margin percentage to compute transfer prices for completed disk drives.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | *Sales of disk drives manufactured by* | | | | |
| | *Seagate Scotts Valley* | | *Seagate Singapore* | | *Total sales* | |
| *Year* | *Units* | *Dollar value* | *Units* | *Dollar value* | *Units* | *Dollar value* |
| 1984 | 654,937 | $295,481,091 | 57,650 | $24,576,808 | 712,587 | $320,057,899 |
| 1985 | 88,170 | 53,075,721 | 184,001 | 60,870,754 | 272,171 | 113,946,475 |
| 1986 | 94,040 | 55,234,269 | 876,606 | 245,307,936 | 970,646 | 300,542,205 |
| 1987 | 20,700 | 20,947,054 | 1,943,785 | 530,132,787 | 1,964,485 | 551,079,841 |

Then, Dr. Clowery used the relative sales values of the disk drives manufactured by Seagate Scotts Valley and Seagate Singapore to allocate adjustments to sales identified in Seagate Scotts Valley's general ledger to derive net sales for the disk drives manufactured at each location. Next, he calculated the cost of sales for the Seagate Scotts Valley and Seagate Singapore-manufactured disk drives.

Dr. Clowery defined cost of sales as the sum of the direct and indirect costs incurred in the production of the products sold to customers. Dr. Clowery obtained the cost of sales data from the details supporting Seagate Scotts Valley's monthly cost of sales journal entries, which separately identified amounts for disk drives manufactured by Seagate Scotts Valley and Seagate Singapore. Seagate Scotts Valley's cost of sales journal entries separately classified amounts for materials, labor, overhead, and Singapore materials. Dr. Clowery added the amounts in the Singapore labor, overhead, and gross profit accounts to the other direct cost of sales amounts for the disk drives manufactured by Seagate Singapore to derive a total cost of materials, labor, and overhead.

In reviewing other direct cost of sales accounts which generally are added to materials, labor, and overhead to arrive at direct cost of sales (such as price and efficiency variances, scrap, and freight), Dr. Clowery identified two items which he concluded related specifically to disk drives manufactured by Seagate Singapore. He treated the costs relating to those two items (freight and import duties, net of drawbacks) solely as costs of the Seagate Singapore-manufactured disk drives. Dr. Clowery allocated the remaining identified direct costs between the Seagate Scotts Valley- and Seagate Singapore-produced disk drives on the basis of relative sales values. He also allocated on the basis of relative sales value other adjustments to cost of sales identified in Seagate Scotts Valley's books and records.

Next, also on the basis of relative sales value, Dr. Clowery allocated to the disk drives manufactured by Seagate Scotts Valley and Seagate Singapore, Seagate Scotts Valley's indirect costs of sales, after certain adjustments including adjustments to conform the total indirect costs with the indirect costs of sales reflected on Seagate Scotts Valley's consolidated income statements. The total of the direct and indirect costs of sales equals the total cost of sales reflected on Seagate Scotts Valley's consolidated income statements.

Finally, Dr. Clowery subtracted the total cost of sales from net sales to derive the gross profit of the disk drives according to the consolidated income statements, as allocated between the disk drives manufactured by Seagate Scotts Valley and Seagate Singapore.

Following the allocations described above, Dr. Clowery calculated Seagate Scotts Valley's gross profit (GP) from the sale of disk drives per the consolidated income statements to be as follows:

| Drives manufactured by | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| Seagate Singapore | $3,485,058 | ($15,025,523) | ($16,970,456) | $40,622,056 |
| Seagate Scotts Valley | 63,469,147 | (1,515,351) | 6,651,755 | 5,438,109 |
| Aggregate GP | 66,954,205 | (16,540,874) | (10,318,701) | 46,060,165 |

Dr. Clowery's calculations reflect the following GP percentages relating to sales of disk drives by Seagate Scotts Valley according to Seagate Scotts Valley's consolidated income statements, as allocated to disk drives manufactured by Seagate Scotts Valley and Seagate Singapore:

| Drives manufactured by | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| Seagate Singapore | 14.18% | (24.43%) | (7.14%) | 7.81% |
| Seagate Scotts Valley | 21.48 | (2.83) | 12.44 | 26.47 |
| Aggregate GP percentage | 20.92 | (14.36) | (3.55) | 8.52 |

Dr. Clowery observed that Seagate Scotts Valley had reduced its cost of sales by the R&D payment Seagate Singapore made to Seagate Scotts Valley (one-half of the total costs included in the R&D cost-sharing amount (see *infra* Issue 8), minus one-half of the R&D expense incurred by Seagate Singapore). He concluded that the R&D payment should have been treated as a reduction in Seagate Scotts

Valley's R&D expense. Consequently, Dr. Clowery reduced Seagate Scotts Valley's cost of sales by the amount of the R&D payment and, instead, added the corresponding amount to the R&D component of Seagate Scotts Valley's SG&A. Dr. Clowery also reduced Seagate Scotts Valley's cost of sales and increased its R&D expense by certain departmental costs which he concluded were included in the R&D cost-sharing calculation but not transferred out to the R&D expense classification.

Following the adjustments described above, Dr. Clowery calculated Seagate Scotts Valley's GP from the sale of disk drives to be as follows:

| Drives manufactured by | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| Seagate Singapore | $3,485,058 | ($16,789,362) | ($21,423,741) | $29,437,154 |
| Seagate Scotts Valley | 63,469,147 | (3,053,315) | 5,649,040 | 4,996,162 |
| Aggregate GP | 66,954,205 | (19,842,677) | (15,774,701) | 34,433,316 |

The GP percentages for Seagate Scotts Valley relating to the sale of disk drives based on GP as adjusted by Dr. Clowery are as follows:

| Drives manufactured by | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| Seagate Singapore | 14.18% | (27.29%) | (9.02%) | 5.66% |
| Seagate Scotts Valley | 21.48 | (5.69) | 10.56 | 24.32 |
| Aggregate GP percentage | 20.92 | (17.23) | (5.42) | 6.37 |

b. *Dr. Frisch*

Dr. Frisch formulated an opinion as to the transfer prices that an unrelated U.S. distributor would have paid to Seagate Singapore for the disk drives.

In formulating his opinion, Dr. Frisch compared the adjusted gross profit for Seagate Scotts Valley, as calculated by Dr. Clowery, to the gross profit margins reported by certain independent distributors. He concluded that the gross profit margins of the independent distributors approximated a reasonable range for the gross profit margin Seagate Scotts Valley would have earned on the resale of the Seagate Singapore-produced disk drives had Seagate Scotts Valley been dealing with Seagate Singapore at arm's length. Dr. Frisch then applied that estimated gross profit margin to Seagate

Scotts Valley's selling prices for the disk drives produced by Seagate Singapore to calculate arm's-length transfer prices.

To locate his comparable companies, Dr. Frisch first considered Seagate Scott Valley's functions, responsibilities, risks, and method of doing business in reselling the Seagate Singapore-produced disk drives. Then, he looked for information about independent resellers performing similar functions and selling similar products.

Dr. Frisch could not locate any independent distributor that performed precisely the same functions under the same circumstances as Seagate Scotts Valley. He concluded that none of the independent distributors he found were on the same level of market as Seagate Scotts Valley; they generally were Seagate Scotts Valley's customers. Nonetheless, Dr. Frisch concluded that, if the independent distributors performed similar levels of functions, assumed similar amounts of risks, and otherwise operated under similar circumstances, their gross margins might serve as valid comparables for Seagate Scotts Valley. His next step was to consider methods for dealing with the differences in the functions and circumstances between Seagate Scotts Valley and the independent distributors.

For his comparables, Dr. Frisch looked for companies which were primarily distributors of computer products, computer systems, or computer peripherals or closely related products; i.e., companies distributing products that were likely to be used in conjunction with disk drives and, therefore, likely to be sold to the same customers and subject to similar market forces as Seagate Scotts Valley. He also looked for companies which appeared to distribute significant amounts of disk drives; did not engage in manufacturing as a significant activity; engaged in no or only a trivial amount of retail-level activities; were going concerns during Seagate Scotts Valley's fiscal 1984 through 1987 period and neither started up nor ceased their operations during those years; and filed public statements with the SEC with financial data for at least part of Seagate Scotts Valley's fiscal 1984 through 1987 period. As long as the company was not a startup operation, Dr. Frisch used the years for which data was available. For the comparables, Dr. Frisch considered companies classified under Standard Industrial Classification (SIC) codes 5045 (wholesalers of computers and computer

peripheral equipment and software) and 5065 (wholesalers of electronic parts and equipment).

Dr. Frisch found 10 companies which satisfied his criteria. He concluded that the functions of selling from an extensive inventory, expeditious order-handling, and granting of credit were important functions for all 10 of the companies. Some of the 10 companies performed a wide range of additional, more technically sophisticated, functions.

In Dr. Frisch's opinion, if Seagate Scotts Valley had been operating at arm's length, it would have expected to earn a gross margin at least equal to the gross margin earned by the company performing the least number of functions. He further opined that, at arm's length, Seagate Scotts Valley may not have expected to earn a gross margin equal to the company which performed the greatest number of functions.

Dr. Frisch noted certain significant differences in the functions performed by the 10 companies and Seagate Scotts Valley. For example, the independent distributors sold to a much larger number of customers but sold in much smaller volumes per order; played a much more modest role in market analysis and planning and in helping their suppliers plan future production; generally did not deal with the large OEM's and, thus, did not have such major responsibilities for handling complex negotiations over technical specifications and production methods; and experienced less risk from holding inventory but more risk from extending credit. Dr. Frisch concluded that differences in levels of inventory and accounts receivable between the 10 companies and Seagate Scotts Valley were the only significant differences which would require adjustments to render them comparable within the meaning of section 1.482–2(e)(3)(ix), Income Tax Regs.[11]

Dr. Frisch obtained financial information about the 10 companies from filings they made with the SEC. Where necessary, he combined appropriate fractions of data for overlapping fiscal years to approximate fiscal periods corresponding

---

[11] Sec. 1.482–2(e)(3)(ix), Income Tax Regs., provides in pertinent part as follows:

(3) Resale price method. * * *

\* \* \* \* \* \* \*

(ix) In determining an arm's length price appropriate adjustment must be made to reflect any material differences between the uncontrolled purchases and resales used as the basis for the calculation of the appropriate markup percentage and the resales of property involved in the controlled sale. The differences referred to in this subdivision are those differences in functions or circumstances which have a definite and reasonably ascertainable effect on price. * * *

to Seagate Scotts Valley's fiscal year. In some instances, the information needed to calculate sales, costs of sales, gross profits, inventories, or accounts receivable for the companies was not available. All 10 of the companies distributed microcomputer or electronic component products as their principal activity. Some of the companies, however, reported more than one type of business segment. The available data did not allow Dr. Frisch to compute gross margins for just the most relevant segment; therefore, except for one such company, the gross margin he computed for each company pertains to the company as a whole.

For each such company, Dr. Frisch first divided the company's gross profit by sales to determine the unadjusted gross margin. Next, to adjust for differences in inventory, he calculated each company's level of inventory relative to sales. Dr. Frisch then subtracted Seagate Scotts Valley's level of inventory from that percentage. Next, he multiplied the difference by the average prime rate during the appropriate fiscal year. Then Dr. Frisch subtracted the result from the unadjusted gross margin. Next, to adjust for differing levels of accounts receivable (as a measurement of the differences in the granting of credit to customers), Dr. Frisch divided each company's level of accounts receivable by its sales. Then he subtracted from that product Seagate Scotts Valley's ratio of sales to accounts receivable. He multiplied the result by the prime rate. Finally, Dr. Frisch subtracted that outcome from the company's gross margin adjusted for inventory differences, yielding the fully adjusted arm's-length gross margin that reflects differences in inventory and accounts receivable.

Dr. Frisch computed the following adjusted gross margins for the 10 companies (percentage of sales in the relevant segment shown in parentheses):

*SIC 5045 Companies*

*Gross margins adjusted for differences in inventories and accounts receivable carrying costs*

|  | 1984 | 1985 | 1986 | 1987 | Average |
|---|---|---|---|---|---|
| Micro D, Inc. | 13.87% | 13.20% | 8.51% | 8.76% | 10.22% |
|  | (100%) | (100%) | (100%) | (100%) | (100%) |
| Microamerica, Inc. | N/A | N/A | N/A | 13.10 | 13.10 |
|  | - - - | - - - | - - - | (100) | (100) |
| Softsel Computer | N/A | 20.65 | 15.16 | 12.63 | 15.64 |

*Gross margins adjusted for differences in inventories and accounts receivable carrying costs*

|                    | 1984   | 1985   | 1986   | 1987   | Average |
|--------------------|--------|--------|--------|--------|---------|
| Products, Inc.     | - - -  | (100)  | (100)  | (100)  | (100)   |
| Tech Data Corp.    | 16.28  | 18.96  | 14.91  | 13.79  | 14.98   |
|                    | (100)  | (100)  | (100)  | (100)  | (100)   |

*SIC 5065 Companies*

*Gross margins adjusted for differences in inventories and accounts receivable carrying costs*

|                              | 1984     | 1985     | 1986     | 1987    | Average  |
|------------------------------|----------|----------|----------|---------|----------|
| Arrow Electronics, Inc.      | 23.09%   | 26.11%   | 20.37%   | 18.78%  | 22.33%   |
|                              | (89.73%) | (91.71%) | (96.74%) | (100%)  | (94.1%)  |
| Co. W                        | 25.39    | 27.81    | 22.61    | 22.14   | 24.54    |
|                              | (76.90)  | (75.57)  | (77.58)  | (76.90) | (76.64)  |
| Ducommun, Inc.[1]            | 22.96    | 26.38    | 20.33    | N/A     | 23.23    |
|                              | (86.94)  | (84.09)  | (84.17)  | - - -   | (84.98)  |
| Pioneer-Standard Electronics, Inc. | 21.41 | 26.00 | 21.72 | 21.60 | 22.70 |
|                              | (87.85)  | (94.04)  | (100)    | (100)   | (95.25)  |
| Western Micro Technology, Inc.[2] | 21.71 | 24.66 | 17.12 | 18.06 | 20.19 |
|                              | (92.40)  | (92.45)  | (94.85)  | (92.7)  | (93.09)  |
| Wyle Laboratories & Subsidiaries | 24.24 | 26.96 | 22.03 | 21.10 | 23.59 |
|                              | (77.35)  | (76.59)  | (74.11)  | (72.67) | (75.18)  |

[1] Ducommun, Inc.'s electronics business was sold to Arrow Electronics, Inc., in early 1988.

[2] Western Micro Technology, Inc.'s gross margins are based on segment sales as reported in the SEC filings.

Dr. Frisch concluded that, taken as a whole, for the fiscal years ended 1984 through 1987, Seagate Scotts Valley earned a negative gross profit margin from reselling the Seagate Singapore-produced disk drives. In contrast, the 10 companies experienced average gross profit margins ranging between 10 and 25 percent of sales over the same 4-year period. Consequently, Dr. Frisch concluded that Seagate Singapore's transfer prices to Seagate Scotts Valley for disk drives should be adjusted so that Seagate Scotts Valley's gross profit margin for each year is at least equal to the gross margin earned by Micro D, which for each such year recorded the lowest gross margin of the companies he identified as comparable to Seagate Scotts Valley.

The resale margin reallocations as calculated by Dr. Frisch[12] are as follows:

---

[12] We note that in his report, Dr. Clowery has restated the resale margin allocations cal-

| Period ending | Margin reallocation adjustment |
|---|---|
| 6/30/84 | [1]($77,302) |
| 6/30/85 | 24,912,466 |
| 6/30/86 | 41,643,167 |
| 6/30/87 | 16,094,363 |
| Total | 82,572,694 |

[1] The adjustment for 1984 is negative because Seagate Scotts Valley's actual gross margin for that year was higher than Micro D's adjusted gross margin for that year.

## B. OPINION

### 1. *Ultimate Findings of Fact*

In the notices of deficiency, respondent did not follow the resale price method described in section 1.482–2(e)(3), Income Tax Regs. The method respondent used to determine the reallocations relating to the resale of the disk drives in issue relied on incorrect sales revenue figures for the sales of the disk drives and an excessive gross margin percentage. Consequently, petitioner has carried the burden of proving that respondent's reallocations with respect to the resale of disk drives are arbitrary, capricious, or unreasonable.

### 2. *Analysis of Completed Disk Drive Issue*

Neither party has proposed that the cost-plus method would apply under the circumstances present in the instant

---

culated by Dr. Frisch to be as follows:

| Period ending | Margin allocation adjustment | Difference |
|---|---|---|
| 6/30/84 | ($76,564) | ($738) |
| 6/30/85 | 24,909,503 | 2,963 |
| 6/30/86 | 41,638,637 | 4,630 |
| 6/30/87 | 16,109,585 | (15,222) |
| Total | 82,581,161 | (8,367) |

Dr. Clowery's numbers are based on a report which was lodged with the Court on Oct. 4, 1991, and do not incorporate minor changes in the amounts for sales and gross profit which are reflected in his report filed at trial. The revised amounts do not have a material effect on Dr. Clowery's calculations, however, and do not explain the differences between the amounts shown by Dr. Frisch and Dr. Clowery. Other than the possible effects of differences in rounding, we are unable to ascertain the source of the variances in their calculations.

In different sections of the answering brief, respondent refers to the amounts stated both in Dr. Clowery's report and in Dr. Frisch's report without explaining why they differ.

case to Seagate Scotts Valley's resale of the disk drives. We agree that the record does not support application of that method. Consequently, we will not discuss it.

Both parties agree that Seagate Singapore generally sold the same disk drive models to Seagate Scotts Valley and to third party customers and that Seagate Scotts Valley resold the disk drives it purchased from Seagate Singapore to third parties. The parties do not agree, however, on the methodology to use to ascertain an arm's-length price for the subject disk drives.

### a. *The CUP Method*

#### i. *Petitioner's Position*

Petitioner argues that Mr. Holdren's CUP analysis establishes arm's-length transfer prices for the disk drives in issue in the instant case. Petitioner contends that Mr. Holdren's analysis shows that Seagate Singapore sold large volumes of disk drives to numerous unrelated parties at prices substantially higher than the prices at which it sold the identical disk drives to Seagate Scotts Valley. Petitioner further contends that, if Seagate Singapore had charged Seagate Scotts Valley the average price for a disk drive that Seagate Singapore charged unrelated third parties, Seagate Singapore would have received over $138,188,450 more in income from Seagate Scotts Valley than Seagate Singapore actually received.

Petitioner contends that no adjustments to the uncontrolled sales are needed for differences in the level of market because disk drives were commodities and, as with all commodities, a manufacturer's price to all customers is essentially the same. Petitioner further contends that the facts do not support any realistic volume discount even remotely approaching the prices that Seagate Singapore actually charged Seagate Scotts Valley. Petitioner agrees that volume purchasers tended to receive lower prices, but it contends that the magnitude of such discounts was small. According to petitioner, using the average price at which Seagate Singapore sold disk drives to its three largest unrelated customers produces a setoff of $131,334,495, rather than $138,188,450, or only a 5-percent reduction in the

amount of the setoff based on the average price paid by all customers.

Petitioner argues that the CUP method, as applied by its experts, shows that Seagate Singapore actually undercharged Seagate Scotts Valley for the disk drives; consequently, petitioner claims, Seagate Scotts Valley is entitled to a setoff for the amount of that undercharge as provided in section 1.482–1(d)(3), Income Tax Regs. Petitioner, thus, concludes that the intercompany prices for the completed disk drives were not arm's length, but the prices were not arm's length only in the sense that Seagate Scotts Valley paid too little, rather than too much for the disk drives.

### ii. *Respondent's Position*

Respondent contends that Seagate Scotts Valley acted as the distributor in the United States of disk drives manufactured by Seagate Singapore and that Seagate Scotts Valley should have paid transfer prices for the disk drives equal to the prices that an uncontrolled distributor operating at arm's length would have paid for the disk drives. Respondent argues that Seagate Scotts Valley and Seagate Singapore did not operate at arm's length in their disk drive transactions. Respondent contends that, under Seagate Scotts Valley's pricing scheme, Seagate Singapore was treated as a limited risk supplier enjoying a cost-plus pricing methodology through which its prices were not affected by Seagate Scotts Valley's resale prices. Respondent contends that, for intercompany transactions, Seagate Scotts Valley bore all of the market risk, yet it enjoyed little, if any, of the returns attributable to that risk, and, as a result, Seagate Scotts Valley incurred significant losses on the resale of the Seagate Singapore-produced disk drives.

Respondent argues that the CUP method advanced by petitioner does not derive an arm's-length price for the disk drives which Seagate Scotts Valley purchased from Seagate Singapore. Respondent argues that Seagate Singapore's sales of disk drives to Asian and European customers are not comparable to the intercompany sales in issue because those third party sales were in a different geographic market and at a different level of market. Respondent further contends that the use of those third party sales as comparables would result in gross margin losses to Seagate Scotts Valley and

would effectively eliminate the resale price method from the regulations.

Respondent offered testimony of Dr. Horst in rebuttal to Mr. Holdren's CUP analysis. Dr. Horst disagrees with Mr. Holdren's recommended transfer prices, which are based on a CUP analysis. On the basis of his comparison of prices charged by Seagate Singapore for the ST225 disk drive, Dr. Horst concluded that, if Seagate Singapore had charged Seagate Scotts Valley the same prices which it charged its unrelated customers, Seagate Scotts Valley would have operated at a gross loss in fiscal years ended 1985, 1986, and 1987. He found that situation to be economically untenable.

Dr. Horst concluded that, given the importance of Seagate Scotts Valley as Seagate Singapore's largest customer, he would expect Seagate Scotts Valley to seek, and Seagate Singapore to offer, some accommodation in the pricing of the disk drives to Seagate Scotts Valley to allow a very critical customer of Seagate Singapore to operate at a profit.

Consequently, Dr. Horst concluded that, under such circumstances, some type of resale price method was the only way to determine what price Seagate Singapore would have charged Seagate Scotts Valley at arm's length. According to Dr. Horst, a resale price method is the only way to determine what price Seagate Scotts Valley would need to charge in order to continue to play the critical role that it played for Seagate Singapore. In Dr. Horst's view, differences in geographic markets and levels of market between Seagate Scotts Valley and Seagate Singapore's other customers justify the rejection of the CUP method in the instant case.

### iii. *The Court's Holding as to the CUP Method*

The regulations pertaining to sales of tangible property provide that, under the CUP method, uncontrolled sales are considered comparable to controlled sales if the physical property and the circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales. Alternatively, if complete identity of property and circumstances is not present, the uncontrolled sales will nonetheless be considered comparable if either the differences have no effect on price or the differences have a definite and reasonably ascertainable effect on price which can be reflected by a reasonable number

of adjustments to the price of the uncontrolled sales. Some of the differences which may affect the price of property are differences in the quality of the product, terms of sale, intangible property associated with the sale, time of sale, and the level of the market and the geographic market in which the sale takes place. Whether, and to what extent, a difference in property or circumstance affects price and whether the difference renders an uncontrolled sale noncomparable depends on the particular circumstances and property involved. Sec. 1.482–2(e)(2)(ii), Income Tax Regs. The regulations further provide that, where there are two or more comparable uncontrolled sales susceptible of adjustment, the comparable uncontrolled sale or sales requiring the fewest and simplest adjustments generally should be selected. Sec. 1.482–2(e)(2)(iii), Income Tax Regs. Moreover, uncontrolled sales do not include sales at unrealistic prices, for example, where a member makes uncontrolled sales in small quantities at a price designed to justify a non-arm's-length price on a large volume of controlled sales. Sec. 1.482–2(e)(2)(ii), Income Tax Regs.

That the disk drives involved in petitioner's CUP analysis are identical to the disk drives Seagate Scotts Valley purchased from Seagate Singapore is undisputed. Petitioner, however, has not established that the circumstances involved in the uncontrolled sales are identical to the circumstances involved in the controlled sales. To the contrary, the record establishes that the circumstances between the controlled and uncontrolled sales did vary.

Moreover, petitioner has not shown that the differences in circumstances had no effect on price. Indeed, we are persuaded that differences in the circumstances of the sales of the disk drives, for example, volume of sale, level of market, geographic market, and timing of sale, did play some part in determining the uncontrolled sales prices of the disk drives.

Petitioner uses the weighted average sale price for all third party sales of a particular disk drive model as the comparable price for the controlled sales of that model. Petitioner, however, has not established that the net average sale price paid by all unrelated customers for the applicable disk drive model is a comparable uncontrolled price which satisfies the requirements of section 1.482–2(e)(2), Income Tax Regs.

Contrary to petitioner's contentions, Seagate Singapore's prices to all of its customers were not essentially the same. The average sale prices third party customers paid to Seagate Singapore for identical disk drive models often differed significantly. For example, during 1984 Seagate Singapore sold the ST412 at average net prices ranging from $440 to $343.83; during 1985, Seagate Singapore sold the ST212 at average net prices ranging from $450 to $219.43; during 1986, Seagate Singapore sold the ST225 at average net prices ranging from $1,334.67 to $246; and during 1987, Seagate Singapore sold the ST225 at average net prices ranging from $341.50 to $211.

Moreover, Seagate Singapore apparently sold the same disk drive models at different prices to unrelated customers that presumably were on the same level of market. For example, during 1984, Seagate Singapore sold the ST412 to IBM (Scotland) for average net sale prices of $410.76 and to Wang (Scotland) at average net sale prices of $440; during 1987 Seagate Singapore sold the ST251 to Co. V for average net sale prices of $361, to Co. U for average net sale prices of $412.05, and to Co. T for average net sale prices of $415.99.

Such disparate prices indicate that a number of factors were involved in setting the prices for the uncontrolled sales. We are given no method, however, to identify and quantify the differences in circumstances among the uncontrolled sales, let alone the differences in circumstances between the uncontrolled sales and the controlled sales. If the effect of the different circumstances on the sale price cannot be quantified, the CUP method cannot be applied. Sec. 1.482–2(e)(2), Income Tax Regs.

Presumably, controlled sales occurred throughout the applicable fiscal year, but it is not clear that disk drive sales to a significant portion of the third party purchasers occurred in a similar manner. The prices for disk drives generally were falling rapidly. Consequently, we would expect that differences in the timing of the sale would have a definite effect on price. Petitioner, however, uses the weighted average net sale prices for uncontrolled sales occurring at unknown times throughout Seagate Scotts Valley's fiscal year to derive the comparable uncontrolled price for each disk drive model, but makes no adjustments for differences in timing. Nonetheless,

petitioner offers no proof establishing that the differences in the timing of the sales had no effect on the disk drive sale prices.

Seagate Scotts Valley offered reduced prices to volume purchasers. Again, the record fails to disclose a method to quantify the effect on price of those volume discounts.

Petitioner has not shown that the differences in circumstances can be reflected by a reasonable number of adjustments to the price of the uncontrolled sales. The average net sale prices alone do not disclose the reasons for the differences in prices; as a result, Mr. Holdren apparently just ignored those differences. There is no evidence that Mr. Holdren attempted to identify among the numerous sales to unrelated customers one or more comparable uncontrolled sales with identical or sufficiently similar circumstances to the controlled sales so that a few simple adjustments to the uncontrolled sale price could be made to arrive at a comparable sale price for the completed disk drives. Sec. 1.482–2(e)(2)(iii), Income Tax Regs. The inference we draw from the failure to identify such comparable transactions is that there are none. Accordingly, we conclude that under the circumstances of the instant case petitioner's averaging methodology is not a reasonable procedure for deriving comparable prices. Consequently, petitioner has not carried its burden of proving that it is entitled to a setoff against any other section 482 reallocation for the years in issue as a result of the difference in prices Seagate Singapore charged Seagate Scotts Valley and the prices it charged unrelated customers.

b. *The Resale Price Method*

Under the resale price method, the arm's-length price of a controlled sale is equal to the applicable resale price reduced by an appropriate markup percentage, with adjustments, if needed. The appropriate markup is computed by multiplying the applicable resale price by the appropriate markup percentage. Sec. 1.482–2(e)(3)(i), Income Tax Regs.

The applicable resale price is generally the price at which the property is resold by the buyer in an uncontrolled sale. Sec. 1.482–2(e)(3)(iv), Income Tax Regs. The appropriate markup percentage is the gross profit percentage, relative to sales, earned by a reseller on property that is both purchased

and resold in an uncontrolled transaction, if the resale is sufficiently similar to the controlled sale. Sec. 1.482–2(e)(3)(vi), Income Tax Regs.

Characteristics important to the similarity of resales include the type of property involved in the sale; the functions performed by the reseller, examples being "packaging, labeling, delivering, maintenance of inventory, minor assembly, advertising, selling at wholesale, selling at retail, billing, maintenance of accounts receivable, and servicing"; the effect on price of any intangible property used by the reseller in connection with the sale; and the geographic market in which the functions are performed by the reseller. Sec. 1.482–2(e)(3)(vi), Income Tax Regs. Close physical similarity of the property is not required under the resale price method. The important consideration is the probable effect on the markup percentage of any differences between the characteristics involved in the uncontrolled transactions and the characteristics involved in the controlled sales. *Id.*

In calculating the markup percentage earned on uncontrolled transactions and in applying such percentage to the applicable resale price to determine the appropriate markup, the same elements that enter into the computation of the sale price and the cost of goods sold of the uncontrolled transactions should be used in the computation of the sale price and the cost of goods sold of the controlled transactions. Sec. 1.482–2(e)(3)(viii), Income Tax Regs.

In calculating an arm's-length price under the resale price method, adjustments should be made to reflect material differences between the uncontrolled transactions used to calculate the appropriate markup percentage and the resales of property involved in the controlled sale. Sec. 1.482–2(e)(3)(ix), Income Tax Regs. The differences which require adjustments are those differences in functions or circumstances that have a definite and reasonably ascertainable effect on price. *Id.*

The uncontrolled transactions must be made within a reasonable time before or after the controlled sales. Generally, for the resale method to be applicable, the reseller may not add more than an insubstantial amount to the value of the property by physically altering the product before resale or by the use of intangible property. Sec. 1.482–2(e)(3)(ii), Income Tax Regs. Nonetheless, even where the

reseller has added more than an insubstantial amount to the value of the property, the resale price method generally is more appropriate than the cost-plus method when the functions performed by the seller are more extensive and more difficult to evaluate than the functions performed by the reseller. Sec. 1.482–2(e)(3)(iii), Income Tax Regs.

In the absence of data on markup percentages of particular sales or groups of sales, the prevailing markup percentage in the particular industry involved may be appropriate. Sec. 1.482–2(e)(3)(vii), Income Tax Regs.

### i. *Respondent's Resale Price Method*

Respondent contends that Dr. Frisch uses the resale price method, described in section 1.482–2(e)(3), Income Tax Regs., in his expert report, to derive the reasonable gross profit margins Seagate Scotts Valley would have earned on the resale of the Seagate Singapore-produced disk drives had Seagate Scotts Valley been dealing with Seagate Singapore at arm's length. Dr. Frisch then uses those gross profit margins to derive his estimate of reasonable transfer prices for the disk drives Seagate Scotts Valley purchased from Seagate Singapore. Respondent offers the difference between the transfer prices calculated by Dr. Frisch and the transfer prices actually paid by Seagate Scotts Valley for those disk drives as respondent's adjustment under section 482 pertaining to Seagate Scotts Valley's resale of the disk drives.

Respondent contends that Dr. Clowery's adjustments to arrive at the gross margin percentages for Seagate Scotts Valley are mandated by section 1.482–2(e)(3)(viii), Income Tax Regs., which requires that, under the resale price method, the same elements be used in computing the cost of goods sold of the controlled and the uncontrolled resale transactions. Dr. Frisch postulates that the gross margin percentages for Seagate Scotts Valley computed by Dr. Clowery were calculated on the same basis and using the same accounting rules as the gross margin percentages Dr. Frisch calculated for the 10 comparable companies because the financial data for the independent companies was taken from the Form 10–K reports and similar SEC filings and Dr. Clowery's starting point for his calculations is the data Seagate Scotts Valley used in preparing its Form 10–K reports. Dr. Frisch starts with the premise that the SEC

requires financial statements filed with it to comply with Generally Accepted Accounting Principles (GAAP). He further believes that GAAP requires companies to calculate cost of goods sold under a full absorption costing method which would incorporate both inventoriable and noninventoriable expenses in cost of goods sold. Dr. Frisch then assumes that all of the companies he selected as comparable complied with GAAP and further that they all allocated to cost of goods sold the identical types of costs that Dr. Clowery allocated in his calculation of Seagate Scotts Valley's cost of goods sold.

Petitioner's principal position is that there is no legal or factual support for the allocations Dr. Clowery made to calculate the gross margins Seagate Scotts Valley earned from sales of Seagate Singapore-produced disk drives and Seagate Scotts Valley-produced disk drives; Dr. Clowery's allocations are unreasonable; and, consequently, Dr. Frisch's results are unreasonable.

Petitioner argues that Dr. Frisch does not use the resale price method described in section 1.482–2(e)(3), Income Tax Regs. Petitioner contends that, had Dr. Frisch followed section 1.482–2(e)(3)(i), Income Tax Regs., then multiplied the resale prices Seagate Scotts Valley received from third parties by the gross margins he computed for Micro D, and next compared the results to the intercompany transfer prices Seagate Scotts Valley actually paid to Seagate Singapore, such comparison would show that Seagate Singapore undercharged Seagate Scotts Valley for the disk drives.

Petitioner contends that Dr. Frisch does not apply the appropriate markup percentages to Seagate Scotts Valley's actual resale prices as required by section 1.482–2(e)(3)(vi), Income Tax Regs.; instead, he compares the gross profit margins calculated for Micro D to the gross profit margins that Dr. Clowery estimated Seagate Scotts Valley earned on the resale of disk drives and then Dr. Frisch allocates income to Seagate Scotts Valley in an amount sufficient to equalize Seagate Scotts Valley's adjusted gross margins with the gross margins of Micro D. Petitioner contends that, without Dr. Clowery's allocation of Seagate Scotts Valley's cost of goods sold between Seagate Singapore- and Seagate Scotts Valley-produced disk drives, there would be no section 482 reallocation relating to the resale of the Seagate Singapore-produced disk drives. Petitioner disputes respondent's posi-

tion that the regulations require the allocations to cost of goods sold made by Dr. Clowery.

Petitioner argues that section 1.482–2(e)(3)(viii), Income Tax Regs., was never intended to encompass the type or extent of allocations made by Dr. Clowery. According to petitioner, section 1.482–2(e)(3)(viii), Income Tax Regs., should be limited to minor differences between resellers; i.e., freight or packaging expenses.

Petitioner further argues that respondent has not shown that the companies selected by Dr. Frisch as comparables allocated the same type of expenses to cost of goods sold in calculating their gross profit as Dr. Clowery allocated to the Seagate Singapore-produced disk drives or that Dr. Clowery properly allocated to the Seagate Singapore-produced disk drives cost of goods sold expenses relating only to Seagate Scotts Valley's distribution functions pertaining to those disk drives. Petitioner's position is that when a company such as Seagate Scotts Valley performs both manufacturing and distribution functions, Dr. Clowery's formulary approach will inappropriately allocate manufacturing costs to the distribution functions; consequently, if any allocations are required, petitioner contends that they must be made only for precisely identified distribution costs. In sum, petitioner argues that respondent's proposed adjustment, which is based on allocated manufacturing and distribution costs, does not comply with the resale price regulations.

ii. *The Court's Holding as to Respondent's Resale Price Method*

Because we agree with petitioner that no factual support exists in the record for the allocations made by Dr. Clowery, we do not need to address petitioner's interpretation of section 1.482–2(e)(3)(viii), Income Tax Regs.

In calculating the gross profit percentage Seagate Scotts Valley earned on the resale of the Seagate Singapore-produced disk drives, Dr. Frisch relied on certain allocations Dr. Clowery made to compute the cost of sales of the Seagate Singapore-produced disk drives. Dr. Clowery made some of those allocations so that the cost of sales for those Seagate Singapore-produced disk drives presumably would contain the same elements as the cost of sales of the products sold

by the purported comparable companies. See sec. 1.482–2(e)(3)(viii), Income Tax Regs.

Dr. Frisch relies on Dr. Clowery's report for information as to the cost of sales Seagate Scotts Valley would have incurred had it simply distributed the disk drives produced by Seagate Singapore. He, however, concedes that if the cost of sales Dr. Clowery allocated to the Seagate Singapore-produced disk drive includes an extensive amount of manufacturing costs, then Dr. Frisch's selected companies would no longer be comparable since he would be comparing a manufacturer and reseller to resellers only.

Dr. Clowery concedes that he possibly allocated some manufacturing expenses to the cost of sales for the disk drives Seagate Scotts Valley purchased from Seagate Singapore. Indeed, from our review of Dr. Clowery's allocation method as described in his report, we conclude that, in all probability, Dr. Clowery allocated a significant portion of Seagate Scotts Valley's manufacturing costs to the cost of sales for the Seagate Singapore-produced disk drives.

Dr. Frisch attempted to restrict his search for comparables to companies which were involved only in distribution functions. Under normal circumstances, a company involved in distribution would not be expected to incur manufacturing-related costs. Consequently, as a result of the allocations to cost of sales made by Dr. Clowery, we are not convinced that the gross profit percentages Dr. Frisch calculated for the 10 companies he selected as comparables constitute a comparable markup percentage for Seagate Scotts Valley's distribution functions relating to the Seagate Singapore-produced disk drives. See sec. 1.482–2(e)(3)(viii), Income Tax Regs.

Consequently, respondent has failed to persuade us that the transfer prices propounded by Dr. Frisch for the completed disk drives are reasonable. Accordingly, we do not address the other arguments advanced by petitioner against the resale price method used by respondent's experts.

### iii. *Petitioner's Resale Price Method*

Petitioner contends that, to calculate the transfer price of the completed disk drives, respondent used the sale price less purchase price stated in the Co. W distribution agreement to estimate the 20-percent gross margin used in the notices of

deficiency. Petitioner contends that, in his report, Mr. Broadhurst used the same method to show that Seagate Scotts Valley generally received a gross margin for the disk drives greater than 20 percent. Petitioner claims that evidence that Seagate Scotts Valley's actual resale margins exceed the margins earned by Co. X, Co. A, and others, including Seagate Scotts Valley's sales representatives, shows that a correct application of the resale method would produce no adjustment.

Respondent counters that Mr. Broadhurst's method renders a "bare bones" cost of goods sold. Respondent contends that Dr. Frisch used financial statements filed with the SEC to obtain his data about the 10 companies he selected as comparables; the SEC requires financial statements to be prepared using the full absorption costing method; under the full absorption costing method other expenses in addition to the purchase price of the product are included in the cost of goods sold of that product; consequently, the cost of goods sold for the products sold by the 10 companies includes other expenses in addition to the purchase price; Mr. Broadhurst does not include other expenses in the cost of goods sold he calculated for the Seagate Singapore-produced disk drives; consequently, Mr. Broadhurst has understated the cost of goods sold for those disk drives and, correspondingly, has overstated the gross margins Seagate Scotts Valley earned on the resale of the Seagate Singapore-produced disk drives. Consequently, respondent argues, it is misleading and inaccurate to compare the gross margins of the 10 companies to the gross margins calculated by Mr. Broadhurst.

Respondent further argues that the notices of deficiency did not apply Co. W's estimated 20-percent gross margin percentage to Seagate Scotts Valley's resale prices to calculate the section 482 reallocation relating to the resale of the completed disk drives Seagate Scotts Valley purchased from Seagate Singapore. Instead, respondent contends that the notices of deficiency used Seagate Singapore's third party prices to attempt to reconstruct the Seagate Scotts Valley resale prices. Additionally, respondent contends that petitioner has not shown that the Co. W, Co. A, or sales representative agreements are comparable transactions to Seagate Scotts Valley's resales of the Seagate Singapore-produced disk drives.

iv. *The Court's Holding as to Petitioner's Resale Price Method*

As we view the instant case, Mr. Broadhurst's resale price method also does not conform to section 1.482–2(e)(3), Income Tax Regs. Mr. Broadhurst uses average third party prices as calculated by Mr. Holdren to compute Seagate Scotts Valley's "actual" gross margin percentage. We have already explained why we find such third party prices unreliable. Moreover, petitioner compares the gross margin percentages Mr. Broadhurst calculated for the Seagate Singapore-produced disk drives to the gross margin that Co. X hoped to earn from the resale of Seagate Scotts Valley's disk drives. Petitioner has presented no evidence of the actual gross margin percentages that Co. X earned during the years in issue. Additionally, the record does not establish the amount of the gross margins earned by Seagate Scotts Valley's sales representatives or that the gross margins can serve as comparable markup percentages. Although there is some evidence in the record of the gross margins earned by Co. A, we do not rely on that data because there is an indication that for some part of the years in issue Co. A sold products at reduced rates in order to increase Co. A's market share. Consequently, we reject the resale price analysis propounded by petitioner.

c. *The Court's Holding as to the Arm's-Length Transfer Prices for the Disk Drives*

We have concluded that petitioner has failed to establish that Mr. Holdren's CUP analysis results in reasonable transfer prices for the Seagate Singapore-produced disk drives. We also have concluded that the record does not contain any basis from which to compute a comparable markup percentage for those disk drives under the resale price analysis advanced by Dr. Frisch or by Mr. Broadhurst. Additionally, we have concluded that the record does not contain information from which we could derive a reasonable transfer price under the cost-plus method described in the regulations. Consequently, we make our best estimate as to the appropriate transfer price for the disk drives on the basis of the available record. *Sundstrand Corp. v. Commissioner,* 96 T.C. 226, 375 (1991).

We begin by noting that Seagate Singapore's third party sales of disk drives were substantial in frequency and volume. Seagate Singapore sold the same disk drive models to Seagate Scotts Valley that it sold to third party customers. It would appear reasonable to conclude that the comparable uncontrolled price method should be appropriate for the instant case. The record, however, does not establish whether the circumstances surrounding any of the third party transactions were sufficiently similar to the circumstances involved in the controlled sales. Consequently, we are unable to consider the third party sale prices, after any reasonable adjustments, as comparable uncontrolled prices. Nonetheless, we believe that the third party transactions can be used as a base line for determining the reasonable transfer prices for the Seagate Singapore disk drives. See *U.S. Steel Corp. v. Commissioner*, 617 F.2d 942 (2d Cir. 1980), revg. T.C. Memo. 1977–290 and T.C. Memo. 1977–140; *Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525 (1989), affd. 933 F.2d 1084 (2d Cir. 1991).

The disk drive market was highly competitive and generally experiencing rapidly declining prices. Some disk drive customers, in particular IBM, could and did exert strong pressure on Seagate Scotts Valley and its competitors to reduce prices. Seagate Scotts Valley was an important customer to Seagate Singapore. Yet, there is no evidence that Seagate Singapore made any adjustment to the prices charged to Seagate Scotts Valley to reflect the market conditions—the sale prices to Seagate Scotts Valley remained at Seagate Singapore's standard cost plus a 25-percent markup.

Some of Seagate Scotts Valley's customers demanded that they receive sale prices at least equal to or lower than the lowest sale prices charged to unrelated customers for similar quantities of products of like quality. Under the circumstances revealed by the record in the instant case, we believe that, if Seagate Singapore had been operating at arm's length, it would have accommodated a demand by Seagate Scotts Valley for sale prices for the disk drives at least equal to or lower than the lowest average net sale prices paid by Seagate Singapore's other customers.

We hold, using our best judgment, *Cohan v. Commissioner*, 39 F.2d 540, 543–544 (2d Cir. 1930), that for each year in issue the reasonable transfer price for each disk drive model

in issue is the lower of (1) the actual transfer price Seagate Singapore charged Seagate Scotts Valley for the particular disk drive model during the year the disk drive was transferred or (2) the lowest average sale price Seagate Singapore charged to an unrelated customer for that disk drive model during that year, minus the warranty adjustment calculated by Mr. Holdren. Consequently, the transfer prices for the disk drive models listed below are reduced to the specified amounts for the following years:

### 1985

| Model | Transfer price |
|-------|---------------:|
| ST212 | $215.43 |
| ST412 | 197.83 |

### 1986

| Model | Transfer price |
|-------|---------------:|
| ST212 | $212.75 |
| ST238 | 255.00 |
| ST4026 | 390.09 |
| ST412 | 186.00 |

### 1987

| Model | Transfer price |
|-------|---------------:|
| ST4096 | $533.62 |

We also hold that the transfer prices for the other disk drive models in issue need not be adjusted for the years in issue.

d. *The Price Allowance and Allowance for Seagate Singapore's Marketing Activities Allowed by Respondent in the Notices of Deficiency*

i. *The Price Allowance*

Petitioner argues that, although at trial respondent's experts used a different methodology than the methodology Dr. Chou used in determining the arm's-length compensation

Seagate Scotts Valley would have received for marketing the disk drives it purchased from Seagate Singapore, Seagate Scotts Valley still is entitled to an offset against the transfer price adjustment for disk drives in an amount equal to the price allowance allowed by Dr. Chou. We do not agree.

We are convinced that the offset for price allowance computed by Dr. Chou was a "plug" amount, totally dependent on the method Dr. Chou used to compute the section 482 reallocations for the value of the services rendered by Seagate Scotts Valley in marketing the Seagate Singapore-produced disk drives. We have rejected Dr. Chou's methodology as unreasonable. The price allowance, consequently, is no longer applicable.

### ii. *The "Offset" for Seagate Singapore's Marketing Activities*

In the notices of deficiency, purportedly to account for any nominal marketing activities by Seagate Singapore and any costs incurred by Seagate Singapore in making disk drive sales, respondent "allocated" to Seagate Singapore an amount equal to 1 percent of the disk drive sales made by Seagate Singapore. The "allocation" to Seagate Singapore had the effect of reducing the amounts respondent reallocated to Seagate Scotts Valley under section 482. The record establishes that the amount "allocated" to Seagate Singapore for its marketing activities was also a "plug" amount and totally dependent on the method respondent used to compute the section 482 reallocations reflected in the notices of deficiency. Because we do not rely on that methodology in determining the reasonable transfer prices for the disk drives in issue, the "allocation" for Seagate Singapore's possible marketing activities also is no longer applicable.

### VI. ISSUES 5 AND 6

*Issue 5.* Whether Seagate Singapore paid Seagate Scotts Valley arm's-length royalties for the use of certain intangibles.

*Issue 6.* Whether the royalty fee Seagate Singapore paid Seagate Scotts Valley for disk drives covered under a section 367 private letter ruling applies to all such disk drives

shipped to the United States, regardless of where title passed.

## A. FINDINGS OF FACT

### 1. *General Background Information*

The disk drive industry in which Seagate Scotts Valley's products compete is characterized by rapid technological development which generally hastens the relative obsolescence of products. Price, quality, and ability to deliver required volumes in a timely manner are critical factors which customers take into account when making disk drive purchasing decisions. OEM customers, furthermore, generally source disk drives simultaneously from more than one supplier.

Seagate Scotts Valley has a significant share of the low-end disk drive market and is considered to be the leader of that market. Seagate Scotts Valley's ability to produce low-cost, quality products in high volume allows it to enter into major purchasing contracts (master contracts) with leading personal computer OEM customers, which gives Seagate Scotts Valley a significant advantage over other disk drive manufacturers. Seagate Scotts Valley's contracts with its OEM customers were not transferred to Seagate Singapore. The agreements between Seagate Scotts Valley and its OEM customers have no formal novations for the benefit of Seagate Singapore.

Disk drive manufacturers and their customers do not typically enter into long-term agreements with each other; a contract does not guarantee a disk drive manufacturer a given volume of sales. Customers generally commit to purchasing disk drives only through the issuance of purchase orders, and have been known to increase, decrease, and even cancel commitments made by purchase order when necessary to cope with a volatile market. Some OEM master contracts provide, however, a cancellation charge of varying amounts depending on the proximity of the receipt of the cancellation notice to the required delivery date. The cancellation charge in some instances includes reimbursement to Seagate Scotts Valley of the cost of materials, labor, and a reasonable profit on the materials and labor costs, or a stated percentage of the contract price.

IBM's facility at Boca Raton, Florida (IBM-Boca Raton), acts as a focal point for the ordering of all disk drives for IBM locations worldwide. Each IBM location requiring hard disk drives (the using IBM site) sends its request to IBM-Boca Raton, which in turn communicates those needs to Seagate Scotts Valley. It in turn responds to IBM-Boca Raton with information on Seagate Scotts Valley's ability to meet those needs. IBM-Boca Raton then communicates Seagate Scotts Valley's capacity to the using IBM sites. Those IBM locations in turn process intercompany purchase requisitions to IBM's international procurement office in Singapore (IBM-IPO), which then issues purchase orders for the drives to Seagate Singapore. IBM-IPO has no purchasing power on its own—it acts only on behalf of the using IBM site. IBM-IPO cannot issue a purchase order for disk drives to Seagate Singapore without an authorizing document from the using IBM site. For each purchase order, Seagate Singapore ships the disk drives f.o.b. shipping point (f.o.b. Singapore) directly to the IBM final destination but sends the invoice to IBM-IPO.

At the time Seagate Scotts Valley's management decided to manufacture disk drives offshore, they anticipated that Seagate Singapore would manufacture all of the high-volume disk drive models.

During the early years of its existence, Seagate Scotts Valley entered into some licensing agreements involving its know-how, including patents. Seagate Scotts Valley entered into those agreements because, as a young company, it needed to raise capital. Additionally, Seagate Scotts Valley's management believed that licensing its technology was a way of "growing" the disk drive market.

## 2. Seagate Scotts Valley and Seagate Singapore Agreements

### a. The Property Transfer Agreement

Under a property transfer agreement, undated but stated to be effective September 30, 1983 (the property transfer agreement), Seagate Scotts Valley gave and transferred to Seagate Singapore:

2.1 * * * the exclusive right in perpetuity of all * * * [Seagate Scotts Valley's] rights in the property described in Section 1.1 [see *infra*] for use within the Country and Territory of Singapore and Southeast Asia.

2.2 * * * the exclusive right in perpetuity of all its rights in the property described in Sections 1.2, 1.3 and 1.4 [see *infra*] to make[,] use and sell within the country and territory of Singapore and the right to sell (other than in the United States) the products or specific successor products emanating from the use of the above property.

2.3 * * * the limited right and privilege to sell products emanating from the property described in Sections 1.2, 1.3 and 1.4 [see *infra*] back into the United States. However, the exclusive right to use the technology and make products in the United States is retained by * * * [Seagate Scotts Valley].

The property referenced in the property transfer agreement included proprietary property, disk drive technology, and know-how, described as follows:

1.1 The term "Proprietary Property" means the corporate name, logos, trademarks, trade names, goodwill and going concern value including contracts, leases, and all other intangible property necessary for the full utilization of the technology.

1.2 The term Disc Drive "technology" includes the technology defined in Exhibit A [13] and the related "know-how" described in Section 1.3.

1.3 The term "know-how" means all engineering, manufacturing and operating information relating to the use and application of the disc drive technology, including, but not limited to drawings, blue prints, design sheets, service manuals, instruction booklets and material specifications including formulas, photographs and similar data and all such design and specifications relating to the technology.

1.4 The terms Disc Drive "technology" and "know-how" also include enhancements developed through December 31, 1985, to the extent approval to transfer is granted by the IRS in a ruling under Section 367 of the Internal Revenue Code.

Under the property transfer agreement, the property specified in sections 2.1 and 2.2 was transferred as a contribution to capital of Seagate Singapore, without the issuance of stock or other consideration. Additionally, Seagate Singapore agreed to pay Seagate Scotts Valley, for the limited right and privilege delineated in section 3.2, "a pseudo royalty better described as a sales commission or allowance in the amount of 1% on sales back into the United States of products utilizing the property described in Section 1.2, 1.3 and 1.4".

---

[13] Exhibit A to the property transfer agreement describes Seagate Scotts Valley's models ST412, ST212, and ST225. The ST212 process is described as an enhancement of the base process technology of the ST412. The ST225 process is described as featuring additional enhancements to the base process technology of the ST412.

Seagate Scotts Valley's trademarks were applied to all of Seagate Scotts Valley's disk drive products and all advertising for Seagate Scotts Valley's products contained its trademark regardless of where the disk drive products were manufactured. Seagate Singapore used Seagate Scotts Valley's logos and tradenames in its sales to third party customers. No patents resulted from work done by Seagate Singapore personnel during the years in issue.

Seagate Scotts Valley and Seagate Singapore entered into the property transfer agreement sometime between May 3, 1984, and August 3, 1984. The 1-percent royalty rate was determined sometime during that period.

b. *The Royalty Agreement*

Under a royalty agreement entered into on July 2, 1985, but deemed to take effect from September 30, 1983 (the royalty agreement), Seagate Scotts Valley gave Seagate Singapore:

non-exclusive rights (a) to use the disc drive technology, (b) to use and/or sell the products obtained by said disc drive technology and (c) to use the know-how relating to said disc drive technology.* * *

For purposes of the royalty agreement, disk drive technology and know-how are described as follows:

2.1 The term disc drive technology means a technology which is defined in Exhibit A attached hereto.[14]

2.2 The term "know-how" means all engineering, manufacturing and operating information relating to the use and application of the disc drive technology and the use of the disc drive technology including but not limited to drawings, blue prints, design sheets, material specifications including formulae, photographs and similar data and all such designs and specifications relating to the technology.

Seagate Scotts Valley also agreed to disclose to Seagate Singapore, for use in connection with the disk drive technology, all of the know-how which Seagate Scotts Valley then possessed or might acquire through December 31, 1984, or such later date as the parties might mutually agree on.

Under the royalty agreement, Seagate Singapore agreed to pay Seagate Scotts Valley a royalty of 1 percent based on

---

[14] Exhibit A of the royalty agreement is identical to exhibit A of the property transfer agreement.

sales into the United States of products using the disk drive technology in exchange for the rights granted and the disclosure of know-how and the giving of such technical assistance that may be incidental to the rights and know-how.

The royalty agreement did not supersede the property transfer agreement. Seagate Singapore's accounting firm prepared the royalty agreement for purposes relating to Singapore taxation issues.

c. *The Marketing Agreement*

On August 22, 1986, Seagate Scotts Valley and Seagate Singapore entered into a marketing agreement (the marketing agreement) which was made effective as of February 27, 1985. Under the marketing agreement, Seagate Scotts Valley agreed to furnish to Seagate Singapore sales and marketing assistance, described as including sales effort, marketing surveys and analyses, identification of product requirements and state of technology in the United States, and assistance in negotiating sales and contracts with customers. In exchange, Seagate Singapore agreed to pay Seagate Scotts Valley a sales and marketing commission of 5 percent on all of its third party sales, excluding sales to distributors in Southeast Asia, the Indian Subcontinent, and the China Basin. The stated objective of the marketing agreement was to minimize or avoid a duplication of sales and marketing efforts and expenses which might arise as a result of the parties' agreement authorizing Seagate Singapore's sale of disk drives into the U.S. marketplace. The purpose of the marketing agreement was to reimburse Seagate Scotts Valley for certain marketing services it would provide to Seagate Singapore, particularly during the early phases of the startup of marketing activities in the Far East.

Seagate Singapore paid to Seagate Scotts Valley the following amounts as marketing commissions under the marketing agreement:

| Year | Amount |
|------|--------|
| 1984 | $1,194,000 |
| 1985 | 4,971,000 |
| 1986 | 8,615,000 |
| 1987 | 20,259,000 |
| Total | 35,039,000 |

## 3. *The Ruling Request and Private Letter Ruling*

### a. *The Request*

On March 27, 1984, Seagate Scotts Valley requested a ruling from respondent that Seagate Scotts Valley's transfer of property to Seagate Singapore was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes within the meaning of section 367(a) (the ruling request). In the ruling request Seagate Scotts Valley represented, among other things, the following:

The proposed transaction is principally a contribution of capital from Seagate [Scotts Valley] to its wholly owned Subsidiary [Seagate Singapore]. The capital contribution consists primarily of the process technology related to the Winchester disc drive, to enable Subsidiary to establish a complete disc drive manufacturing facility. It is anticipated that Subsidiary will sell directly to Original Equipment Manufacture (OEM) customers located outside the United States, however Subsidiary may also sell its product back to OEM customers in the United States.

On September 30, 1983, valuable Winchester disc drive base technology was transferred to Subsidiary in the form of complete "process instructions" and "inspection instructions" essential for successful manufacture of the complete Winchester disc drive.* * *

\* \* \* \* \* \* \*

The transfer of Technology and other property by * * * [Seagate Scotts Valley to Seagate Singapore] is pursuant to an agreement between * * * [Seagate Scotts Valley and Seagate Singapore]. Subject to the conditions of said agreement, it is provided that * * * [Seagate Scotts Valley] transfer to Subsidiary in perpetuity certain specific rights retained by * * * [Seagate Scotts Valley] in the Technology including all enhancements to that Technology through December 31, 1985. The rights granted to Subsidiary include all rights retained by Seagate [Scotts Valley] to the manufacturing rights in Singapore to the Technology. * * * [Seagate Scotts Valley] also grants to Subsidiary the right to sell products outside Singapore (other than the United States) manufactured in Singapore by use of the Technology to the extent that such rights do not contravene any rights previously granted to other unrelated parties through executed license agreements. All royalty rights of * * * [Seagate Scotts Valley] relating to the rights previously granted to unrelated parties will be retained by * * * [Seagate Scotts Valley]. The income stream associated with these rights will not be transferred to Subsidiary.

For all sales made by Subsidiary within the United States, provision will be made for payment of specified royalties based on an arms length determination of the fair value of the license rights entitling Subsidiary to sell products within the United States which have been manufactured by Subsidiary as a result of the transferred technology.

b. *The Private Letter Ruling*

On February 27, 1985, respondent issued a section 367 ruling (the section 367 private letter ruling), concerning, among other things,[15] the transfer of the manufacturing know-how and related intangibles from Seagate Scotts Valley to Seagate Singapore. In the section 367 private letter ruling respondent determined that the transfer of property before January 1, 1985, by Seagate Scotts Valley to Seagate Singapore was in constructive exchange for Seagate Singapore's stock of equal value and was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes within the meaning of section 367(a). The section 367 private letter ruling did not cover transfers of technology, specifically enhancements to the know-how transferred in 1984, occurring after December 31, 1984.

The section 367 private letter ruling noted that

With regard to sales within the United States by Subsidiary of products manufactured by Subsidiary as a result of the transferred know how, * * * [Seagate Scotts Valley] entered into a license agreement providing for payment of an arm's length royalty to * * * [Seagate Scotts Valley]. Subsidiary has sold its product in the United States to both * * * [Seagate Scotts Valley] and unrelated customers. Subsidiary has made royalty payments to * * * [Seagate Scotts Valley] at the rate of one percent of the sales price on all such sales.

The section 367 private letter ruling, however, cautioned that

No opinion is expressed as to whether any of the sections of the Code specifically enumerated in section 367(a)(1) of the Code is applicable to the transfers * * *. Further, no opinion is expressed as to whether the provisions of section 482 of the Code may require a reallocation of income or expenses between * * * [Seagate Scotts Valley] and Subsidiary * * * to reflect the value of the royalty payments due * * * [Seagate Scotts Valley] by virtue of Subsidiary's * * * sales into the United States.

---

[15] On May 29, 1984, petitioner requested a second ruling pursuant to secs. 367 and 368(a)(1)(D). This second ruling requested that a proposed transfer of assets from Seagate Technology Singapore, Pte. Ltd. (Seagate Singapore) to Seagate Technology International (Seagate Cayman Islands) was not in pursuance of a plan having as one of its principal purposes the avoidance of income tax within the meaning of sec. 367(a). Respondent's ruling on the May 29, 1984, request also is contained in the Feb. 27, 1985, sec. 367 private letter ruling. Seagate Singapore did not transfer assets to Seagate Cayman Islands during the years in issue. Seagate Singapore later transferred assets to Seagate Cayman Islands and was liquidated on Sept. 27, 1989.

## 4. *Royalties Paid*

Seagate Singapore began manufacturing the ST412, ST212, and ST225 during approximately December 1983, June 1984, and November 1984, respectively. By December 31, 1984, Seagate Singapore had manufactured over 400,000 disk drives using Seagate Scotts Valley's disk drive technology. Seagate Singapore discontinued production of the ST412 by September 30, 1986. It discontinued production of the ST212 by June 30, 1986.

Seagate Singapore paid Seagate Scotts Valley a royalty of 1 percent of the sale price on certain sales of disk drives for the technology transferred to Seagate Singapore before January 1, 1985. Seagate Singapore generally paid the royalty to Seagate Scotts Valley on direct sales to Seagate Scotts Valley but not on sales "f.o.b. Singapore" with shipment destinations into the United States. Seagate Scotts Valley, however, did receive a royalty on some sales that were f.o.b. Singapore during the year ended June 30, 1984, and possibly in other taxable years.

Seagate Singapore paid Seagate Scotts Valley the following amounts as royalty payments for the disk drive technology it transferred to Seagate Singapore before January 1, 1985:

| Period ended | Amount |
|---|---|
| June 30, 1984 | $436,000 |
| June 30, 1985 | 757,000 |
| June 30, 1986 | 2,710,000 |
| June 30, 1987 | 2,972,000 |
| Total | 6,875,000 |

## 5. *Third Party Licensing Agreements*

### a. *Co. R and Co. S*

During April 1980, Seagate Scotts Valley and its founders entered into an agreement with Co. R, a manufacturer of rigid and flexible disks and disk packs, and Co. S. At that time, Co. S was in the process of developing thin-film heads for use in connection with high capacity rigid disk drives. Under the agreement, Cos. R and S agreed to give Seagate Scotts Valley a limited exclusive right to use Co. S's thin-film heads in connection with the "Shugart Drive" (apparently the ST503 and ST506 models) in exchange for a royalty-free,

nonassignable, worldwide, nonexclusive license to manufacture and sell rigid disk drives using Seagate Scotts Valley's rights and technology, but only for inclusion in products or systems manufactured or sold by Co. R and its subsidiaries. The agreement asserts that "Primary development goals are to have optimized demonstration units of the Shugart Drive by May 19, 1980".

Additionally, under that agreement Co. R agreed to fund, up to a total of $437,640, Seagate Scotts Valley's development of the Shugart Drive. Co. R also obtained, for $1,000, a warrant to purchase 2,861,538 shares of Seagate Scotts Valley's common stock at a purchase price of 1 cent per share. Under specified conditions, the agreement further guaranteed Co. R, after exercise of the warrant, and depending on the amount of voting rights owned by Co. R, one to two seats (out of a total of five seats) on Seagate Scotts Valley's board of directors, plus the right to approve the fifth director. Additionally, Co. R obtained certain rights of first refusal on additional issuances or transfers of securities by Seagate Scotts Valley or Seagate Scotts Valley's founders. Co. R further agreed to lend to Seagate Scotts Valley's founders a total of $100,000, which the founders then were to contribute to Seagate Scotts Valley's capital. Additionally, under specified conditions, Co. R agreed to lend to Seagate Scotts Valley up to $125,000 per month for Seagate Scotts Valley to continue development work and meet operating expenses and to prepare for manufacturing.

Furthermore, under the agreement, Cos. R and S appointed Seagate Scotts Valley, if certain conditions were met, for a 2-year period, as the exclusive distributor to incorporate and sell thin-film heads developed and supplied by Co. S for OEM applications in rigid disk drives using certain disks.

b. *Texas Instruments, Inc.*

On July 3, 1980, Seagate Scotts Valley entered into a licensing agreement with Texas Instruments, Inc. (TI), an unrelated U.S. manufacturer. Under that agreement Seagate Scotts Valley gave TI, among other things, the nonexclusive right to manufacture, use, and sell the ST506 throughout the world, except for 3 years in Japan, in exchange for a fixed payment of $1,750,000, payable in four separate install-

ments. Seagate Scotts Valley also agreed to provide, at no charge except travel expenses, consultation services and training for TI's employees. Seagate Scotts Valley further agreed to sell a specified number of ST506's to TI at a reduced rate.

### c. *Honeywell Bull*

On October 24, 1980, Seagate Scotts Valley entered into a licensing agreement with Compagnie Internationale pour l'Informatique Honeywell Bull (Honeywell Bull), an unrelated French manufacturer. The agreement gave Honeywell Bull the nonexclusive right to manufacture and sell the ST506 (as well as other products announced by Seagate Scotts Valley over a period of 3 years and meeting certain specified characteristics) throughout the world, except for North America and Japan, when integrated or connected to other products, in exchange for a fixed payment of $1,500,000, payable in three installments, plus a royalty of $15 per unit up to a maximum of 80,000 units (possibly limited to 40,000 units or extended to 100,000 units if certain contingencies occurred). Seagate Scotts Valley also agreed to provide, at no charge, training to Honeywell Bull's personnel in the manufacture, assembly, and testing of the ST506. Seagate Scotts Valley also gave Honeywell Bull the right to purchase disk drives from Seagate Scotts Valley at the lowest available OEM price and for which Seagate Scotts Valley agreed to give Honeywell Bull a per-unit credit for up to a specified number of units as reimbursement of a part of the license cash payment. At that time, the ST506 had an OEM price of approximately $725.

### d. *TEAC Corp.*

By an agreement dated February 2, 1982, Seagate Scotts Valley entered into a licensing agreement with TEAC Corp. (TEAC), an unrelated Japanese manufacturer. Under the agreement, Seagate Scotts Valley gave TEAC, among other things, the exclusive right to manufacture and sell the ST506 and ST412 disk drives in Japan and certain listed countries in Asia, subject to the rights retained by Seagate Scotts Valley or previously granted to TI and Honeywell Bull. Under the agreement, Seagate Scotts Valley also gave TEAC such nonexclusive right throughout the world, except for North

America and most of Western Europe. TEAC further received the right to use Seagate Scotts Valley's applicable trademarks and trade names. Seagate Scotts Valley further agreed to provide, at no charge, comprehensive training to TEAC's employees. In return, TEAC agreed to pay Seagate Scotts Valley $400,000 (allocated $399,999 to the exclusive manufacturing and selling rights and $1 to the nonexclusive manufacturing and selling rights), payable in four installments, plus royalties of 2.5 percent of TEAC's net selling price for the first 10,000 units, 2.0 percent for the second 10,000 units, and 1.0 percent with respect to any additional units sold by TEAC. Additionally, TEAC agreed to purchase from Seagate Scotts Valley at a favorable price a specified number of ST506's and ST412's in proportions to be determined by TEAC.

### e. *Co. K*

During August 1982, Seagate Scotts Valley entered into a licensing agreement with Co. K. Under the agreement, Seagate Scotts Valley gave Co. K, among other things, the exclusive right to manufacture, use, and sell the ST506 disk drives in Brazil, subject to the rights retained by Seagate Scotts Valley or previously granted to TI, Honeywell Bull, and TEAC. Seagate Scotts Valley also gave Co. K such nonexclusive right in other countries in South America. Co. K further received the right to use Seagate Scotts Valley's applicable trademarks and trade names. Seagate Scotts Valley also agreed to provide, at its expense, comprehensive training to Co. K's personnel relating to the transfer of technology. In return, Co. K agreed to pay Seagate Scotts Valley $50,000 (allocated $49,999 to the exclusive manufacturing and selling rights and $1 to the nonexclusive manufacturing and selling rights). Additionally, Co. K agreed to purchase from Seagate Scotts Valley a specified number of ST506's and kit assemblies at prices set forth in the agreement.

### f. *Co. L*

During December 1982, Seagate Scotts Valley entered into a licensing agreement with Co. L. Under the agreement, Co. L gave Seagate Scotts Valley, among other things, the nonexclusive right to manufacture, use, and sell throughout the world certain floppy disk drives compatible with the

floppy disk drive system for which Co. L had developed the design and manufacture technical specifications. Co. L also agreed to provide consultation services to Seagate Scotts Valley relating to the transfer of technology. In exchange Seagate Scotts Valley agreed to pay Co. L $5,000, plus royalties of zero for drives sold during the first year of the agreement; 50 cents per drive for drives sold during the second year; 75 cents per drive for drives sold during the third and fourth years; 25 cents per drive for drives sold during the fifth year; and rates subject to renegotiation for years beyond the fifth year. Seagate Scotts Valley also agreed to give Co. L a nonexclusive license under any of Seagate Scotts Valley's patents or patent applications covering any modifications or improvements relating to that floppy disk drive.

### g. *Co. M*

During September 1983, Seagate Scotts Valley entered into a licensing agreement with Co. M. Under the agreement, Co. M gave Seagate Scotts Valley a royalty-free, nonexclusive right and license to make and use Co. M's technical data and patents in the manufacture of certain subassemblies. Co. M also agreed to provide consulting services in connection with the transfer of the technical data. In exchange, Seagate Scotts Valley agreed to pay Co. M $150,000, payable in four equal quarterly installments.

### h. *IBM*

Seagate Scotts Valley entered into a cross-licensing arrangement with IBM effective as of May 1, 1984. Under the agreement, Seagate Scotts Valley received a nonexclusive license under IBM's patents with respect to Winchester disk drive technology and IBM's computer system technologies in exchange for $200,000, payable in five annual installments, and a cross-license under Seagate Scotts Valley's disk drive patents.

### i. *Co. N*

During April 1987, Seagate Scotts Valley entered into a licensing agreement with Co. N, a corporation with a foreign associate, Co. O. Under the agreement, Seagate Scotts Valley gave Co. N, among other things, for use only by Co. O, the exclusive right to use Seagate Scotts Valley's technology to

manufacture and sell ST225 disk drives in Brazil. Seagate Scotts Valley also gave Co. N such nonexclusive right in other countries in South America, except Chile and Central America, subject to the rights retained by Seagate Scotts Valley. Seagate Scotts Valley also agreed to provide, at no charge, comprehensive training of Co. N's personnel. In return, Co. N agreed to pay Seagate Scotts Valley $100,000 (allocated $44,999 for the exclusive manufacturing and selling rights; $55,000 for tooling rights; and $1 for the nonexclusive selling rights). Co. N further agreed to pay Seagate Scotts Valley a royalty of $10 on all ST225's manufactured and sold or otherwise transferred by Co. N, unless at least a specified percentage of the component cost was furnished by Seagate Scotts Valley or the ST225 was purchased complete from Seagate Scotts Valley and resold by Co. N, in which cases no royalties were payable. Additionally, Co. N agreed to purchase from Seagate Scotts Valley subassemblies, products, and spare parts at prices set forth in the agreement.

As discussed earlier, see *supra* Issue 4, Mr. Holdren concluded that during Seagate Scotts Valley's fiscal year ended 1987 the average, lowest, and highest sales prices Seagate Singapore charged to a third party for the ST225 were $228.09, $211, and $260, respectively. If Co. N had charged those prices for the ST225 disk drives it sold to its customers, a $10 per-unit royalty fee would equate to rates of 4.4 percent, 4.7 percent, and 3.8 percent, respectively.

### j. *Co. B and Co. C Agreement*

During February 1984, Co. B gave Co. C a nonexclusive license to use Co. B's technical data and patents to manufacture, use, and sell throughout the world all 5.25-inch half-height Winchester technology-based disk drives that Co. B announced over a 2-year period, and all improved versions produced over a 5-year period. In return, Co. C agreed to pay for 5 years royalties of 3 percent of its net sales of disk drives with capacities exceeding 27 megabytes; 2 percent of its net sales of disk drives with capacities of 14.1 to 27 megabytes; and 1 percent of its sales of disk drives with capacities of 0 to 14 megabytes. Cos. B and C further agreed to cooperate to reduce the costs of raw materials, manufacturing facilities, maintenance, and other items important to the disk drive

manufacturing process. Under the agreement, Co. C further agreed to purchase over a 2-year period commencing January 1, 1984, a specified number of disk drives from Co. B at Co. B's best OEM price for that quantity.

### k. *LaPine Technology Corp. and Kyocera Corp. Agreements*

LaPine Technology Corp. (LTC), a U.S. corporation, was incorporated in 1984, as a successor to a company (incorporated in 1983) engaged in the design, manufacture, and marketing of computer data systems primarily for desk-top and compact microcomputers. LTC was possibly the second company to announce the introduction of a 10-megabyte 3.5-inch Winchester disk drive. LTC also commenced development of technology for a 20-megabyte 3.5-inch Winchester disk drive.

On November 1, 1984, but effective as of October 1, 1984, LTC entered into an agreement of principles regarding the manufacture, financing, and marketing of LTC's products with Kyocera Corp. (Kyocera), a Japanese diversified industrial company engaged, among other things, in the manufacture of electronic equipment, and Prudential-Bache Trade Corp. (PBTC), a U.S. corporation engaged in the business of providing financing for international trading transactions, acting through its wholly owned Japanese subsidiary, K.K. PB Trade Corp. (KKPB). PBTC was wholly owned by Prudential Securities Group Inc.

In the agreement of principles, LTC, Kyocera, PBTC, and KKPB indicated their basic agreement to arrangements under which Kyocera would produce and sell disk drives and parts which LTC would buy as inventory, while KKPB would facilitate the arrangements with Kyocera and provide trade financing to LTC and, if desired, to Kyocera. The agreement of principles led to additional agreements discussed below.[16]

Both Kyocera and PBTC made initial capital investments in LTC. Kyocera and PBTC also were each given a seat on LTC's board of directors.

---

[16] Disputes later arose between those parties, resulting in amended agreements and a restructuring and reorganization of LTC. The successor to LTC ceased operations by November 1987. We will limit our discussion to the first series of agreements between LTC, Kyocera, PBTC, and KKPB.

PBTC and its affiliates held or guaranteed substantial amounts of LTC debt. Some of the debt held by PBTC and its affiliates was convertible into LTC stock.

### i. *The Research and Development Agreement*

In December 1984 LTC entered into a research and development agreement with Pru Tech Research & Development Partnership (Pru Tech), a California limited partnership engaged in the business of investing in and developing new technology. The general partner of Pru Tech was R&D Funding Corp., a subsidiary of Prudential Securities Group, Inc., the parent also of PBTC.

The research and development agreement related to the development of technology for a 20-megabyte 3.5-inch Winchester disk drive. That technology later was licensed to Kyocera.

Under the research and development agreement with Pru Tech, LTC gave Pru Tech a license to use the technology developed by LTC before that point. LTC additionally agreed to undertake further development work on the technology. Pru Tech paid LTC $2,950,000 for the license. LTC received the rights to use and acquire technology developed by Pru Tech in exchange for royalties of 3.9 percent of the first $77 million of sales, 2.2 percent of the next $120 million of sales, and 1.5 percent of the next $184 million of sales, up to a maximum of $8,400,000 in royalties. LTC further received an option to purchase the developed technology from Pru Tech for $7 million.

### ii. *The Trading Agreement*

As of September 14, 1985, LTC entered into a trading agreement with Kyocera, PBTC, and KKPB, in which KKPB, PBTC, and LTC, respectively, agreed, among other things, to buy from Kyocera, KKPB, and PBTC, respectively, and Kyocera, KKPB, and PBTC, respectively, agreed to sell to KKPB, PBTC, and LTC, respectively, according to a prearranged schedule, disk drives and parts produced by Kyocera. LTC further agreed to purchase disk drives and parts only from PBTC and to sell only disk drives or parts purchased from PBTC or disk drives manufactured by LTC from parts purchased from PBTC. For the disk drives and parts purchased

from PBTC, LTC agreed to pay a "base price",[17] plus a trading fee of 4 percent, all shipping, insurance, and handling costs, taxes and customs duties, etc., and a finance charge calculated on all such sums. Kyocera received from KKPB the base price, converted into Japanese yen, for the disk drives Kyocera sold to KKPB.

### iii. *The Technology Transfer and Manufacturing Agreement*

On October 26, 1985, LTC entered into a technology transfer and manufacturing agreement (the technology transfer and manufacturing agreement) with Kyocera and KKPB in which LTC agreed, among other things, to make its technology available to Kyocera to enable Kyocera to manufacture and sell 3.5-inch disk drives. LTC further agreed generally not to manufacture commercial quantities of 3.5-inch disk drives using that technology. Kyocera agreed to develop, with LTC's assistance, the manufacturing processes and facilities for volume production of the disk drives under license from LTC.

Under the technology transfer and manufacturing agreement, LTC gave Kyocera the exclusive right to manufacture 3.5-inch disk drives and parts using LTC's technology. Kyocera generally agreed to sell products or parts manufactured using LTC's technology only to LTC (or to KKPB or PBTC for resale to LTC). Kyocera further agreed not to use any products or parts so manufactured.

Under the technology transfer and manufacturing agreement, however, Kyocera could incorporate disk drives it manufactured in systems or devices to be sold to its customers. Furthermore, at LTC's discretion, Kyocera could repurchase disk drives from LTC for resale to Kyocera's customers. Products sold to Kyocera for its own use or for resale to Kyocera's customers were deemed sold first by Kyocera to KKPB, then sold by KKPB to LTC, and then resold by LTC to Kyocera. For the disk drives that Kyocera repurchased from LTC for use in Kyocera's systems or for resale, Kyocera agreed to pay LTC for each unit the base price plus a sales

---

[17] The original agreements between LTC, Kyocera, PBTC, and KKPB do not define the term "base price" or provide a formula for its computation. The base price was intended to provide Kyocera some margin over its manufacturing costs. At some point in time after the signing of the original agreements, the base price was set at 78 percent of the market price, which was a price agreed to by LTC and Kyocera and based on the competition in LTC's resale marketplace.

commission to each of KKPB and LTC, as follows: (1) For sales between October 26, 1985, and September 13, 1987, 8 percent of the base price, of which 75 percent was payable to LTC and 25 percent was payable to KKPB; (2) for sales on or after September 14, 1987, 6 percent of the base price, of which 83 ⅓ percent was payable to LTC and 16 ⅔ percent was payable to KKPB.

Under the technology transfer and manufacturing agreement, LTC agreed to market and sell the disk drives in quantities sufficient to meet certain minimum volume purchase requirements agreed to by LTC and Kyocera. In the event LTC failed to purchase the minimum purchase requirements, at Kyocera's discretion, Kyocera could convert the exclusive right given it under the agreement to a nonexclusive right to manufacture and sell the disk drives. In that event, Kyocera was obligated to pay LTC a royalty of 3 percent of the base price for each unit sold, used, or otherwise disposed of, except for sales to LTC, for which no royalties would be payable.

Under the technology transfer and manufacturing agreement, LTC agreed to purchase, subject to adjustments for market conditions, a minimum of 120,000 units in the year starting April 1, 1986; 240,000 units in the year starting April 1, 1987; and 360,000 units in the year starting April 1, 1988. Kyocera in return agreed not to manufacture, or in any way sponsor the manufacture of, 3.5-inch disk drives other than pursuant to the terms of the technology transfer and manufacturing agreement.

### l. *Co. B and Co. F Agreement*

During March 1985, Co. B gave Co. F, an unrelated Japanese manufacturer, an exclusive license to manufacture Co. B's 13-, 26-, and 40-megabyte half-height disk drives in the Far East, and the nonexclusive right to manufacture, use, and sell such disk drives throughout the world. In return, Co. F agreed to pay Co. B $1,500,000, plus a royalty of 3 percent of Co. F's sales revenue from sales of the first 100,000 units and 2 percent of the sales revenue thereafter. [18]

---

[18] Because of the manner used to redact the licensing agreement placed in evidence, it is impossible to discern definitively all of the terms of the licensing agreement between Co. B and Co. F. As a result, we have not described all of the relevant provisions contained in that agreement.

### m. *Co. P and Co. Q Agreement*

During April 1985, Co. P entered into a licensing agreement with Co. Q. Under that agreement, Co. P gave Co. Q, among other things, the nonexclusive right to use Co. P's technology and patents to manufacture, use, and sell throughout the world certain floppy disks. In exchange Co. Q agreed to pay Co. P $20,000. Co. Q also agreed to give Co. P, without further consideration, a fully paid-up, nonexclusive license under any of Co. Q's patents or patent applications useful in Co. P's floppy disks.

### n. *Co. D and Co. E Agreement*

During April 1985, Co. D gave Co. E, an unrelated South Korean manufacturer, a license to manufacture and sell Co. D's 25-megabyte and 38-megabyte disk drives. In exchange for the exclusive rights to manufacture and sell those disk drives to third parties in South Korea, and to incorporate them into computer systems to be sold to third parties around the world, Co. E agreed to pay a license fee of $200,000, plus a royalty of $5 per unit sold, except for units sold to Co. D. Co. E also agreed to pay Co. D $126,571 for tooling. Additionally, Co. E agreed to purchase material component kits from Co. D at set prices until Co. E obtained local sources for material components. Co. E further agreed to pay Co. D an additional $P [19] for each material component kit or partial kit it purchased from Co. D until Co. E paid all of the license fee. Under the agreement, Co. D agreed to purchase during 1985, 1986, and 1987 specified numbers of disk drives from Co. E at designated prices.

The average selling prices during Co. D's fiscal years ended 1985 and 1986 for the Co. E-built 25-megabyte disk drives were $X and $Y, respectively. At such prices, for the fiscal years ended 1985 and 1986, the $5 royalty would approximate royalty rates of 1.2 percent and 1.7 percent, respectively. The average selling prices during Co. D's fiscal years ended 1985 and 1986 for the Co. E-built 38-megabyte disk drives were $Z and $S, respectively. At such prices, for the

---

[19] It is impossible to discern definitively all of the terms of the licensing agreement between Co. D and Co. E because of the manner used to redact the licensing agreement placed in evidence. As a result, all of the relevant provisions contained in that agreement may not have been described above. The sales prices here and below are not specified to prevent the disclosure of information under seal.

fiscal years ended 1985 and 1986, the $5 royalty would approximate royalty rates of 0.9 percent and 1.2 percent, respectively.

### o. *Co. G and Cos. H and J Agreement*

During July 1987, Co. G entered into a product license agreement with Co. H and Co. J. Under that license agreement, Co. G gave Cos. H and J, among other things, the right to use its technology to manufacture and sell its computer peripheral subsystem in the Far East, Southeast Asia, Australia, and New Zealand, or to sell the subsystems directly to Co. G. In exchange Cos. H and J agreed to pay Co. G $1,500,000, plus royalties of $100 for each unit sold during calendar year 1988, $90 during 1989, $80 during 1990, and $70 during 1991. No royalties, however, were payable on units sold to Co. G. Co. G further agreed to provide training to employees of Cos. H and J. Co. G also agreed in a separate OEM purchase agreement to purchase from Cos. H and J at designated prices minimum purchase quantities of the products manufactured under the license agreement. Pursuant to the terms of the OEM purchase agreement, Co. G was required to purchase a minimum percentage of its annual product requirements from Co. J through a specified date. Co. J further agreed in a separate document to purchase from Co. G convertible preferred stock for a specified purchase price.

When introduced in 1987, Co. G's subsystem increased storage capacity by more than 10 times that of comparable 5.25-inch form factor subsystems. With its large capacity, Co. G's subsystem allowed its customers to back up multiple disk drives, and in some cases an entire computer system, on one storage device. The storage device fits into the industry standard 5.25-inch full-height form factor.

During its fiscal year ended 1989, Co. G's unit price for the subsystem was a function of purchase volume, with the annual 1,000 units price set at $2,225. During 1989, the royalty fee payable by Cos. H and J was $90 per unit. Assuming Cos. H's and J's unit prices for the subsystem were the same as Co. G's unit prices, the royalty rate for the subsystem would approximate 4 percent of the sales price. The storage media generates a higher margin than disk drives.

## 6. *Respondent's Notices of Deficiency*

In the notices of deficiency, respondent determined that Seagate Singapore paid less than arm's-length compensation for the intangible property it obtained from Seagate Scotts Valley. Respondent reallocated the following income to Seagate Scotts Valley under section 482 with respect to manufacturing intangibles Seagate Singapore received from Seagate Scotts Valley:

| Period ending | Sec. 482 reallocation |
|---|---|
| 6/30/84 | $6,827,000 |
| 6/30/85 | 245,000 |
| 6/30/86 | 23,981,000 |
| 6/30/86 | 97,652,000 |
| Total | 128,705,000 |

In the notices of deficiency, to compute the section 482 reallocation with respect to the value of manufacturing intangibles for each year, Dr. Chou first adjusted the income that Seagate Singapore received on its intercompany sales of disk drives by a "price allowance" and then added that adjusted intercompany sales amount to the income from third party sales to calculate Seagate Singapore's "adjusted sales" for the applicable year (see *supra* Issue 4). Next, Dr. Chou reduced Seagate Singapore's cost of goods sold by the amount of the warranty, royalty, marketing commission, and cost-sharing payments Seagate Singapore made to Seagate Scotts Valley during the year. To that adjusted cost of goods sold amount, Dr. Chou added a "processing fee" (the procurement fee reallocation, see *infra* Issue 7) and Seagate Singapore's G&A expenses to derive Seagate Singapore's "adjusted costs". Dr. Chou then deducted the "adjusted costs" from Seagate Singapore's "adjusted sales" to derive Seagate Singapore's net profit for the year. Next, Dr. Chou estimated the "value of marketing" (respondent's section 482 reallocation relating to Seagate Scotts Valley's resale of the disk drives produced by Seagate Singapore, see *supra* Issue 4) and deducted this amount from the net profit to derive Seagate Singapore's residual profits. Dr. Chou then split the residual profits, classified as the "value of manufacturing", between Seagate Singapore (25 percent) and Seagate Scotts Valley (75

percent), identified in the notices of deficiency as the manufacturing services and intangibles adjustment. That adjustment now is encompassed in respondent's proposed royalty income reallocation.

Because Dr. Chou calculated the total value of manufacturing intangibles as a residual, his estimate of the value of manufacturing intangibles is dependent on the prices that Seagate Singapore received for it products. Consequently, under Dr. Chou's method, any change in the value of the intercompany transfer price would lead to a corresponding and equal change in the estimated value of the manufacturing intangibles.

The notices of deficiency further determine, in the alternative, an increase in the income allocable to Seagate Singapore, resulting in a corresponding reduction in the section 482 adjustment for Seagate Scotts Valley, should respondent not be upheld in the determination that petitioner did not adequately substantiate that (1) Seagate Scotts Valley transferred to Seagate Singapore the property described in the property transfer agreement or, if so transferred, that the transfer occurred as of September 30, 1983, or (2) Seagate Singapore should be treated as having engaged in sales outside of the United States for purposes of the section 367 private letter ruling or for purposes of analyzing functions, risks, and intangibles under section 482. The amounts set forth in the notices of deficiency for the reduction to the section 482 adjustments are as follows:

| Year | Reduction amount |
| --- | --- |
| 1984 | $4,461,000 |
| 1985 | 184,000 |
| 1986 | 6,511,000 |
| 1987 | 36,519,000 |
| Total | 47,675,000 |

7. *The Experts' Positions*

a. *Petitioner's Experts*

i. *Dr. Chandler*

Dr. Chandler evaluated what would be a reasonable range of royalty rates in the disk drive industry for the intangibles

that Seagate Scotts Valley transferred to Seagate Singapore based on the economic conditions in the disk drive industry and the prevailing royalty license rates and license agreements for disk drives or broadly comparable or analogous products.

Dr. Chandler evaluated certain third party licenses to analyze whether the economic and business circumstances surrounding such licenses were sufficiently similar to the license in issue to allow them to be used as a comparable of the arm's-length compensation unrelated parties would pay for similar technology. He cautioned in his report, however, that he made no conclusion as to whether the technology covered in the third party licenses he evaluated is similar to the technology in issue in the instant case or whether such agreements are legal "comparables" in the sense set forth in the section 482 regulations.

The licenses Dr. Chandler evaluated include certain license agreements Seagate Scotts Valley had entered into with unrelated parties, specifically, the agreements with TI, Honeywell Bull, TEAC, Co. K, and Co. N. Dr. Chandler also examined a number of other agreements covering technologies used in the manufacture of a variety of computer accessories which he viewed as broadly analogous to the technology Seagate Scotts Valley conveyed to Seagate Singapore. From his review of these various agreements, Dr. Chandler concluded that the royalty rates for disk drive or computer accessory technology ranged generally between 1 and 5 percent and tended to fall at the lower end of that range as the value of sales covered by the agreements increased. Dr. Chandler concluded that a reasonable range of royalty rates for the property in issue would fall between 1 and 3 percent; he accordingly concluded that the 1-percent royalty paid by Seagate Singapore to Seagate Scotts Valley was a reasonable rate.

ii. *James Patterson*

Mr. Patterson has worked in various positions in the computer peripherals industry since 1960. At various times he was employed by, among others, IBM, Memorex Corp., System Industries, and Quantum Corp. He also has worked as a director or on a consulting basis with various companies in the computer field.

Mr. Patterson concluded that the ST412, ST212, and ST225 licensed to Seagate Singapore were in the low cost segment of the disk drive industry. He further concluded that such products did not involve any significant technology and were very similar to products being produced at that time by Seagate Scotts Valley's competitors. According to Mr. Patterson, the major buying criteria of Seagate Scotts Valley's customers, with the exception of the start of the industry, always has been cost. Mr. Patterson concluded that, given the competitiveness of the industry, the lack of technical advantage of the products, and the economics of the market, a 1-percent royalty rate seems very reasonable.

Mr. Patterson's opinion is based on industry practice in general rather than on the specific facts in the instant case.

### iii. *Zoltan M. Mihaly*

Mr. Mihaly is an attorney who began practicing law in 1962. Several of his clients are manufacturers of computer peripheral products, such as Maxtor Corp., Quantum Corp., Verbatim, Micom, Inc., Applied Magnetics Corp., and Qume Corp. In his capacity as an attorney, Mr. Mihaly has drafted agreements for his clients relating to the licensing of intangibles, such as know-how, patents, and trademarks. He also has obtained documents from his clients relating to the licensing of similar intangibles between unrelated parties. He has received additional information concerning the rates of royalties used between unrelated companies in the disk drive industry. Based on his experiences and the information made available to him, Mr. Mihaly concluded that the royalty paid by an unrelated licensee to an unrelated licensor for the use of lower end technology of disk drive products ranges from 0.6 percent to 2 percent.

Mr. Mihaly further indicated that, because of his work with many manufacturers of disk drives, he is familiar with the value of technology involved in the production of various disk drives. Based on such experience and knowledge, Mr. Mihaly concluded that the technology licensed by Seagate Scotts Valley to Seagate Singapore in 1984 was at the lower end of disk drive technology, considerably less valuable than the technology developed and licensed by other manufacturers of disk drives that had been or are his clients or with which he otherwise has been acquainted. He accordingly con-

cluded that a royalty rate in the area of 1 percent of the licensee's sales would be reasonable, fair, and an arm's-length consideration for the use of such technology.

Mr. Mihaly was not responsible for negotiating the royalty rates in the agreements on which he relied for his opinion. On the basis of confidentiality, Mr. Mihaly declined to reveal the sources for the opinions expressed in his report. In light of such refusal, we give little weight to his testimony.

### iv. *Paul M. Enlow*

Mr. Enlow is an attorney, practicing in patent law. His career, commencing in 1951, has been associated with the licensing of intellectual property in the computer industry. At various times he was employed by several of the leading developers of computer technology, including IBM, Xerox, and AT&T. Mr. Enlow also reviewed six license agreements that Seagate Scotts Valley entered into, including the property transfer agreement.

Mr. Enlow concluded, on the basis of his experience as a patent attorney, that royalty rates in the computer industry during the early to mid-1980's generally ranged between less than 1 percent and 2 percent. He accordingly concluded that, considering the economic factors surrounding the Seagate Scotts Valley and Seagate Singapore license agreement, a 1-percent running royalty rate was clearly justified.

### v. *Mr. Holdren*

Mr. Holdren was asked to quantify the number of disk drives Seagate Scotts Valley sold to IBM and to other third party customers. He concluded that IBM purchased the following number of disk drives from Seagate Singapore:

| Year | Total drives sold to third parties | Number of drives sold to IBM |
|------|------------------------------------|------------------------------|
| 1984 | 60,254    | 60,160  |
| 1985 | 358,839   | 304,083 |
| 1986 | 508,391   | 253,240 |
| 1987 | 1,403,337 | 727,247 |

Based on Mr. Holdren's report, Seagate Singapore's total third party sales, sales to IBM, and the percentage of Seagate

Singapore's sales to IBM to the total third party sales are shown in the table below.

| Period ended | Total third party sales | IBM sales | % of IBM sales to total sales |
|---|---|---|---|
| 6/30/84 | $23,874,420 | $23,833,060 | 99.8% |
| 6/30/85 | 98,078,286 | 82,098,810 | 83.7 |
| 6/30/86 | 172,888,607 | 101,609,657 | 58.8 |
| 6/30/87 | 417,563,610 | 230,346,121 | 55.2 |

### vi. *Mr. Broadhurst*

Mr. Broadhurst expressed his opinion as to the percentage of Seagate Singapore-manufactured disk drives shipped into the United States to purchasers other than Seagate Scotts Valley computed on the basis of total third party sales. Mr. Broadhurst concluded that, for sales to unrelated third parties, the following percentages of Seagate Singapore disk drive sales were made to U.S. customers as compared with total third party Seagate Singapore disk drive sales:

| Year | Total drives sales | Drive sales to U.S. | U.S. % of drive sales |
|---|---|---|---|
| 1984 | $23,874,420 | $16,934,400 | 70.9% |
| 1985 | 98,078,286 | 16,585,220 | 16.9 |
| 1986 | 172,888,607 | 54,556,307 | 31.6 |
| 1987 | 417,563,610 | 176,007,306 | 42.2 |

### b. *Respondent's Experts*

### i. *Dr. Horst*

In reaching his conclusion as to a reasonable arm's-length royalty rate for the Seagate Scotts Valley and Seagate Singapore transaction, Dr. Horst reviewed six licenses of Winchester disk drive technology by Seagate Scotts Valley, the LaPine and Kyocera agreements, the Co. G and Cos. H and J agreement, two agreements involving Co. B, and two agreements involving Co. D. Based on his review of those agreements, Dr. Horst concluded that, for Seagate Singapore sales into the United States, a royalty of at least 6 percent was reasonable for the use of the disk drive design, know-how, and other manufacturing intangibles Seagate Singapore acquired from Seagate Scotts Valley.

The section 482 reallocations for the royalty issue as proposed by Dr. Horst are as follows in the table below.

| Year | Royalty |
|---|---|
| 1984 | $2,007,956 |
| 1985 | 3,019,382 |
| 1986 | 10,807,922 |
| 1987 | 24,508,731 |
| Total | 40,343,991 |

Dr. Horst concluded that, of the third party licenses he examined, the LaPine and Kyocera agreements were the most comparable to the Seagate Scotts Valley and Seagate Singapore license. Dr. Horst believes that the difference in volume commitment in the LaPine and Kyocera agreements from the volume commitment in the agreements between Co. B and Co. C and between Co. D and Co. E is critical. According to Dr. Horst, "a substantial volume commitment by the licensor allows the licensee to know that it will be able to get its production volumes up, which means it will be able to get its unit cost down, which will allow it to operate at a higher profit level, out of which it can afford to pay a higher royalty rate".

Dr. Horst also noted that the agreement involving Co. B and Co. F provided for a substantial "up front" payment. Dr. Horst believes that it is difficult to use a license agreement that has a substantial advance fee as a comparable because the value of the advance payment depends on several factors, such as the expected volume of production of the licensed product, that vary according to the specific products covered, geographic limitations, etc.

In reaching his conclusion as to which agreements he found comparable to the Seagate Scotts Valley and Seagate Singapore license, Dr. Horst relied on the royalty agreement between Seagate Scotts Valley and Seagate Singapore, executed in 1985, rather than the property transfer agreement, which was effective September 30, 1983.

Dr. Horst further concluded that had Seagate Singapore been operating at arm's length, it would have paid Seagate Scotts Valley an additional royalty for marketing intangibles of 2 percent of all of Seagate Singapore's sales of disk drives, except for certain sales to unrelated Far East distributors.

The additional royalty for marketing intangibles would compensate Seagate Scotts Valley for permitting Seagate Singapore to capture the manufacturing profit on sales to Seagate Scotts Valley's customers.

Dr. Horst proposes adjustments for marketing intangibles relating to the following Seagate Singapore sales to Seagate Scotts Valley as set forth in the table below.

| Year | Sales of disk drives covered under sec. 367 letter ruling | Sales of disk drives covered under cost-sharing agreement | Total |
|---|---|---|---|
| 1984 | $19,699,500 | N/A | $19,699,500 |
| 1985 | 61,374,990 | 364,600 | 61,739,590 |
| 1986 | 171,528,583 | 46,197,445 | 217,726,028 |
| 1987 | 218,891,573 | 214,972,202 | 433,863,775 |
| Total | 471,494,646 | 261,534,247 | 733,028,893 |

ii. *Anthony LaPine*

Mr. LaPine founded LTC and served as its president and chief executive officer during 1984 and 1985. In that capacity he negotiated on LTC's behalf the agreements between LTC and Kyocera, PBTC, and KKPB described above.

According to Mr. LaPine, factors that may be considered in analyzing an appropriate arm's-length fee for any given product include: (1) The age of the technology; (2) the volume expected to be produced; (3) the profit margins expected to be achieved; (4) the geographical areas over which the licensee has a right to sell the product; (5) any exclusivity that is provided by the agreement; (6) the amount of any advance "lump-sum" payments; (7) any other forms of consideration that the licensee or licensor may contribute to the transaction; (8) the default criteria in any purchase contracts that exist between the parties; and (9) special consideration for products that the licensor may perceive to be obsolete.

Mr. LaPine concluded that the relationship between LTC and Kyocera under the technology transfer and manufacturing agreement was essentially similar to the relationship between Seagate Scotts Valley and Seagate Singapore under the property transfer agreement. He noted the following differences between the transactions between LTC and Kyocera, on the one hand, and Seagate Scotts Valley and Seagate

Singapore, on the other hand: LTC gave Kyocera exclusive manufacturing rights and agreed to purchase a minimum quantity of products from Kyocera; LTC gave Kyocera a more restrictive covenant on the geographic areas in which Kyocera could sell LTC's products; Kyocera agreed to pay a sales commission for Kyocera's use of products in its own subsystems or on sales to its own customers, which required LTC's prior approval, of 8 percent on sales made before September 17, 1987, and 6 percent thereafter; the LTC and Kyocera agreements provided primarily for the establishment of Kyocera as the equivalent of LTC's exclusive OEM supplier of products with Kyocera's primary profit to be derived from the sale of products to LTC; Kyocera gave LTC preferential pricing which assured LTC a certain operational profitability; Seagate Scotts Valley licensed older 5.25-inch disk drive technology, but with an entrenched market position, while LTC licensed a newer, but competitive, 3.5-inch disk drive technology, which had virtually no market presence; and the Seagate name had greater value to Seagate Singapore than the LaPine name had to Kyocera. In Mr. LaPine's view, Seagate Scotts Valley in reality had full control over the Singapore operation and was its prime source of capital, technology, manufacturing assistance, and marketing and sales support. LTC, on the other hand, was an early-stage company dependent on Kyocera and PBTC for survival.

Mr. LaPine concluded that the property transfer agreement between Seagate Scotts Valley and Seagate Singapore provided significantly more value to Seagate Singapore than did the similar LTC and Kyocera agreements. He concluded further that an arm's-length agreement between Seagate Scotts Valley and Seagate Singapore would require a royalty rate similar to the royalty rate contained in the LTC and Kyocera agreements. Mr. LaPine posited that, taking into consideration the broader marketing rights provided to Seagate Singapore, the royalty rate for Seagate Singapore should be 6 percent, with an added premium to reflect the broad marketing and distribution rights provided to Seagate Singapore along with the Seagate name which had an incremental value of its own. Mr. LaPine concluded that an initial appropriate royalty for the Seagate Scotts Valley and Seagate Singapore transaction would be between 6 and 8

percent, with consideration given to modification in later years as gross margins, volumes, and returns were analyzed.

### iii. *Mark R. Sherwood*

Since 1977, Mr. Sherwood has held various technical and sales positions with a number of disk drive companies, including Shugart Associates, Western Digital Corp., SyQuest Technology, and Kalok Corp. Additionally, Mr. Sherwood has reviewed various agreements between certain disk drive manufacturers for unrelated party transactions possibly similar to the Seagate Scotts Valley and Seagate Singapore arrangement.

Mr. Sherwood noted that Seagate Scotts Valley designed both the disk drive products and the manufacturing and testing processes for, and controlled the offshore manufacturing in Singapore of, the disk drives. He believes that Seagate Scotts Valley's success was attributable, in part, to its management's ability to negotiate agreements for volume sales of disk drives to major OEM customers and, in part, to the sales strategy for the OEM and plug compatible market developed and implemented by Seagate Scotts Valley.

Mr. Sherwood concluded that in the industry, a finder's fee of 1 to 3 percent would be paid to an unrelated entity which generated OEM business as Seagate Scotts Valley did for Seagate Singapore. In his view, the finder's fee would be in the nature of a royalty for an intangible, the right to take advantage of the contract.

Mr. Sherwood further concluded that the 1-percent royalty paid by Seagate Singapore to Seagate Scotts Valley was not an arm's-length royalty rate. According to Mr. Sherwood, payment arrangements of an advance payment plus a royalty rate, similar to the Seagate Scotts Valley's arrangements with TEAC and Honeywell Bull, are common in the disk drive industry. He concluded that, if no advance payment is made in addition to a royalty, the royalty rate should be much higher, perhaps between 10 and 15 percent.

Mr. Sherwood concluded, on the basis of his industry experience and review of licensing agreements for similar technology, that a royalty of between 8 and 12 percent would be appropriate.

iv. *Harold J. McLaughlin*

Mr. McLaughlin has spent 36 years in the electronics industry, of which 32 involved the disk drive industry. He is the publisher of Rumors and Raw Data, a weekly intelligence newsletter, which reports information about the rigid disk and disk drive industries. He also is an associate editor of Magnetic Media Information Services International Newsletter which reports information about the magnetic media industries.

Mr. McLaughlin concluded that an inverse relationship exists between the payment of advance money and the payment of royalties. According to Mr. McLaughlin, the licensor of technology will want to get as much money as possible in advance, while the licensee will want to pay as little advance money as possible, preferring instead to pay the money later in royalties.

Mr. McLaughlin refused to reveal his sources for the information on which he relied in formulating his opinion. In light of such refusal, we give little weight to his opinion.

v. *George E. Frost*

Mr. Frost has a degree in engineering. He also has a juris doctor degree and has practiced as a patent attorney for over 40 years, including serving as the director of the patent section of General Motors Corp. for approximately 17 years. Mr. Frost has no experience in the licensing of disk drive technology, but he has been involved with licenses for related technology.

Mr. Frost concluded that the 1-percent royalty paid by Seagate Singapore to Seagate Scotts Valley was not reasonable. In his opinion, Seagate Scotts Valley lost a sale for each sale Seagate Singapore made to a customer in the United States. Additionally, Seagate Singapore had no alternatives to the licensing arrangement since Seagate Singapore did not have the capability to reverse engineer or design around the disk drives developed by Seagate Scotts Valley. Moreover, no cross-license was involved in the licensing transaction between Seagate Scotts Valley and Seagate Singapore. Additionally, Seagate Singapore received some measure of exclusivity arising from the exclusive rights to the know-how and technology licensed to it by Seagate Scotts Valley. Con-

sequently, Mr. Frost concluded, he would expect a reasonable royalty to be around 10 percent.

In his view, at a minimum, each disk drive sold by Seagate Singapore into the United States should cover its fair share of the research and development costs for the disk drive model. Mr. Frost estimated that the minimum royalty rate needed for that purpose would be 5 percent of U.S. sales. On the other hand, the maximum royalty rate would be measured by the benefit Seagate Singapore's management perceived that Seagate Singapore would attain from engaging in the disk drive manufacturing business, as distinguished from not engaging in that business. Mr. Frost estimated the maximum royalty rate for that purpose would be approximately 20 percent.

Mr. Frost further concluded that the licensing agreements between Seagate Scotts Valley and TEAC and Seagate Scotts Valley and Co. K was not comparable to the licensing agreement between Seagate Scotts Valley and Seagate Singapore primarily because neither TEAC nor Co. K was importing the disk drives into the United States. Additionally, the agreement with TEAC involved a substantial advance payment. According to Mr. Frost, the royalty rate provided in an agreement containing an advance payment is not comparable to the royalty rate provided in an agreement which provides no advance payment. Mr. Frost stated that advance payments always reduce the running royalty, very frequently to zero.

In reaching his conclusions as to a reasonable royalty rate, Mr. Frost was not aware that Seagate Singapore paid marketing commissions to Seagate Scotts Valley. He also was not aware that Seagate Singapore made R&D cost-sharing payments to Seagate Scotts Valley (see *infra* Issue 8). Additionally, Mr. Frost was not aware that some of the property was transferred to Seagate Singapore as a contribution to capital.

In light of Mr. Frost's lack of experience in the disk drive industry, we give little weight to his testimony.

## B. OPINION

### 1. *Analysis of Arm's-Length Royalties for Use of Intangibles*

#### a. *The Regulations in General*

Section 1.482–2(d), Income Tax Regs., provides a framework for determining an arm's-length consideration for the transfer, sale, assignment, loan, or other use of intangible property or an interest therein between related entities. Intangible property is defined to include patents, inventions, formulas, processes, designs, patterns, trademarks, trade names, licenses, methods, programs, systems, procedures, customer lists, and technical data. Sec. 1.482–2(d)(3)(ii)(a), (c), (d), (e), Income Tax Regs.

An arm's-length consideration is defined specifically as "the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances." Sec. 1.482–2(d)(2)(ii), Income Tax Regs. The best indication of such arm's-length consideration generally is transfers by the same transferor to unrelated parties for the same or similar intangible property under the same or similar circumstances. *Id.* If a sufficiently similar transaction involving an unrelated party is unavailable, the arm's-length consideration is determined by evaluating various facts and circumstances. Sec. 1.482–2(d)(2)(iii), Income Tax Regs.

The relevant factors identified in section 1.482–2(d)(2)(iii), Income Tax Regs., for determining the amount of an arm's-length consideration where an adequately similar transaction is absent are:

(a) The prevailing rates in the same industry or for similar property,

(b) The offers of competing transferors or the bids of competing transferees,

(c) The terms of the transfer, including limitations on the geographic area covered and the exclusive or nonexclusive character of any rights granted,

(d) The uniqueness of the property and the period for which it is likely to remain unique,

(e) The degree and duration of protection afforded to the property under the laws of the relevant countries,

(f) Value of services rendered by the transferor to the transferee in connection with the transfer within the meaning of paragraph (b)(8) of this section,

(g) Prospective profits to be realized or costs to be saved by the transferee through its use or subsequent transfer of the property,

(h) The capital investment and starting up expenses required of the transferee,

(i) The next subdivision is (j),

(j) The availability of substitutes for the property transferred,

(k) The arm's-length rates and prices paid by unrelated parties where the property is resold or sublicensed to such parties,

(l) The costs incurred by the transferor in developing the property, and

(m) Any other fact or circumstance which unrelated parties would have been likely to consider in determining the amount of an arm's-length consideration for the property.

## b. *The Parties' Positions*

### i. *Respondent's Position*

Respondent's position in the notices of deficiency is not supportable by the facts and circumstances present in the instant case and results in an excessive reallocation of income from Seagate Singapore to Seagate Scotts Valley. On brief, respondent argues that the LTC and Kyocera technology transfer and manufacturing agreement is the only license agreement in the record providing for the transfer of the same or similar intangible property under the same or similar circumstances within the meaning of section 1.482–2(d)(2)(ii), Income Tax Regs. According to respondent, an arm's-length royalty for the manufacturing and marketing intangibles associated with the ST412, ST212, and ST225 disk drive models that Seagate Scotts Valley transferred to Seagate Singapore is 6 percent.

Respondent contends further that Seagate Scotts Valley developed marketing intangibles such as Seagate Scotts Valley's trademark and an extensive set of contracts, agreements, and relationships between Seagate Scotts Valley and its customers which helped Seagate Scotts Valley become a leading supplier of disk drives. Respondent asserts that Seagate Singapore acquired from Seagate Scotts Valley the right to use those marketing intangibles. Respondent contends further that the marketing intangibles were not transferred pursuant to the section 367 private letter ruling. According to respondent, to compensate Seagate Scotts Valley for Seagate Singapore's use of the marketing intangibles at arm's length, Seagate Singapore would have had to pay Seagate Scotts Valley an additional royalty of 2 percent on all disk drive sales.

Respondent argues further that the disk drive technology Seagate Scotts Valley transferred to Seagate Singapore should be valued as of the date the parties entered into the agreement for payment of royalties. Respondent asserts that that date must be presumed to be July 2, 1985, which is the date reflected on the royalty agreement. According to respondent, there is no other probative evidence in the record of the date on which Seagate Scotts Valley and Seagate Singapore entered into an agreement for the payment of a royalty.

### ii. *Petitioner's Position*

Petitioner, on the other hand, argues that a 1-percent royalty on the disk drives subject to the section 367 private letter ruling is an arm's-length compensation for the intangibles transferred. Petitioner contends that, for the years in issue, Seagate Singapore earned modest markups on costs, ranging between 21 and 30 percent, in contrast to the markups earned by the taxpayers in other transfer pricing cases recently decided by this Court where the nature of the business involved in those cases permitted those taxpayers to earn above-normal markups on costs. Petitioner asserts that, because of the nature of the disk drive industry, disk drive intangibles do not permit an above-normal return which would allow the payment of a high royalty rate. Petitioner contends that, in the disk drive industry, intangibles do not protect against competition; profitability depends on efficient manufacturing.

Petitioner contends further that the technology Seagate Scotts Valley licensed to Seagate Singapore was not distinguishable from that of Seagate Scotts Valley's competitors. Accordingly, petitioner contends that the low royalty rates for disk drive intangibles of 1 to 3 percent propounded by Dr. Chandler should be applied to the Seagate Singapore disk drives subject to the section 367 private letter ruling. Petitioner argues that the third party licenses and testimony of Seagate Scotts Valley's industry experts in the record establish that licenses of disk drive technology typically bear low royalty rates and support Dr. Chandler's conclusion that the 1-percent royalty rate Seagate Singapore paid to Seagate Scotts Valley is within the range of arm's-length royalty rates. Petitioner argues that, as long as an intercompany roy-

alty rate is within the range of those royalty rates found in arm's-length transactions, no section 482 adjustment is appropriate.

Petitioner contends that respondent has offered no credible evidence to support respondent's royalty adjustment. In petitioner's view, neither the LTC and Kyocera agreements nor the Co. G and Cos. H and J agreement are comparable to the Seagate Scotts Valley and Seagate Singapore license.

According to petitioner, the LTC and Kyocera transaction was not an arm's-length dealing, but was more in the nature of a joint venture relationship. Petitioner contends further that, although the LTC and Kyocera agreements provide for four different royalty rates, Dr. Horst and Mr. LaPine selected, without justification, the highest rate provided in the agreements. Petitioner additionally argues that, under the terms of the LTC and Kyocera agreements, 4 percent of the 6-percent "sales commission" required on Kyocera transactions subject to the royalty was payable to PBTC; therefore, LTC actually would receive only 2 percent of the base price on such transactions, not the 6 percent asserted by Mr. LaPine. Petitioner further contends that, unlike the LTC and Kyocera transaction, there was no volume guaranty, implicit or explicit, in the Seagate Scotts Valley and Seagate Singapore license; therefore, if the LTC and Kyocera transaction provides any comparable royalty rate, the rate is 3 percent on third party sales only (i.e., the default rate provided for in the LTC and Kyocera agreements).

Petitioner, moreover, contends that, if the LTC and Kyocera transaction is a comparable transaction, applying it in a comparable manner would require that no royalty be payable by Seagate Singapore on sales to Seagate Scotts Valley since under the LTC and Kyocera agreements no royalty was payable by Kyocera on sales to LTC. Finally, petitioner contends that under the LTC and Kyocera agreements Kyocera received at no additional charge services for which respondent proposes separate, additional adjustments, for example, the procurement services fee adjustment (see *infra* Issue 7) and the research cost-sharing adjustment (see *infra* Issue 8). Accordingly, petitioner argues, the royalty adjustment proposed by respondent duplicates other proposed adjustments.

Petitioner contends that the Co. G and Cos. H and J agreement is irrelevant since it was executed after the years in

issue and 4 years after the royalty rate was established. Additionally, petitioner asserts that the Co. G and Cos. H and J agreement involved different technology that was not comparable to the disk drives involved in the instant case.

Petitioner argues further that no marketing intangibles exist that would support an additional 2-percent royalty. Petitioner contends that trade names and trademarks are not significant in the disk drive industry and none of respondent's experts rely on those traditional marketing intangibles in support of the additional 2-percent royalty for marketing intangibles. Petitioner argues that the "finder's fee" proposed by Mr. Sherwood is not credible since no one in the disk drive industry would pay 2 percent of sales to find potential customers. Furthermore, petitioner argues that a finder's fee is indistinguishable from a marketing service and that respondent has stipulated that that issue is no longer in dispute.

Additionally, petitioner contends that the right to sell to Seagate Scotts Valley's customers described by Dr. Horst has no substance. Petitioner contends that Seagate Scotts Valley had no customer rights that it could license to anyone.

Petitioner also contends that respondent's rationale that the 2-percent marketing intangibles royalty rate serves as a premium for the transferred technology because Seagate Singapore could sell disk drives using those intangibles to Seagate Scotts Valley's existing customers is flawed in its theory and its application. First, petitioner argues, in light of the competition in the disk drive market, the potential customer has alternative products from which to choose. Accordingly, on any sale, petitioner argues that the licensee is not per se taking away the profit from the licensor. Furthermore, petitioner contends that many in the computer industry, including the management of IBM and Seagate Scotts Valley, believed that allowing widespread use of a company's technology was beneficial and profitable.

Petitioner additionally argues that, if the adjustment is a premium royalty on the transferred technology, respondent has computed the adjustment improperly. Petitioner contends that under respondent's premium royalty theory: (1) No royalty should be due on disk drives covered under the cost-sharing agreement; (2) under the section 367 private letter ruling no royalty is due on sales of disk drives subject to

that ruling outside the United States; and (3) the 2-percent premium should not apply to Seagate Singapore sales to Seagate Scotts Valley. Petitioner argues that, as computed by respondent, the 2-percent additional marketing intangibles royalty adjustment applies to all of those sales.

Additionally, petitioner contends that, regardless of when the written license agreements were executed, Seagate Scotts Valley and Seagate Singapore had agreed on a 1-percent royalty in 1983, at the time of the first transfer of technology. In petitioner's view, the date the royalty agreement was signed is irrelevant. Petitioner also contends that the facts known at July 2, 1985, are not more favorable for respondent.

### c. *The Court's Holding as to the Arm's-Length Royalty Rate*

We do not agree completely with the results propounded by either party. We conclude that petitioner has shown that the royalty rate advanced by respondent's experts is unreasonably high. On the other hand, we believe that the 1-percent royalty rate urged by petitioner's experts is unreasonably low for the property involved in the instant case. While we have considered all of the arguments raised by the parties, we do not believe that it would serve any useful purpose to dissect point by point all such arguments raised by the parties. Accordingly, we will focus only on those factors which we believe are necessary to a full understanding of our holding as to a reasonable arm's-length consideration for the intangibles in issue. In reaching such conclusion, we draw on the record as a whole to determine the rate we believe that unrelated parties, under the facts and circumstances of the instant case, would have negotiated for the subject property. See *Sundstrand Corp. v. Commissioner*, 96 T.C. 226, 383 (1991); *Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525, 597 (1989), affd. 933 F.2d 1084 (2d Cir. 1991).

For the reasons discussed below, we do not find any of the third party agreements relied upon by the parties or introduced into the record to involve "the same or similar intangible property". Additionally, we do not believe that the transfers occurred under "the same or similar circumstances". Sec. 1.482–2(d)(2)(ii), Income Tax Regs.

The agreements with TI and Honeywell Bull involved the ST506, which was the first 5.25-inch hard disk drive. Seagate

Scotts Valley entered into the agreements with TI and Honeywell Bull at the beginning of that model's life cycle, at a time when Seagate Scotts Valley needed capital. Both agreements required substantial advance payments and guaranteed the licensees special rates for specified numbers of disk drives. The agreement with Honeywell Bull also provided for a royalty payment, expressed in dollars per units. [20] Additionally, the agreement with Honeywell Bull did not include the North American and Japanese marketplaces and required that the disk drives Honeywell Bull produced using the licensed technology be integrated or connected to other products.

The licensing agreement with TEAC involved the ST506 and the ST412, the latter of which also was one of the disk drive models involved in the instant case. That agreement, however, also required an advance payment and excluded North America and most of Western Europe.

Respondent's experts rely heavily upon the LTC and Kyocera agreements. We do not agree with that reliance.

First, we do not consider the LTC and Kyocera agreements to have been negotiated at arm's length. Both Kyocera and PBTC made capital investments in LTC and each held a seat on LTC's board of directors. PBTC, moreover, provided substantial trade financing to LTC. Additionally, financing for the development of the technology LTC licensed to Kyocera was provided through an entity related to PBTC.

Second, we do not believe that the LTC and Kyocera agreements are sufficiently similar to the Seagate Scotts Valley and Seagate Singapore license. Sec. 1.482–2(d)(2)(ii), Income Tax Regs. The LTC drive was a 3.5-inch Winchester disk drive, designed for use primarily in desk-top and compact microcomputers. Apparently, at the time the LTC and Kyocera agreements were made, the technology was still in the development stage. LTC was required to purchase substantial volumes of disk drives from Kyocera at prices which appear designed to permit Kyocera to recover its costs. Kyocera could sell disk drives to its own customers only with LTC's permission.

---

[20] Because the royalty was expressed in dollars per units and the number of units on which a royalty was required varied on the basis of certain contingencies, the percentage royalty rate cannot be calculated.

Finally, we find the LTC and Kyocera arrangement so complex and convoluted that it is impossible to ascertain exactly what the parties intended.

Other agreements in the record between Seagate Scotts Valley and unrelated third parties involved different technology, required advance payments, provided a cross-license, granted exclusive rights, or contained geographic limitations. Similarly, other third party agreements in the record suffer from the same impediments. The parties would have us speculate on the relative value of the advance payments, cross-licensing agreements, exclusivity provisions, and geographic restrictions without providing any methodology for us to quantify the differences. As a result, we do not find any of those agreements sufficiently similar to the Seagate Scotts Valley and Seagate Singapore license. Consequently, we reject petitioner's argument that these agreements establish that the 1-percent royalty is within the range of arm's-length royalty rates for the same or similar technology.

Petitioner has made no attempt to adjust the 1- to 3-percent range it contends is the reasonable range of arm's-length royalty rates for the intangibles in issue for the differences in circumstances between the proposed comparable licensing transactions and the Seagate Scotts Valley and Seagate Singapore license. Nor has respondent made any effort to quantify the differences in circumstances between the LTC and Kyocera agreement and the subject transaction. Consequently, to determine the arm's-length consideration for the property transferred to Seagate Singapore, we use the appropriate factors set forth in section 1.482–2(d)(3)(iii), Income Tax Regs.

In reaching our conclusion, we consider first the prevailing royalty rates for hard disk drives and other computer peripherals as revealed by the record. We agree with petitioner's premise that, given the nature of the disk drive industry, the marketplace could not support the high royalty rates advanced by respondent's experts. We accept as reasonable Dr. Chandler's conclusion that royalty rates for disk drive or computer accessory technology ranged generally between 1 and 5 percent. We do not agree, however, that 1 to 3 percent is a reasonable range of royalty rates for all of the intangibles involved in the instant case.

From our review of the third party agreements in the record, we conclude that those licensing agreements encompass merely the transfer of technology and know-how relating to the applicable products. Consequently, the compensation in those agreements applies only to manufacturing intangibles. On the other hand, in the case of the Seagate Scotts Valley and Seagate Singapore license, we agree with respondent that Seagate Scotts Valley transferred certain valuable marketing intangibles as well as manufacturing intangibles to Seagate Singapore.

Through the marketing efforts of Seagate Scotts Valley's sales executives, Seagate Scotts Valley already had installed itself as the leading producer of 5.25-inch hard disk drives and had established worldwide markets for those disk drives at the time the property transfer agreement between Seagate Scotts Valley and Seagate Singapore became effective. Master purchasing contracts which governed the terms of purchase orders from the leading OEM customers already were in place. Seagate Singapore, therefore, had a waiting market for the disk drives it would produce. The 1-percent royalty rate advocated by petitioner does not compensate Seagate Scotts Valley for those valuable marketing intangibles. Nor do the transfer prices we determined earlier account for such intangibles, see *supra* Issue 4. Cf. *Perkin-Elmer Corp. v. Commissioner*, T.C. Memo. 1993–414.

Moreover, we are convinced that when Seagate Scotts Valley transferred to Seagate Singapore the technology relating to the ST412, ST212, and ST225, Seagate Scotts Valley's management anticipated that, as between Seagate Singapore and Seagate Scotts Valley, Seagate Singapore would become the sole manufacturer of those disk drive models. Consequently, a higher royalty rate than 1 percent seems appropriate for Seagate Scotts Valley to recover its research and development or other costs incurred in developing the property transferred, especially the ST225, which was in the early stages of its commercial life cycle when transferred.

Furthermore, Seagate Scotts Valley's management must have foreseen that any direct sales by Seagate Singapore to Seagate Scotts Valley's customers would reduce the latter's own sales. We agree with respondent's experts that, at arm's length, Seagate Scotts Valley would have demanded some compensation for those lost profit opportunities.

From our review of the record as a whole, we believe that royalty rates in a range of 3 to 5 percent are more reasonable for the intangibles involved in the instant case. Under the circumstances present in the case, however, we believe that a royalty rate in excess of 3 percent would be too high in light of the attendant risks undertaken by Seagate Singapore, such as the age of the transferred technology (except for the ST225), the volatility of the disk drive market, and the absence of a cross-license provision. Consequently, using our best judgment, we conclude that a royalty rate of 3 percent of the disk drive sale prices is reasonable arm's-length consideration for the intangibles in issue. We conclude further that the royalty is payable only on "sales back into the United States" as that term is defined *infra,* because of the fact that the intangibles otherwise were transferred to Seagate Singapore as a contribution to capital.

### d. *The Offset for the Marketing Commissions Paid by Seagate Singapore to Seagate Scotts Valley*

Seagate Singapore paid Seagate Scotts Valley a commission of 5 percent on all of Seagate Singapore's third party sales, excluding sales to distributors in Southeast Asia, the Indian Subcontinent, and the China Basin. In the notices of deficiency, respondent included the marketing commissions paid by Seagate Singapore as an offset in respondent's calculation of Seagate Scotts Valley's cost of goods sold for purposes of deriving the residual income to be split between Seagate Singapore and Seagate Scotts Valley.

Before trial, respondent conceded the marketing services reallocation encompassed in the notices of deficiency within the marketing services and intangibles adjustment, see *supra* Issue 2. The marketing services reallocation represents the arm's-length charge respondent calculated for marketing and sales support services Seagate Scotts Valley provided to Seagate Singapore for third party sales made by Seagate Singapore. Respondent correspondingly eliminated the offset allowed in the notices of deficiency for the marketing commissions Seagate Singapore paid to Seagate Scotts Valley under the marketing agreement, see *supra*, p. 261.

Petitioner contends that the marketing commission payments Seagate Singapore paid to Seagate Scotts Valley should offset the additional 2-percent royalty respondent pro-

poses for marketing intangibles Seagate Singapore received from Seagate Scotts Valley. Petitioner also contends that respondent's concession of the marketing services adjustment and assertion of a marketing intangibles adjustment in its place is an attempt to draw a distinction between Seagate Scotts Valley's provision of services relating to Seagate Singapore's sales to customers and Seagate Scotts Valley's provision of access to those customers to Seagate Singapore. Petitioner contends that such a distinction is contrived, impossible to make, and simply too fine to justify disallowing the offset respondent previously allowed to Seagate Scotts Valley in the notices of deficiency. Petitioner also contends that Seagate Singapore acquired the right to all marketing intangibles associated with its royalty-free sales of disk drives to unrelated customers all over the world, including goodwill and going concern value, as part of Seagate Scotts Valley's contribution of capital subject to the section 367 private letter ruling.

We do not agree with petitioner that Seagate Scotts Valley is entitled to an offset to the section 482 reallocation for the marketing commissions Seagate Singapore paid to Seagate Scotts Valley. The mere presence of the offset for the marketing commissions in the notices of deficiency does not justify allowing such an offset. Like the price allowance computed in the notices of deficiency, see *supra* Issue 4, the offset for marketing commissions was merely a computational adjustment used to derive the residual profits respondent then split between Seagate Singapore and Seagate Scotts Valley. Because we do not rely on respondent's notice methodology for determining the section 482 reallocation, our decision must rest upon an independent rationalization for such an offset.

The marketing commissions payable under the marketing agreement between Seagate Scotts Valley and Seagate Singapore reimbursed Seagate Scotts Valley for certain marketing services it would provide Seagate Singapore, particularly during the early phases of the startup of marketing activities in the Far East. We do not agree that those marketing services cannot be distinguished from the marketing intangibles Seagate Singapore tapped into when Seagate Scotts Valley transferred the ST412, ST212, and ST225 technology to Seagate Singapore.

To show entitlement to an offset for the marketing commissions, petitioner must establish that Seagate Singapore overpaid Seagate Scotts Valley for the marketing services the latter provided to Seagate Singapore. Petitioner, however, made no such showing. Consequently, no such offset is allowed.

### 2. *Analysis of Scope of Ruling*[21]

Under the property transfer agreement between Seagate Scotts Valley and Seagate Singapore, Seagate Scotts Valley contributed to Seagate Singapore's capital the rights to the ST412, ST212, and ST225 disk drive models, except for the right to sell in the United States disk drives produced by Seagate Singapore using the transferred technology and the exclusive right to use the transferred technology and make products in the United States, which rights Seagate Scotts Valley retained. Seagate Scotts Valley, however, gave Seagate Singapore a limited right to sell products produced through the use of the transferred technology "back into the United States" in exchange for a royalty of 1 percent on such sales. Under the property transfer agreement, therefore, Seagate Singapore was required to pay royalties to Seagate Scotts Valley only on sales by Seagate Singapore of ST412, ST212, and ST225 disk drive models in the United States because, as a result of such contribution to its capital, Seagate Singapore owned directly all rights to such disk drive models except for the right to sell or manufacture those disk drive models in the United States.

Seagate Scotts Valley did not recognize any gain from such transfer of technology to Seagate Singapore because, in a section 367 private letter ruling issued to Seagate Scotts Valley in February 1985, respondent had determined that the transfer of the technology was not made principally for a tax avoidance purpose.[22] The section 367 private letter ruling cautioned, however, that respondent may reallocate income under section 482 to reflect the value of royalty payments

---

[21] At trial, respondent conceded the question of the validity of the transfer of the intangibles subject to the sec. 367 private letter ruling and agreed to limit the issue relating to the sec. 367 private letter ruling to the scope of the ruling.

[22] Under sec. 367, as in effect at the time that Seagate Scotts Valley transferred the technology to Seagate Singapore, Seagate Scotts Valley was required to recognize any gain from the transfer unless it had timely requested and received a ruling from the Commissioner that such transfer was "not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes."

Seagate Singapore owes Seagate Scotts Valley on sales by Seagate Singapore into the United States. The parties do not agree as to what constitutes sales into the United States. Accordingly, we must decide what constitutes sales "back into the United States".

Petitioner argues that no royalty should be imposed on Seagate Singapore sales to customers other than to Seagate Scotts Valley. In petitioner's view, royalties should not apply to sales that were f.o.b. Singapore even if Seagate Singapore shipped the disk drives directly to sites in the United States. We do not agree.

Petitioner argues first that respondent admitted in the answer that the notices of deficiency state that no royalty would apply to any direct sale of disk drives covered by the section 367 private letter ruling if petitioner substantiated that Seagate Scotts Valley had transferred the technology to Seagate Singapore. Petitioner contends that it has substantiated that transfer and that, consequently, unless respondent is allowed to withdraw such favorable determination granted in the notices of deficiency and admitted in the answer, no royalty should be imposed on such direct sales. Respondent does not directly address petitioner's arguments regarding the significance of the wording in the notices of deficiency, the petition, and the answer which petitioner contends is a concession that royalties are not owed on any direct sales of disk drives covered by the section 367 private letter ruling. From other arguments made in respondent's brief, however, we understand respondent's position to be that respondent denies that such concession is contained either in the notices of deficiency or in the answer.

The relevant portions of the notice of deficiency for the fiscal year ended 1986 state as follows:

(B) It is determined that you have failed to substantiate adequately the existence of the following facts, among others, offered in support of your contention that * * * [Seagate Scotts Valley] and Seagate Singapore were operating at arm's length during the fiscal year 1986:

(1) That patents, sales contracts and all of the other items of intangible property described in the undated document entitled "Property Transfer Agreement" were transferred to Seagate Singapore from * * * [Seagate Scotts Valley]. And further, if such intangible property was transferred,

that it was transferred as of September 30, 1983, as alleged in the undated document entitled "Property Transfer Agreement";

\* \* \* \* \* \* \*

(3) That during the fiscal year 1986 Seagate Singapore should be treated as having engaged in sales outside of the United States for purposes of the February 27, 1985 Section 367 Ruling or for purposes of analyzing functions, risks and intangibles under I.R.C. Section 482; and

\* \* \* \* \* \* \*

Accordingly, considering the functions performed, intangibles used and developed, services received and risks incurred, \* \* \* [$71,520,000 is allocated under section 482 to Seagate Scotts Valley from Seagate Singapore as shown on attached schedules B-1 through B-4].

(C) In the alternative, should the determinations in paragraphs (B)(1) and (B)(3) above relating to the absence of adequate substantiation as to the transfer of manufacturing intangibles and as to sales outside of the United States not be upheld, it is determined that the allocation adjustment amount shown in paragraph (B) above is reduced by \* \* \* [$6,511,000 as shown on attached schedule C].

Computation of the alternate reduction amount for fiscal year ended June 30, 1986, as reflected on Schedule C of the notice of deficiency for such year is as follows:

|  | 1986 Computation of reduction amount (000's omitted) | |
| --- | --- | --- |
|  | Direct sales | Interco sales |
| Sales of disk drives included in sec. 367 ruling | $61,315 | $186,137 |
| Percent of total sales | 35.0% | 85.9% |
| Reduction in adjustment for increase in manufacturing allocation to Seagate Singapore | 1,204 | 2,899 |
| Reduction in allocation for sales outside the United States under sec. 367 ruling | 2,408 | - - - |
| Total | [1] 6,511 | |

[1] $6,511 is the total reduction, which is the sum of $1,204, $2,899, and $2,408.

The relevant portions of the notice of deficiency for the fiscal years ended 1984, 1985, and 1987 are worded substantially the same except for the dates and amounts. Accordingly, the above excerpts from the notice of deficiency for fis-

cal year ended June 30, 1986, demonstrate that, in the notices of deficiency, respondent did not separately calculate an arm's-length royalty rate to reallocate income to Seagate Scotts Valley relating to the intangible property it transferred to Seagate Singapore. Instead, respondent used a profit split method for such purpose. As we understand respondent's methodology, the effect of the alternate reduction amount set forth in the notice of deficiency is to increase the income to be allocated to Seagate Singapore and, correspondingly, to decrease the income to be reallocated to Seagate Scotts Valley.

In the petition, petitioner alleges the following regarding the reduction amount:

5. The facts relating to the errors in paragraph 4 are as follows:

(a) Section 482 Adjustments Relating to Parts and Components Sold by Petitioner to Seagate. * * *

(b) Additional Section 482 Adjustments. * * *

(lx) In the alternative ("First Alternative Section 482 Adjustment"), in the event Petitioner provides adequate substantiation of the transfers of Know-how and Related Technology covered by the [Section 367 Private Letter] Ruling issued February 27, 1985, Respondent would reduce the Section 482 Adjustment by the following amounts for the following taxable years:

| Taxable Year Ended | Amount |
|---|---|
| June 30, 1984 | $4,461,000 |
| June 30, 1985 | 181,000 |
| June 30, 1986 | [23] 6,541,000 |
| June 30, 1987 | 36,519,000 |

(lxi) Schedule C to the Notices of Deficiency shows the computation of the reductions mentioned in paragraph 5(b)(lxii). However, the Notices of Deficiency provide no explanation with respect to the basis for Respondent's computation of these reductions.

(lxii) The reductions in Schedule C of the Notices of Deficiency have the effect of reversing the entire Manufacturing Services and Intangibles Adjustment with respect to direct sales of drives to unrelated parties covered by the Ruling. In addition, these reductions allow Seagate Singapore an additional twenty-five percent of the Value of Manufacturing Services and Intangibles with respect to intercompany sales.

---

[23] We note a $30,000 difference between the reduction amount reflected on Schedule C of the notice of deficiency for fiscal year ended June 30, 1986, and the reduction amount for that period as stated in the petition. We assume that the amount reflected in the petition contains a typographical error. The correct reduction amount for the fiscal year ended June 30, 1986, is not material to our holding as to the issue.

In the answer, respondent responds to the above-quoted allegations as follows:

(lx). Admits.

(lxi). Admits that Schedule C of the notice of deficiency shows the calculation of the amounts listed in petitioner paragraph 5(b)(lxii).

(lxii). Admits.

We agree with respondent that the interpretation petitioner places on respondent's position in the notices of deficiency and answer regarding the effect on the section 482 reallocation of the reduction amount detailed in the notices of deficiency is overly broad. We do not read the excerpted language from the notice of deficiency and answer to constitute a concession by respondent that, if petitioner established, as it has, that Seagate Scotts Valley transferred the technology to Seagate Singapore, then no royalty is payable on any direct sale of disk drives covered by the section 367 private letter ruling. Respondent's application of the alternative reduction amount was dependent on the use of respondent's residual profit method. Because we have found respondent's residual profits method unreasonable and reject its application here, the reduction is no longer applicable, no matter which entity owns the disk drive technology.

Petitioner argues further that, even if a disk drive was shipped into the United States, it *may* have been reshipped out of the country. Petitioner contends that the best measure of whether a drive was sold into the United States should be where title passes initially, in the instant case generally at the shipping dock.

Petitioner's position essentially is that a sale is outside the United States if title to the property passes outside the United States. Respondent's position, on the other hand, is that all sales with U.S. shipment destinations are subject to a royalty regardless of where title passes. Although petitioner's position is appealing, it fails to address the real question, which is: what constitutes a "sale back to the United States" under the property transfer agreement that would trigger the right in Seagate Scotts Valley to collect a 1-percent royalty? The agreement neither provides that the place of title controls nor gives any other clue as to what constitutes a "sale back into the United States".

The purpose of the 1-percent royalty, as we understand it, was to compensate Seagate Scotts Valley for disk drive sales by Seagate Singapore to customers located in the United States. At least for purchases by IBM, the record reveals that IBM-IPO acted merely as a buying agent for the IBM sites using the disk drives. IBM-IPO issued the purchase order for the IBM sites using the disk drives. Seagate Singapore sent the invoice to IBM-IPO but shipped the disk drives directly to the IBM site using the disk drives. We conclude that, under such circumstances, the IBM site using the disk drives is the customer for purposes of determining whether a royalty is payable on the sale and the sites using the disk drives were located in the United States. Petitioner has not shown that other customers functioned any differently than IBM. Accordingly, as we read the property transfer agreement, Seagate Singapore was required to pay royalties on sales of disk drives shipped from Singapore to customers located in the United States even though title may have passed in Singapore. For disk drives that were shipped to destinations outside the United States, Seagate Singapore would not be liable for royalties. Consequently, we hold that the 3-percent royalty is payable on all sales of disk drives shipped into the United States, regardless of where title legally may have passed but not for disk drives shipped to destinations outside of the United States.[24] We do not consider whether our conclusion would be different had the contract language been different.

## VII. ISSUE 7

Whether the procurement services fees Seagate Singapore paid Seagate Scotts Valley were arm's length.

---

[24] Amendments to sec. 367(a) added by sec. 131(a) of the Deficit Reduction Act of 1984, Pub. L. 98–369, 98 Stat. 494, 662–663, are not applicable to the property Seagate Scotts Valley transferred to Seagate Singapore under the property transfer agreement because such transfer occurred before Jan. 1, 1985. Even if such amendments had been effective at the time of such transfer, the exception for transfers of certain property used in the active conduct of a trade or business outside of the United States, which is set forth in sec. 367(a)(3)(A), would not apply to such transfer because the property involved is intangible property within the meaning of sec. 936(h)(3)(B). Sec. 367(a)(3)(B).

## A. FINDINGS OF FACT

### 1. *Background*

#### a. *The Services Agreement*

Seagate Scotts Valley and Seagate Singapore entered into a services agreement effective for the period July 1, 1986, through June 30, 1987 (the services agreement).[25] The stated objectives of the services agreement are to "maintain the independent management of each facility, maximize efficiency and productivity, minimize the duplication of effort, control personnel levels, and minimize the use of third party contractors".

Under the services agreement, Seagate Scotts Valley and Seagate Singapore agreed:

1) THAT although * * * [Seagate Scotts Valley and Seagate Singapore] independently will continue to develop their management teams and technical skills and expertise, each agrees to review its staff and make available as requested by the other any and all expertise (exclusive of any design engineering) * * * [such as engineering, quality, purchasing and testing] to carry out the objectives * * * [described above], and

2) THAT each party will review and concurrently develop programs and hiring practices to attract and retain talent with the specific educational and business backgrounds necessary to carry out the objectives of this agreement regardless of the geographic location of the individual.

Under the services agreement, Seagate Scotts Valley and Seagate Singapore each also agreed to charge the other party an arm's-length fee for any service undertaken for the joint benefit of either party or performed exclusively for the benefit of one of the parties. They agreed further, however, that no charge would be made for services that were merely duplicative or where the benefit was indirect, remote, or de minimis in nature.

Seagate Scotts Valley calculates the fees it charges Seagate Singapore for procurement services on the basis of the time and effort spent by employees in various departments relative to Seagate Singapore support functions.

Seagate Singapore paid Seagate Scotts Valley the following amounts for services, other than marketing services, that

---

[25] It is not clear from the record whether another services agreement was in effect during fiscal years 1984, 1985, and 1986. The arm's-length compensation for procurement services Seagate Scotts Valley rendered to Seagate Singapore during fiscal years 1984, 1985, and 1986 is in dispute for those years as well as for fiscal year 1987.

Seagate Scotts Valley provided to Seagate Singapore (the worldwide support payments):

| Period ended | Amount |
|---|---|
| 6/30/84 | $465,000 |
| 6/30/85 | 662,654 |
| 6/30/86 | 4,227,000 |
| 6/30/87 | 14,339,991 |
| Total | 19,694,645 |

Neither Seagate Scotts Valley nor Seagate Singapore is in the trade or business of rendering procurement services to one or more unrelated parties.

b. *Procurement Services Performed by Seagate Scotts Valley for Seagate Singapore*

Seagate Singapore obtains some of the materials it uses for manufacturing disk drives and component parts through Seagate Scotts Valley. Seagate Scotts Valley sells to Seagate Singapore materials that Seagate Scotts Valley purchased from related entities and from third parties. Seagate Scotts Valley transfers the materials to Seagate Singapore at their standard cost.

Seagate Scotts Valley sold to Seagate Singapore the following amounts of materials purchased from third parties and related entities:

| Period ended | Amount purchased from | | Total |
| | Third parties | Related entities | |
|---|---|---|---|
| 6/30/84 | $20,582,968 | - - - | $20,582,968 |
| 6/30/85 | 59,813,506 | - - - | 59,813,506 |
| 6/30/86 | 80,460,048 | $34,860 | 80,494,908 |
| 6/30/87 | 112,167,888 | 20,507,893 | 132,675,781 |

The materials that Seagate Scotts Valley transfers to Seagate Singapore generally fall into three categories: (1) Seagate Scotts Valley's excess inventory and materials remaining after Seagate Scotts Valley reduces its manufacturing of a product in the United States; (2) materials for new disk drive models for the period Seagate Singapore's purchasing and quality personnel are locating local vendors

to supply the materials directly to Seagate Singapore; and (3) disks and some custom integrated circuits which are more readily available in the United States.

Seagate Scotts Valley sometimes ships materials to Seagate Singapore in excess of the quantities Seagate Singapore ordered, or without Seagate Singapore's having ordered them. At times, Seagate Singapore has to reschedule its commitments to purchase materials from its third party suppliers because Seagate Scotts Valley overshipped the same materials to Seagate Singapore.

At various times, for materials Seagate Scotts Valley procures for Seagate Singapore, Seagate Scotts Valley performs the following functions: Vendor selection; vendor qualification; inspection of materials; inventory; packaging; and assistance with vendor manufacturing.

### c. *Seagate Singapore's Procurement Activities*

Seagate Singapore purchases directly from third parties some of the materials that it uses to manufacture component parts. The materials which Seagate Singapore purchases are chosen by drawing specifications which are provided by Seagate Scotts Valley.

Seagate Singapore's procurement strategy is to establish low-cost Far East sources for disk drive materials as quickly as possible so that higher cost sources in the United States can be phased out. Seagate Singapore personnel work closely with vendors in the Far East who initially are unfamiliar with materials for disk drives. Seagate Singapore has international procurement offices (IPO's) in Taiwan, Hong Kong, Japan, and South Korea, to facilitate direct purchases from vendors in those countries.

Seagate Singapore's purchasing group monitors the materials supply market, locates vendors, negotiates prices, sets delivery schedules, imposes inventory controls, handles returns, and performs other activities necessary to acquire materials. Seagate Singapore's vendor quality engineering group conducts supplier surveys and performs vendor qualification, first article testing, source inspection, incoming inspection, and other activities.

Seagate Singapore possesses full authority to give final approval to vendors of noncritical materials. With respect to critical materials, after Seagate Singapore performs first arti-

cle testing and preliminarily approves the vendor for a critical material, Seagate Singapore sends the testing documentation to Seagate Scotts Valley for final approval. Except for disks and some custom integrated circuits, Seagate Singapore generally purchases all of its materials requirements from third party suppliers located in the Far East and throughout the world. Seagate Singapore could purchase disks and custom integrated circuits directly from U.S. suppliers but does not do so because of the corporate policy of centralizing the procurement of such products for convenience.

Seagate Singapore also procures some materials for Seagate Scotts Valley. Seagate Singapore does not charge Seagate Scotts Valley a fee for those procurement services. Seagate Singapore transfers those materials to Seagate Scotts Valley at Seagate Singapore's standard cost.

By 1987, Seagate Singapore had approximately 260 employees in its materials department, of whom 20 were in its purchasing group, including those employees working in the IPO's. By 1987, Seagate Singapore also had approximately 120 employees in its vendor quality engineering group.

### d. *Solarise Enterprises, Inc.*

Solarise Enterprises, Inc. (Solarise), is a California corporation, located in Saratoga, California. Solarise acts as a consultant for domestic technology companies that sell or manufacture products overseas. Additionally, Solarise provides a purchasing function for some companies located overseas, particularly in Japan. Solarise arranges contract manufacturing agreements with Japanese companies. It also has produced for a U.S. manufacturer, on a turnkey basis, floppy and hard disk controllers under a contract manufacturing arrangement with a Japanese company, for which Solarise charged a markup of 5 percent of the cost of such products made in Japan.

Solarize charges a commission fee for its procurement services which is based on a markup of the costs involved in procuring the materials. The commission fee ranges between 2 and 35 percent, depending on the complexity of the product involved and the functions Solarize performs for the customer. Generally, Solarise marks up low-volume orders between 15 and 35 percent; complicated, expensive parts

between 5 and 10 percent; and high-volume orders, consisting of purchases of $500,000 or more, between 3 and 5 percent.

Solarise procures over 100 different materials for export overseas, including materials similar to some of the materials that Seagate Scotts Valley procures for Seagate Singapore. Most of the items Solarise procures are electrical parts. Solarise purchases the items in the United States, verifies their quantity and markings, and arranges their transportation overseas, including securing export documentation for the items. Solarise does not conduct preproduction evaluation of the items, qualify the items, or inspect the items.

For a time, Solarise performed inventory functions for some customers, for which service Solarise charged an additional commission ranging between 15 and 25 percent. Solarise stopped inventorying materials, however, because of the high risks involved in performing that service.

2. *Respondent's Notices of Deficiency*

In the notices of deficiency, respondent determined that Seagate Singapore paid to Seagate Scotts Valley as purchasing fees under the services agreement the amounts set forth in the table below.

| Year | Amount |
|------|--------|
| 1984 | $500,000 |
| 1985 | 278,000 |
| 1986 | 2,237,000 |
| 1987 | 6,112,000 |

Respondent determined further in the notices of deficiency that the arm's-length charge for procurement services Seagate Scotts Valley provided to Seagate Singapore was the amount of the fees Seagate Singapore had paid to Seagate Scotts Valley for procurement-related activities under the services agreement, plus 5 percent of the cost of the materials Seagate Singapore purchased from Seagate Scotts Valley and incorporated into disk drives produced by Seagate Singapore.

Respondent calculated the adjustments for procurement services fees in the notices of deficiency on the basis of an erroneous assumption that Seagate Scotts Valley had trans-

ferred materials to Seagate Singapore in the amounts set forth in the table below.

| Year | Total materials sales |
|------|----------------------|
| 1984 | $28,727,000 |
| 1985 | 80,324,000 |
| 1986 | 150,845,000 |
| 1987 | 178,812,000 |

Next, using the erroneous amounts set forth in the table immediately above, respondent estimated the amount of materials incorporated into disk drives produced by Seagate Singapore. Respondent then calculated the arm's-length procurement services fees on the basis of those resulting amounts, as set forth in the table below.

| Year | Materials estimated incorporated into disc drives | 5% of cost of materials estimated incorporated (rounded) |
|------|---------------------------------------------------|----------------------------------------------------------|
| 1984 | $10,370,000 | $519,000 |
| 1985 | 67,392,000 | 3,370,000 |
| 1986 | 136,666,000 | 6,833,000 |
| 1987 | 173,090,000 | 8,655,000 |

### 3. The Experts' Positions

#### a. Petitioner's Expert—Dr. Chandler

Dr. Chandler stated that respondent's evidence of arm's-length fees for procurement services was based solely on industry averages for sales commission agents, as opposed to purchasing agents, and was not tied directly to the circumstances surrounding the transaction between Seagate Singapore and Seagate Scotts Valley. Dr. Chandler concluded that respondent's approach was unreasonable.

In Dr. Chandler's opinion, Seagate Scotts Valley should be compensated for its costs of procuring components and dealing with suppliers on behalf of Seagate Singapore, but Seagate Singapore already has reimbursed Seagate Scotts Valley for the costs of providing those services. Dr. Chandler concludes that no section 482 reallocation is warranted unless Seagate Scotts Valley has failed to identify and charge

for all of the costs incurred in providing the services to Seagate Singapore and Seagate Scotts Valley's purchasing activities are substantial enough and distinct enough to require a profit markup.

b. *Respondent's Experts*

i. *Martin Ehrlich*

Martin Ehrlich (Mr. Ehrlich) is the president of GLA-MAR Enterprises, Inc. (GLA-MAR), which assists clients in locating sources of electronic and electromechanical products in Asia. GLA-MAR offers a range of services, including: Product design and engineering; source or vendor identification, qualification, and selection; manufacturing supervision and schedule maintenance; quality inspection and control; freight supervision; import and export customs clearance; and financing of goods purchased on behalf of clients. Mr. Ehrlich has been active in various aspects of procurement from and sales to the Far East since the latter part of 1965.

Mr. Ehrlich concluded that Seagate Scotts Valley acts as a buying agent and vendor of materials and is a quality control and reliability resource for Seagate Singapore. He stated that a buying agent's fee schedule for basic services of expediting and inspection ranges between 3 and 5 percent of the f.o.b. value of goods procured, with fees of 3 percent generally paid only for very high volumes of highly repetitive goods where the flow of merchandise is virtually assured through an uninterrupted lengthy production schedule. He stated further that, in the Far East, after accounting for scheduled fees, retainers, and other reimbursed expenses, buying agents historically receive fees of approximately 5 percent of the f.o.b. value of the goods. Mr. Ehrlich also stated that a buying agent would charge an additional fee for price negotiation services. Mr. Ehrlich concluded that additional fees of 2 to 4 percent would be expected for those price negotiation services.

Mr. Ehrlich stated that vendor qualification and first article inspection and approval are critical services, usually performed by the principal. He concluded that a fee equal to the basic expediting and inspection fee (between 3 and 5 percent) might be expected for the additional responsibility of performing those critical services.

Mr. Ehrlich also stated that Seagate Scotts Valley should receive further compensation for the additional costs and risks it incurs when Seagate Scotts Valley acts as a vendor of materials. Mr. Ehrlich concluded that for its vendor-related services an additional markup of 10 percent should be applied to the goods Seagate Scotts Valley purchases and resells to Seagate Singapore.

In sum, Mr. Ehrlich concluded that the arm's-length charge for the procurement services Seagate Scotts Valley renders to Seagate Singapore should range between 8 and 14 percent, before including any markup for goods Seagate Scotts Valley buys and resells to Seagate Singapore. He concluded further that, for such goods, the 8- to 14-percent arm's-length charge should be increased by the cost of any financing expenses provided plus an additional 10 percent for risk-taking.

ii. *Dr. Clowery*

Using an 8-percent procurement services fee, Dr. Clowery calculated respondent's reallocation adjustment for procurement services based on his estimate of the cost of materials Seagate Singapore purchased from Seagate Scotts Valley and incorporated into completed disk drives (for which calculation he used the ratio of his estimate of Seagate Singapore's disk drive materials cost to Seagate Singapore's total materials cost times Seagate Singapore's total purchases of materials from Seagate Scotts Valley), and offset by his calculation of the "materials and planning" component[26] of the worldwide support fees Seagate Singapore paid to Seagate Scotts Valley, as set forth in the following table:

---

[26] Dr. Clowery does not explain why he did not calculate offsets for the portion of the worldwide support payments relating to procurement services that Seagate Singapore paid Seagate Scotts Valley during fiscal years 1984 and 1985. In addition, he does not explain how he calculated such offsets for fiscal years 1986 and 1987. Petitioner assumes that Dr. Clowery based the offsets for fiscal years 1986 and 1987 on information contained in Ex. 483–RO, which is a summary for fiscal years ended 1987, 1986, and 1985, of research and development and worldwide support charges to Seagate Singapore. Respondent sheds no light on the source or amount of the offsets. We accept petitioner's assumption that Ex. 483–RO is the source of Dr. Clowery's offsets for fiscal years 1986 and 1987.

| | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| Procurement fee | $526,176 | $4,026,906 | $5,784,517 | $10,166,645 |
| Materials and planning component of worldwide support payments | - - - | - - - | 2,237,000 | 5,759,810 |
| Net procurement fee adjustment | 526,176 | 4,026,906 | 3,547,517 | 4,406,835 |

## B. OPINION

### 1. *The Burden of Proof*

Before trial, we decided that, because of the complex nature of the instant case, we would require that the specific issues to be tried be narrowed and identified well before trial. Accordingly, to give the parties ample opportunity to adequately prepare for trial, the parties were apprised that, once the issues for trial were identified, we would not allow the parties to raise any additional issues. In furtherance of such objectives, we held pretrial hearings during which the parties were required to identify the issues to be tried. Based upon the parties' submissions, we issued an order (order) in which we designated the specific issues which would be tried.

The eighth issue in our order related to arm's-length charges for ongoing procurement and technical support services Seagate Scotts Valley provided to Seagate Singapore. Prior to trial, respondent conceded the question of the arm's-length charge for technical support services Seagate Scotts Valley provided to Seagate Singapore, leaving for trial the question of the arm's-length charge for procurement services.

In the notices of deficiency, respondent calculated the section 482 reallocation for procurement services Seagate Scotts Valley provided to Seagate Singapore on the basis of 5 percent of the cost of the materials Seagate Singapore purchased from Seagate Scotts Valley and incorporated into completed disk drives produced by Seagate Singapore. See *supra* p. 294. Shortly before, and at, trial respondent revised the Government's position on the procurement services issue to be that the arm's-length charge for procurement services Seagate Scotts Valley performs for Seagate Singapore is at least 8 percent of the cost of the completed disk drive and component parts materials Seagate Scotts Valley procures for Seagate Singapore, as well as the materials Seagate Singa-

pore itself procures from vendors whose products Seagate Scotts Valley had qualified.

Petitioner contended that respondent's increase in the procurement services fees from 5 percent to 8 percent and the addition of transactions involving Seagate Singapore's direct purchases of materials from third party vendors and Seagate Scotts Valley's purchases of materials to be incorporated into component parts manufactured by Seagate Singapore raise new issues in violation of our order. Consequently, petitioner argued, respondent should be precluded from raising such new issues. Respondent, on the other hand, contended that the Government's position at trial did not raise new issues because the functions performed by Seagate Scotts Valley relating to procurement of materials are the same regardless of whether Seagate Scotts Valley purchases the material from the third party vendors and then resells them to Seagate Singapore or whether Seagate Singapore purchases the materials directly from the third party vendors. Consequently, respondent argued, the evidence for both types of transactions is the same.

At trial, we ruled that respondent may raise the issue of whether a percentage above 5 percent would be an appropriate arm's-length charge for the procurement services Seagate Scotts Valley rendered to Seagate Singapore because no new evidence is needed to refute respondent's position as to the amount of the arm's-length procurement services fee. Additionally, we ruled that respondent may not raise any issue with respect to other transactions in addition to the transactions covered by the notices of deficiency because new evidence would be needed to refute respondent's revised position as to which transactions require Seagate Singapore to pay a procurement service fee to Seagate Scotts Valley. Respondent accepts the burden of proof as to any increased deficiency resulting from the increase in the procurement fee reallocation from 5 percent to 8 percent.

## 2. *The Services Regulations*

Section 1.482–2(b), Income Tax Regs., applies to transactions in which one related entity provides marketing, managerial, administrative, technical, or other services for another related entity for less than an arm's-length charge. Sec. 1.482–2(b)(1), Income Tax Regs. An arm's-length charge

is the "amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts". Sec. 1.482–2(b)(3), Income Tax Regs. Unless the services are an integral part of the business activity of either the entity rendering the services (renderer) or the entity receiving them (recipient), the arm's-length charge is deemed to be equal to all the costs or deductions incurred which are directly or indirectly related to the services performed. The taxpayer, however, may establish a more appropriate charge. Sec. 1.482–2(b)(3) and (4), Income Tax Regs.

For services which are an integral part of the business activity of either the renderer or the recipient, the costs or deductions incurred in rendering the services are not deemed equal to the arm's-length charge. Sec. 1.482–2(b)(7), Income Tax Regs.[27] Services are considered an integral part of the business activity of a related entity if (i) either the renderer or the recipient is engaged in the trade or business of rendering similar services to one or more unrelated parties; (ii) the renderer renders services to one or more related parties as one of its principal activities; (iii) the renderer is peculiarly capable of rendering the services and such services are a principal element in the operations of the recipient; or (iv) the recipient has received the benefit of a substantial amount of services from one or more related parties during its taxable year. *Id.*

---

[27] Sec. 1.482–2(b)(7), Income Tax Regs., provides in pertinent part as follows:

(7) *Certain services.* An arm's length charge shall not be deemed equal to costs or deductions with respect to services which are an integral part of the business activity of either the member rendering the services (referred to in this subparagraph as the "renderer") or the member receiving the benefit of the services (referred to in this subparagraph as the "recipient"). Subdivision (i) through (iv) of this subparagraph describe those situations in which services shall be considered an integral part of the business activity of a member of a group of controlled entities.

\*       \*       \*       \*       \*       \*       \*

(iii) Services are an integral part of the business activity of a member of a controlled group where the renderer is peculiarly capable of rendering the services and such services are a principal element in the operations of the recipient. The renderer is peculiarly capable of rendering the services where the renderer, in connection with the rendition of such services, makes use of a particularly advantageous situation or circumstance such as by utilization of special skills and reputation, utilization of an influential relationship with customers, or utilization of its intangible property (as defined in paragraph (d)(3) of this section). However, the renderer will not be considered peculiarly capable of rendering services unless the value of the services is substantially in excess of the costs or deductions of the renderer attributable to such services.

Except for services which constitute a manufacturing, production, extraction, or construction activity, the renderer is presumed not to render services to related parties as one of its principal activities for a taxable year if the costs attributable to rendering the services do not exceed 25 percent of the total costs or deductions of the renderer for the taxable year. For services which constitute a manufacturing, production, extraction, or construction activity, or where the costs of the services are in excess of 25 percent of the total costs or deductions of the renderer for a taxable year, the determination of whether the renderer renders such services to one or more related parties as one of its principal activities is based on the facts and circumstances of each case. Factors to be considered are "the time devoted to the rendition of the services, the relative cost of the services, the regularity with which the services are rendered, the amount of capital investment, the risk of loss involved, and whether the services are in the nature of supporting services or independent of the other activities of the renderer." Sec. 1.482–2(b)(7)(ii)(a), Income Tax Regs.

The renderer is not peculiarly capable of rendering services unless the value of the services is substantially in excess of the renderer's costs or deductions attributable to such services. Upon satisfaction of such condition, the renderer is considered peculiarly capable of rendering the services if the renderer, in connection with the rendition of such services, makes use of a particularly advantageous situation or circumstance, such as by using special skills and reputation, an influential relationship with customers, or its intangible property. Sec. 1.482–2(b)(7)(iii), Income Tax Regs.

Services rendered by one or more related parties are considered substantial in amount if the total costs or deductions of the renderer which are directly or indirectly related to such services exceed an amount equal to 25 percent of the total costs or deductions of the recipient during its taxable years. Sec. 1.482–2(b)(7)(iv), Income Tax Regs.

### 3. *The Parties' Positions*

#### a. *Petitioner's Position*

Petitioner contends that the value of the procurement services Seagate Scotts Valley rendered to Seagate Singapore is

the cost of those services because the procurement services are not an integral part of the business activity of either Seagate Scotts Valley or Seagate Singapore. Alternatively, petitioner contends that no procurement services adjustment is required under the section 482 regulations because Seagate Singapore did not benefit from such services; to the extent that Seagate Scotts Valley is selling parts produced by other members of the group, it is acting as a vendor of property and any adjustment should be made to the transfer price of the property in accordance with section 1.482–2(e), Income Tax Regs.; a charge for the qualification of vendors for the ST412, ST212, and ST225 is duplicative because the royalty rates are based on the licensor providing vendor information; and Mr. Ehrlich's testimony is not sufficient to establish an arm's-length fee for procurement services.

Petitioner also contends that, if any adjustment for procurement services is upheld, then Seagate Scotts Valley should be allowed full offsets for Seagate Singapore's procurement services payments that respondent allowed in the notices of deficiency. Additionally, petitioner contends that, if respondent is basing the procurement services adjustment on first article inspection and similar engineering and quality functions, then Seagate Scotts Valley is entitled to an offset for additional portions of the worldwide support payments.

Petitioner contends that the offsets calculated by Dr. Clowery represent the portion of Seagate Singapore's worldwide support payments for certain services rendered by Seagate Scotts Valley's purchasing and materials departments during fiscal years 1986 and 1987. Additionally, petitioner contends that Seagate Scotts Valley should be allowed offsets for the following procurement-related services rendered by Seagate Scotts Valley's purchasing and materials departments for fiscal year 1985 and the engineering and quality departments for fiscal years 1986 and 1987:

| Department | 1985 | 1986 | 1987 |
| --- | --- | --- | --- |
| Corporate materials | $16,305 | - - - | - - - |
| Materials logistics | 233,205 | - - - | - - - |
| Traffic/distribution | 28,109 | - - - | - - - |
| Component reliability | - - - | $248,000 | $283,374 |
| Procurement quality | - - - | 685,000 | 1,635,305 |
| Worldwide quality | - - - | - - - | 1,119,902 |
| Corporate reliability | - - - | - - - | 847,832 |

| Department | 1985 | 1986 | 1987 |
|---|---|---|---|
| M&P lab | - - - | - - - | 196,108 |
| Disc reliability | - - - | - - - | 200,058 |
| Total | 277,619 | 933,000 | 4,282,579 |

b. *Respondent's Position*

As a result of our ruling at trial, see *supra* pp. 298–299, respondent limits the procurement services fee reallocation to 8 percent of only the cost of disk drive parts materials Seagate Scotts Valley procures for Seagate Singapore. Consequently, respondent contends that the arm's-length charges for services Seagate Scotts Valley performs for Seagate Singapore relating to the procurement of materials are the amounts calculated by Dr. Clowery.

Respondent contends that, when identifying and qualifying potential and actual vendors of materials for Seagate Singapore, Seagate Scotts Valley acts as a buying agent for Seagate Singapore. Respondent contends that 8 percent is a reasonable fee for the procurement services Seagate Scotts Valley performs for Seagate Singapore because of the complexity of the materials procured and the functions performed.

Respondent contends that Dr. Clowery has allowed the correct offsets for the procurement payments Seagate Singapore made to Seagate Scotts Valley. Respondent further contends that petitioner has produced no evidence at trial supporting the amounts petitioner asserts Seagate Scotts Valley should be allowed as offsets for procurement services.

c. *The Court's Holding as to the Arm's-Length Procurement Services Fee*

The parties' positions as to the procurement services issue focus on whether Seagate Scotts Valley is peculiarly capable of procuring materials for Seagate Singapore to incorporate into completed disk drives. Accordingly, we do not consider the trade or business, principal activities, or substantial amount of services tests described in section 1.482–2(b)(7)(i), (ii), and (iv), Income Tax Regs., but concentrate on the peculiarly capable test described in section 1.482–2(b)(7)(iii), Income Tax Regs., to decide whether the procurement services that Seagate Scotts Valley renders to Seagate Singapore

are an integral part of the business activity of either Seagate Scotts Valley or Seagate Singapore.

Procuring materials incorporated into completed disk drives will be considered an integral part of the business activity of Seagate Scotts Valley or Seagate Singapore if Seagate Scotts Valley is peculiarly capable of rendering those services and the services are a principal element in Seagate Singapore's operations. Sec. 1.482–2(b)(7)(iii), Income Tax Regs. Seagate Scotts Valley will be considered peculiarly capable of rendering the procurement services if, in performing those services, Seagate Scotts Valley uses a particularly advantageous situation or circumstance, such as special skills and reputation, an influential relationship with customers, or its intangible property, and the value of those services is substantially in excess of Seagate Scotts Valley's costs or deductions attributable to such services. We are convinced that Seagate Scotts Valley did not use any such advantageous situation or circumstance.

We are also convinced that Seagate Scotts Valley did not perform any services that could not be performed by Seagate Singapore. Seagate Singapore's purchasing group monitors the materials supply market, locates vendors, negotiates prices, sets delivery schedules, imposes inventory controls, handles returns, and performs other activities necessary to acquire materials. Additionally, its vendor quality engineering group conducts supplier surveys and performs vendor qualification, first article testing, source inspection, incoming inspection, and other activities. Except for disks and some custom integrated circuits, Seagate Singapore generally purchases all of its materials requirements from third party suppliers located in the Far East and throughout the world. Moreover, Seagate Singapore could purchase disks and custom integrated circuits directly from U.S. suppliers, but does not, only because of corporate policy. Seagate Singapore also procures materials on behalf of Seagate Scotts Valley. Under such circumstances, we conclude that Seagate Scotts Valley is not peculiarly capable of performing the procurement services. Sec. 1.482–2(b)(7)(iii), Income Tax Regs.

Accordingly, we hold that the procurement of materials to be incorporated into completed disk drives is not an integral part of the business activity of either Seagate Scotts Valley or Seagate Singapore. The cost of procuring those materials,

therefore, is deemed to be the arm's-length charge for the procurement services. Sec. 1.482–2(b)(3), Income Tax Regs. We find nothing in the record which shows that Seagate Singapore has not fully reimbursed Seagate Scotts Valley for its costs in procuring the materials. Consequently, we conclude that no adjustment is required under section 482 for the procurement services Seagate Scotts Valley performed on Seagate Singapore's behalf.

As we have concluded that procuring the materials is not an integral part of the business activity of either Seagate Scotts Valley or Seagate Singapore, we do not address the other arguments raised by the parties relating to Issue 7.

## VIII. ISSUE 8

Whether the consideration Seagate Singapore paid Seagate Scotts Valley pursuant to a cost-sharing agreement was arm's length.

### A. FINDINGS OF FACT

### 1. *Background*

Seagate Scotts Valley incurs substantial expenses each year in research and development (R&D) to develop and improve its products and manufacturing processes. Primarily to improve manufacturing processes, Seagate Singapore also conducts some R&D, but not to the same extent as Seagate Scotts Valley. During 1987, Seagate Scotts Valley employed at least 200 people in the United States dedicated to product design and development. Not all products that Seagate Scotts Valley begins to design and develop ultimately are produced in volume. Some of the R&D projects which Seagate Scotts Valley undertakes fail to become commercially produced products.

At the time Seagate Scotts Valley decided to manufacture disk drives in Singapore, Seagate Scotts Valley's management anticipated that all of its high-volume products would be made outside the United States. At that time, Seagate Scotts Valley's management also planned to continue manufacturing some high-performance, but low-cost and non-labor-intensive, disk drives in the United States.

## 2. *The Research and Development Cost-Sharing Agreement*

Sometime during or near late Spring 1985, Seagate Scotts Valley and Seagate Singapore entered into an R&D cost-sharing agreement (the cost-sharing agreement), effective January 1, 1985, through June 30, 1985, and subsequent fiscal years through June 30, 1993. The objective of the cost-sharing agreement is "to minimize duplication of effort and overall R&D costs and expenses".

Under the cost-sharing agreement, R&D:

1.1 * * * including experimental, new product and component development, improvement of existing products and components (updates) and process technology, may be performed at either STSV OR STSG [Seagate Scotts Valley or Seagate Singapore].

1.2 At the beginning of each fiscal year, the parties shall determine whether to participate and share costs and expenditures for the total combined R & D activities of both or, if more appropriate under the circumstances, develop separate R & D budgets and identify those projects that are separate and those that are joint, for which costs and expenditures would be shared.

1.3 Amendments and modifications to project identification or budget amounts may be made at anytime during the fiscal year as agreed to by the parties.

Additionally, under the cost-sharing agreement, in exchange for an equal share of the costs, each party receives the "right to use", within limited geographical areas, the intangible property developed under the cost-sharing agreement. The "right to use" includes:

(1) the right to (i) make products, (ii) use intangible property, and (iii) sell products, and

(2) the right to license, or sublicense, the rights to any intangible property.

Seagate Scotts Valley's exclusive territory is North America, South America, Central America, and the Caribbean; Seagate Singapore's exclusive territory is Southeast Asia, the Indian Subcontinent, and the China Basin. Both parties share the right to use the intangibles in the rest of the world.

## 3. *Payments Under the Cost-Sharing Agreement*

The total amount of R&D expenses that Seagate Scotts Valley identified as costs to be covered by the cost-sharing

agreement and the amounts paid by Seagate Singapore are set forth in the following table:

| Period ended | Cost-sharing portion of R&D costs | Portion paid by Seagate Singapore |
|---|---|---|
| 6/30/85 | $6,603,607 | $3,801,804 |
| 6/30/86 | 19,891,000 | 9,945,500 |
| 6/30/87 | 41,567,151 | 20,783,577 |
| Total | 68,061,758 | 34,530,881 |

### 4. The Experts' Opinions

#### a. Petitioner's Expert—Dr. Chandler

Dr. Chandler considered whether the cost-sharing agreement serves useful economic and business purposes and is consistent with the sort of agreement that the parties would have reached if operating at arm's length. Dr. Chandler concluded that the cost-sharing agreement serves reasonable economic and business purposes because the agreement: (1) Allows Seagate Singapore to buy the ongoing technology that it needs for future-generation products; (2) gives both Seagate Scotts Valley and Seagate Singapore access to the disk drive technology; (3) allows both parties to share the risks of developing the technology; and (4) provides Seagate Scotts Valley with payments linked to the costs of developing the technology rather than the market value of licensing the technology, which Dr. Chandler concluded could be less than the cost. Dr. Chandler stated that because Seagate Singapore pays for the technology in advance, regardless of its subsequent value, the allocation of risks between the parties differs from a licensing arrangement under which Seagate Singapore presumably would pay only in the event a product could be produced.

Dr. Chandler stated that cost-sharing payments should reflect the expected market value of the rights and benefits received by each party. Dr. Chandler concluded that Seagate Scotts Valley and Seagate Singapore both obtained important rights under the cost-sharing agreement: they each obtained the right to produce disk drives in their own exclusive territory.

Dr. Chandler concluded further that Seagate Singapore receives substantially greater benefits from the cost-sharing agreement than Seagate Scotts Valley. Nonetheless, he concluded that it is reasonable to assume that, at the time Seagate Scotts Valley and Seagate Singapore entered into the cost-sharing agreement, Seagate Scotts Valley would have been willing to support the R&D effort required to maintain its capability to produce disk drives in the United States because of uncertainties relating to the disk drive market and Seagate Singapore's manufacturing abilities.

According to Dr. Chandler, allocating costs using a preset fixed formula is consistent with arm's-length behavior as long as both parties have a reasonable expectation of using the technology developed by the shared R&D. Dr. Chandler stated that, for fiscal years 1985 and 1986, he saw no evidence that the equal sharing of costs agreed to by Seagate Singapore and Seagate Scotts Valley was inappropriate. Dr. Chandler asserted that, during fiscal years 1985 and 1986, certain producers expanded their U.S. production, while certain Singapore operations ran into technical and financial difficulty. For fiscal year 1987, however, because of the preponderance of production of disk drives by Seagate Singapore, Dr. Chandler concluded that it is reasonable to assume that Seagate Scotts Valley may have insisted on a renegotiation of the terms of the cost-sharing agreement at the beginning of that year. Consequently, for fiscal year 1987, Dr. Chandler concluded that a new 67/33-percent or 75/25-percent split appears reasonable, with Seagate Singapore incurring the larger share of the R&D costs.

Dr. Chandler indicated that little information is available about specific cost-sharing agreements. He stated that many of the cost-sharing agreements that he was able to locate differ from the cost-sharing agreement due to the diversity of companies included and, in many cases, public involvement in the cost-sharing arrangement. Dr. Chandler noted, however, that most of such agreements specified a minimum contribution on the part of the participants, set independent of the direct benefits received, and that all of the participants were provided with access to the results of the research.

b. *Respondent's Experts*

i. *Dr. Horst*

Dr. Horst concluded that, under an arm's-length cost-sharing agreement, R&D costs are borne by the participating members in proportion to the benefits they expect to receive from the R&D. According to Dr. Horst, the primary benefit of R&D, in general, is the right to sell the resulting products at arm's-length prices or to receive an arm's-length royalty on third party sales of such products. Dr. Horst stated that an arm's-length formula for sharing R&D would be based on the value or volume of sales, or some measure of the gross or net profit from sales, of the specific products benefiting from the R&D. He concluded that, in the instant case, the R&D costs should be shared on the basis of the ratio of the number of disk drives produced in the United States to the total number of disk drives produced in the United States and Singapore.

ii. *Dr. Clowery*

Dr. Clowery also concluded that the R&D costs should be shared on the basis of the expected future benefits to be derived from the intangibles generated by the R&D activity. He stated that an ideal allocation, however, is not achieved in practice because of the need to divide the costs as they are incurred, or at least before the end of the year; the uncertainty related to the successful introduction of the product; and the lag between R&D and the manufacture of the product. Dr. Clowery stated that some means, therefore, must be found to divide contemporaneously the relevant costs between the participating members of a cost-sharing agreement.

Dr. Clowery calculated the amount of R&D costs allocable to Seagate Singapore using the ratio of the number of disk drives produced by Seagate Singapore to the total number of disk drives produced by both Seagate Scotts Valley and Seagate Singapore. The allocations to Seagate Singapore of the R&D expenses as calculated by Dr. Clowery, based upon

petitioner's figures, and the resulting allocation adjustments are set forth in the following table:

| Period ended | Allocation based on production | Allocation made by petitioner | Allocation adjustment |
|---|---|---|---|
| 6/30/85 | $80,235 | $3,301,804 | ($3,221,569) |
| 6/30/86 | 16,189,000 | 9,945,500 | 6,243,898 |
| 6/30/87 | 40,884,015 | 20,783,577 | 20,100,438 |
| Total | 57,153,250 | 34,030,881 | 23,122,767 |

### iii. *Dr. Chandler's Critique of Dr. Horst's and Dr. Clowery's Method*

Dr. Chandler criticized Dr. Horst's and Dr. Clowery's method of allocating the R&D expenses. He stated that their method recommends a cost-sharing allocation based exclusively on after-the-fact results. According to Dr. Chandler, respondent's methodology permits one party or the other to obtain valuable rights to technology at negligible cost and negates the risk-sharing function of the cost-sharing agreement. Dr. Chandler does not believe that an unrelated third party would agree to the type of allocation arrangement that respondent's experts recommend.

Dr. Horst disputed Dr. Chandler's characterization of Dr. Horst's and Dr. Clowery's cost-sharing allocation method. According to Dr. Horst, in the instant case, the benefits Seagate Scotts Valley and Seagate Singapore expected from the R&D are difficult to assess because the actual date they entered into the cost-sharing agreement is not known. Furthermore, Dr. Horst stated that evidence in the record shows that, during 1985, Seagate Scotts Valley anticipated shifting its disk drive production to Seagate Singapore as quickly as possible. Dr. Horst therefore surmised that, during 1985 and 1986, Seagate Scotts Valley expected the level of Seagate Singapore's future production to be higher than the level of production it was experiencing at the time. Dr. Horst stated that, had he been able to quantify the expected production levels for Seagate Scotts Valley and Seagate Singapore with any precision, he probably would have allocated more R&D expenses to Seagate Singapore for 1985 and 1986 and the same amount for 1987. According to Dr. Horst, in the absence of specific contemporaneous evidence of Seagate Scotts Valley's expected production levels for Seagate Scotts Valley and Seagate Singapore, their contemporaneous actual

production levels provide the most objective basis for allocating R&D expenses.

### B. OPINION

### 1. *The Cost-Sharing Regulations*

Section 1.482–2(d)(4), Income Tax Regs., provides in pertinent part as follows:

Where a member of a group of controlled entities acquires an interest in intangible property as a participating party in a bona fide cost-sharing arrangement with respect to the development of such intangible property, the district director shall not make allocations with respect to such acquisition except as may be appropriate to reflect each participant's arm's length share of the cost and risks of developing the property. A bona fide cost-sharing arrangement is an agreement, in writing, between two or more members of a group of controlled entities providing for the sharing of the costs and risks of developing intangible property in return for a specified interest in the intangible property that may be produced. In order for the arrangement to qualify as a bona fide arrangement, it must reflect an effort in good faith by the participating members to bear their respective shares of all the costs and risks of development on an arm's length basis. In order for the sharing of costs and risks to be considered on an arm's length basis, the terms and conditions must be comparable to those which would have been adopted by unrelated parties similarly situated had they entered into such an arrangement. * * *

### 2. *The Parties' Positions*

#### a. *Petitioner's Position*

Petitioner contends that an equal division of the R&D costs reflects Seagate Scotts Valley's arm's-length share of those costs. Petitioner contends that a 50-percent share is reasonable for Seagate Scotts Valley considering the package of rights which it receives under the cost-sharing agreement. Petitioner argues that, under Dr. Horst's and Dr. Clowery's method of allocating R&D costs between Seagate Scotts Valley and Seagate Singapore, Seagate Scotts Valley obtains all of its exclusive and nonexclusive rights to products developed under the cost-sharing agreement during fiscal year 1987 for less than 2 percent of the R&D costs incurred that year. Petitioner contends that such an allocation result is unreasonable.

Petitioner further contends that Dr. Horst and Dr. Clowery provide no reference to any third party transactions or any

economic theory to support their allocation method. Additionally, petitioner contends that respondent's allocation method is further flawed because: (1) Seagate Scotts Valley's expectations are not approximated by subsequent production; (2) any expectation that Seagate Scotts Valley would not exploit the technology must rest on the fact that Seagate Scotts Valley owns Seagate Singapore; (3) respondent's method allocates current costs on the basis of the success or failure of prior research; and (4) the results of respondent's method would be unacceptable to unrelated parties.

b. *Respondent's Position*

Respondent, on the other hand, contends that, if Seagate Singapore were operating at arm's length, the costs would have been apportioned using the ratio of Seagate Singapore's production of disk drives to Seagate Scotts Valley's and Seagate Singapore's total production of disk drives. Respondent contends that, at the time Seagate Scotts Valley and Seagate Singapore entered into the cost-sharing agreement, they clearly anticipated that Seagate Singapore's production would be larger than Seagate Scotts Valley's production. Accordingly, respondent contends that, at the time they entered into the cost-sharing agreement, if the parties had been operating at arm's length, Seagate Scotts Valley would not have agreed to an arrangement by which it was reimbursed for only one-half of its R&D costs, receiving only a small fraction of the manufacturing profit.

Additionally, respondent contends that, as no one considered or reviewed any unrelated third party transactions to determine how to allocate the R&D costs under the agreement, Seagate Scotts Valley and Seagate Singapore entered into the cost-sharing agreement for tax reasons.

3. *The Court's Holding as to the Arm's-Length Share of the Research and Development Costs*

Section 1.482–2(d)(4), Income Tax Regs., provides that the Commissioner may not make reallocations relating to a controlled group member's acquisition of an interest in intangible property acquired pursuant to a bona fide cost-sharing arrangement if the arrangement reflects each member's arm's-length share of the costs and risks of developing the intangible property. In the instant case, the experts agree

that a reasonable allocation of the R&D expenses would be based on the expectations of the parties benefiting from the R&D. They do not agree, however, on the method to use for valuing those expectations. Although we agree with petitioner that an allocation formula based on future production is not a reasonable basis for estimating the risks and benefits of the R&D, we do not agree that an equal division of the R&D expenses is reasonable in the instant case.

For other purposes, petitioner spent considerable time and effort throughout the trial attempting to persuade us that Seagate Singapore's ability to produce large volumes of disk drives at low costs was absolutely essential for Seagate Scotts Valley's continuing existence in the highly competitive disk drive marketplace. For the cost-sharing agreement issue, however, petitioner seemingly would have us forget that evidence. Petitioner would have us believe that, at the same time Seagate Scotts Valley's management thought Seagate Singapore's ability to mass produce Seagate Scotts Valley's products was crucial for Seagate Scotts Valley's economic survival, those same individuals also expected Seagate Scotts Valley to continue to produce significant volumes of disk drives in the United States. We do not accept the logic of petitioner's scenario.

To the contrary, we are persuaded that, although Seagate Scotts Valley's management may have planned to continue manufacturing some high-performance, low-cost, and non-labor-intensive disk drives in the United States, at the time Seagate Scotts Valley and Seagate Singapore entered into the cost-sharing agreement, Seagate Scotts Valley's management knew that most of Seagate Scotts Valley's disk drives would be produced by Seagate Singapore. Moreover, we are convinced that Seagate Scotts Valley's management also expected Seagate Singapore to reap most of the benefit from the R&D conducted in the United States after disk drive manufacturing capability was transferred to Seagate Singapore.

On the other hand, we agree with petitioner that respondent's allocation formula shifts many of the risks of the R&D to Seagate Singapore. Not all R&D results in a product which can be manufactured commercially. By the very nature of research, some of it will be unsuccessful and benefit neither entity. Respondent's allocation method results in Seagate

Singapore's bearing most of the cost of unsuccessful research. Petitioner has persuaded us that Seagate Scotts Valley should share more of the risks of that unsuccessful research than is provided by respondent's allocation method.

Neither party introduced into the record any third party cost-sharing agreements. Consequently, we have no unrelated transactions to use as a guide for our decision. Accordingly, we use our best judgment and conclude that 75 percent of the R&D expenses should be allocated to Seagate Singapore and 25 percent should be allocated to Seagate Scotts Valley.

## IX. ISSUE 9

Whether Seagate Scotts Valley is entitled to offsets for warranty payments Seagate Singapore paid to Seagate Scotts Valley.

### A. FINDINGS OF FACT

#### 1. *Background*

Seagate Singapore reimburses Seagate Scotts Valley for warranty expenses incurred by Seagate Scotts Valley's repair centers relating to disk drives manufactured and sold by Seagate Singapore to third parties. Seagate Scotts Valley uses a preset per-unit warranty charge to calculate the amount of reimbursement Seagate Singapore owes Seagate Scotts Valley for warranty services. Seagate Scotts Valley calculates the per-unit warranty charge for each disk drive model by multiplying the disk drive model's average disk drive return rate times the average cost per repair type to derive the total expected cost of repairs for the disk drive model for the period. Seagate Scotts Valley then divides the total expected cost of repairs for the disk drive model by the number of expected third party sales of the disk drive model to derive the per-unit charge for the disk drive model. Monthly, Seagate Singapore calculates and records on its income statements warranty expense based on third party unit sales information. Seagate Scotts Valley records the warranty payments as a reduction of the warranty expenses included in its cost of goods sold.[28]

---

[28] The issue of whether Seagate Scotts Valley and Seagate Singapore have correctly treated the warranty expenses as part of Seagate Scotts Valley's cost of goods sold when the sale is

Seagate Singapore paid Seagate Scotts Valley the following amounts as reimbursement for warranty expenses incurred by Seagate Scotts Valley for the disk drives Seagate Singapore produced and sold to third parties:

| Year | Warranty payments |
|------|------------------:|
| 1984 | $241,000 |
| 1985 | 1,460,000 |
| 1986 | 2,505,000 |
| 1987 | 7,445,000 |
| Total | 11,651,000 |

## 2. *Respondent's Notices of Deficiency*

In the notices of deficiency, respondent included the warranty payments Seagate Singapore paid Seagate Scotts Valley as an offset in respondent's calculation of Seagate Singapore's cost of goods sold, which respondent then used for purposes of deriving the residual income to be split between Seagate Singapore and Seagate Scotts Valley. (See *supra* Issue 5.) The section 482 reallocations respondent now proposes do not include an offset for the warranty payments.

### B. OPINION

## 1. *The Parties' Positions*

### a. *Petitioner's Position*

Petitioner contends that Seagate Scotts Valley should receive the full offsets for warranty payments included in the notices of deficiency. Petitioner contends that, for the fiscal year ended 1985, respondent, in effect, had determined that Seagate Singapore overpaid Seagate Scotts Valley during that year for warranty services by the amount of the offset. Petitioner contends that respondent cannot now reverse that determination. As to the other years in issue, petitioner asserts that respondent is unable to identify the amount of any specific adjustment in the notices of deficiency for warranty services; therefore, it is impossible to discover whether respondent also had determined that Seagate Singapore overpaid for warranty services during those years. Petitioner

made by Seagate Singapore is not before this Court. Consequently, we do not consider such issue.

argues that Seagate Scotts Valley should not be penalized because respondent does not know the amount of the Government's own adjustments.

### b. *Respondent's Position*

Respondent counters that the allowances in the notices of deficiency for the offset for the warranty payments Seagate Singapore made to Seagate Scotts Valley were part of the profit split methodology respondent used to determine the section 482 reallocation. Respondent contends that the profit to be split was computed by "netting out" from cost of goods sold all the intercompany payments, including the payments Seagate Singapore made to Seagate Scotts Valley for warranty expenses. Respondent contends that, in the methodology used for the notices of deficiency, the warranty amount, in effect, was included as profit to be divided between Seagate Scotts Valley and Seagate Singapore. Respondent, however, argues that under the methodology used to compute the section 482 reallocation at trial, the applicable adjustment applies only to intercompany sales. Consequently, respondent argues, Seagate Singapore would receive a windfall if the warranty payments were eliminated through a setoff because Seagate Scotts Valley did perform the warranty services for Seagate Singapore. Additionally, respondent contends that petitioner did not timely notify the District Director that Seagate Scotts Valley was claiming an offset, or establish that Seagate Singapore had overpaid Seagate Scotts Valley for warranty services. Respondent further contends that petitioner is raising the overpayment issue for the first time on brief.

### 2. *The Court's Holding as to the Warranty Offset*

We find no support in the record for petitioner's contention that respondent determined in the notices of deficiency that Seagate Singapore had overpaid Seagate Scotts Valley for the warranty expenses Seagate Scotts Valley incurred on Seagate Singapore's behalf. As discussed more fully above, in the notices of deficiency respondent used a profit split methodology to reallocate to Seagate Scotts Valley income relating to the value of the manufacturing intangible which Seagate Scotts Valley had transferred to Seagate Singapore. To compute the residual profit to be split between Seagate Scotts

Valley and Seagate Singapore for each year, respondent increased (reduced for fiscal year ended 1985) Seagate Singapore's income from sales of disk drives by the price allowance, reduced Seagate Singapore's cost of goods sold by the warranty, royalty, marketing commissions, and cost-sharing payments Seagate Singapore made to Seagate Scotts Valley, added a processing fee to Seagate Singapore's cost of goods sold, and then subtracted the adjusted cost of goods sold and Seagate Singapore's G&A expense from the sales income, as adjusted, to derive Seagate Singapore's net profit. From that net profit, respondent deducted an estimated value of marketing to derive the value of manufacturing, or residual profit. We agree with respondent that the offset for the warranty payments, like the price allowance (see *supra* Issue 4) and the offset for marketing commissions (see *supra* Issue 5), was merely a computational adjustment respondent used to derive the profits to be split between Seagate Singapore and Seagate Scotts Valley. Because we do not rely on respondent's methodology in the notices of deficiency in deciding the section 482 reallocation, an offset for warranty payments must rest upon an independent rationale. To show entitlement to an offset for the warranty payments, petitioner must establish that Seagate Singapore overpaid Seagate Scotts Valley for the warranty services the latter provided to Seagate Singapore. Sec. 1.482–1(3)(d), Income Tax Regs. Petitioner has not shown that Seagate Singapore overpaid Seagate Scotts Valley for warranty services. Consequently, no such offset is allowed.

Because we agree with respondent that the offset for warranty payments was merely a computational adjustment, we do not address the parties' other arguments relating to the warranty offset issue.

## X. PROCEDURAL MATTERS

### A. *Petitioner's Motion To Exclude Part IV of Dr. Clowery's Report*

#### 1. *Background*

The first issue identified in our order designating the issues to be tried, see *supra* Issue 7, was whether Seagate

Scotts Valley's resale margin on the distribution of disk drives purchased from Seagate Singapore was arm's length.

Before trial, the parties exchanged expert reports relating to the specific issues designated for trial. Following the exchange of such reports, a pretrial hearing was held. At the hearing, and in a memorandum filed subsequently, petitioner argued that the resale margin analysis contained in Dr. Frisch's report, and part IV of Dr. Clowery's report, was not the resale price methodology described in section 1.482–2(e)(3), Income Tax Regs. Petitioner asserted that, based on discovery responses, it had prepared for trial on the understanding that respondent would contend that the transfer price for the disk drives Seagate Singapore sold to Seagate Scotts Valley should be based on the resale price method set forth in section 1.482–2(e)(3), Income Tax Regs., and that the resale margin was 20 percent. Petitioner contended that the method adopted by respondent's experts was a fourth method under section 1.482–2(e)(1)(iii), Income Tax Regs., and that such method was not encompassed within our order. Petitioner further contended that, if respondent were allowed to raise such fourth method on the eve of trial, petitioner would be unfairly prejudiced because petitioner would have to advance new and different proof to counter respondent's new methodology. Petitioner argued that Dr. Frisch's report and part IV of Dr. Clowery's report, accordingly, should not be admitted into evidence because they violated our order.

At the pretrial hearing, and in a memorandum filed subsequently, respondent acknowledged that the resale margin analysis contained in Dr. Frisch's and Dr. Clowery's reports was either a variation of the resale method described in section 1.482–2(e)(3), Income Tax Regs., or a fourth method described in section 1.482–2(e)(1)(iii), Income Tax Regs. Respondent contended, however, that the Government's experts merely worked from the "bottom up" to compute the resale margin and that their methodology, nonetheless, was a resale price method, even though it was not the resale price method described in section 1.482–2(e)(3), Income Tax Regs. Respondent did not agree that Dr. Frisch's and Dr. Clowery's methodology raised an issue that was not encompassed within our order. Respondent contended that the notices of deficiency did not use the resale method described in section 1.482–2(e)(3), Income Tax Regs., and that the

order did not restrict respondent to such a method. Respondent contended further that petitioner would not have to submit any new evidence to rebut the methodology adopted by the Government's experts in their reports because petitioner's experts analyzed some of the same evidence that respondent's experts relied on in their analysis.

After reviewing the experts' reports and memoranda submitted by the parties, we concluded that Dr. Frisch's and Dr. Clowery's "bottom-up" analysis was a fourth method under section 1.482–2(e)(1)(iii), Income Tax Regs., and that the use of such method violated our order. Accordingly, at the start of trial, we ruled that, as to the completed disk drive pricing issue, respondent would not be allowed to make any adjustments relating to the completed disk drive pricing issue other than those made in the notices of deficiency. We ruled further, however, that respondent was not precluded from submitting evidence as to the appropriate markup percentage to be applied to the applicable resale price under section 1.482–2(e)(3), Income Tax Regs.

At trial, respondent submitted reports that Dr. Frisch and Dr. Clowery had revised relating to the completed disk drive pricing issue to conform their resale margin analysis to section 1.482–2(e)(3), Income Tax Regs. Petitioner then moved to exclude part IV of Dr. Clowery's revised report. Petitioner contended that part IV of Dr. Clowery's revised report introduces accounting issues into the case which were not in the notices of deficiency or allowed by our order. Petitioner contended that the introduction of such accounting issues unfairly burdens and surprises petitioner.

Respondent, on the other hand, did not agree with petitioner's position that the revised reports raise a new issue. Respondent contended that the revised reports are a "top-down" resale price analysis, consistent with the Court's ruling at the start of trial. Respondent contended further that part IV of Dr. Clowery's report applies the resale price method prescribed in section 1.482–2(e)(3), Income Tax Regs. According to respondent, in part IV of his report, Dr. Clowery merely calculated cost of goods sold in the manner required by section 1.482–2(e)(3)(viii), Income Tax Regs.[29] Respondent

---

[29] Sec. 1.482–2(e)(3)(viii), Income Tax Regs., provides as follows:

contended that petitioner cannot be unfairly surprised by Dr. Clowery's method because the calculation is contemplated by the regulations and the resale margin is a designated issue. According to respondent, in part IV of his report, Dr. Clowery merely calculated cost of goods sold in a manner mandated by the regulations in order to compare Seagate Scotts Valley's resale margin to the resale margins earned by the comparable companies identified by Dr. Frisch.

Respondent acknowledged that the method used to compute the resale price method in the notices of deficiency is not the same as the resale price method used by Dr. Frisch and Dr. Clowery to compute the transfer prices for completed disk drives. Respondent contended that Dr. Frisch's and Dr. Clowery's revised method, nonetheless, did not raise a new issue because the method complies with the Court's directive for respondent to prepare an analysis of the resale price method under section 1.482–2(e)(3), Income Tax Regs.

In sum, at the start of trial, we ruled that, as to the completed disk drive pricing issue, we would hold respondent to the adjustment in the notices of deficiency but that respondent could submit evidence on the appropriate markup percentage to be applied. Respondent contends that Dr. Clowery's method is required to calculate that appropriate markup percentage. Petitioner, on the other hand, contends that Dr. Clowery's method does not duplicate the adjustment in the notices of deficiency and, therefore, raises a new issue. We decided to take under advisement petitioner's motion to exclude part IV of Dr. Clowery's report.

## 2. *Ruling on Exclusion of Part IV of Dr. Clowery's Report*

We must decide whether part IV of Dr. Clowery's report complies with our ruling. Petitioner contends that it does not. Respondent disagrees.

---

(viii) In calculating the markup percentage earned on uncontrolled purchases and resales, and in applying such percentage to the applicable resale price to determine the appropriate markup, the same elements which enter into the computation of the sales price and the cost of goods sold of the property involved in the comparable uncontrolled purchases and resales should enter into such computation in the case of the property involved in the controlled purchases and resales. Thus, if freight-in and packaging expense are elements of the cost of goods sold in comparable uncontrolled purchases, then such elements should also be taken into account in computing the cost of goods sold of the controlled purchase. Similarly, if the comparable markup percentage is based upon net sales (after reduction for returns and allowances) of uncontrolled resellers, such percentage must be applied to net sales of the buyer (reseller).

Expert opinion is admissible if it will assist the trier of fact to understand evidence that will decide a fact in issue. See Fed. R. Evid. 702. Accordingly, expert testimony is not relevant if it does not relate to an issue in the case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ____, ____, 113 S. Ct. 2786, 2795 (1993). Evidence which is not relevant is not admissible. Fed. R. Evid. 402.

Petitioner's primary criticism of part IV of Dr. Clowery's revised report centers on certain allocations of costs which he made in calculating the cost of goods sold relating to completed disk drives that Seagate Scotts Valley purchased from Seagate Singapore. Respondent contends that Dr. Clowery made the allocations to comply with section 1.482–2(e)(3)(viii), Income Tax Regs., which provides that, in calculating the markup percentage earned on uncontrolled purchases and resales, the same elements which enter into the computation of cost of goods sold of the property involved in the uncontrolled purchases and resales should enter into the computation of cost of goods sold of the property involved in the controlled purchases. Petitioner does not agree with respondent's interpretation of section 1.482–2(e)(3)(viii), Income Tax Regs.

At the start of trial, we ruled that respondent could submit evidence on the appropriate markup percentage to be applied in the instant case for the completed disk drive pricing issue. Respondent raises a legal argument as to the proper application of section 1.482–2(e)(3)(viii), Income Tax Regs., in calculating the appropriate markup percentage for the resale price method. We did not reach that argument in our discussion of Issue 4 because we found Dr. Clowery's allocations unsupported by the evidence. See *supra* Issue 4. Under the circumstances, we conclude that part IV of Dr. Clowery's report relates to the issue of the proper markup percentage to be applied in the instant case and is an issue which complies with the ruling we made at the start of trial. Accordingly, we deny petitioner's motion to exclude part IV of the report. We have given Dr. Clowery's report appropriate weight under the circumstances.

## B. *Petitioner's Motion To Exclude Certain Documents*

At trial, petitioner moved to exclude, on relevancy grounds, certain stipulated documents which contain materials relat-

ing to tax periods following the years in issue. For some of the documents, petitioner had not reserved a relevancy objection. Respondent objected to the motion, contending that the documents contain materials relevant to issues involved in the instant case. Respondent also contended that petitioner did not make a timely relevancy objection to the introduction of the documents. We reserved ruling on petitioner's motion, pending further arguments on brief.

On brief, petitioner contests the relevancy only of documents regarding the agreement between Co. G and Cos. H and J. See *supra* Issue 5. Petitioner contends that such agreement is not relevant because it was executed after the years in issue and 4 years after the 1-percent royalty rate was established. Consequently, as to the stipulated documents for which petitioner raised a relevancy objection at the end of trial, we deem such objection withdrawn except for the documents pertaining to the Co. G and Cos. H and J agreement.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Co. G and Cos. H and J entered into the agreement 1 month after the close of Seagate Scotts Valley's fiscal year ended 1987. The documents to which petitioner objects provide information pertaining to industry practice for the years in issue relating to licensing rates for computer peripheral equipment. Accordingly, we find the information contained in the documents relevant to an issue in the case. Consequently, we deny petitioner's motion to exclude from evidence the documents relating to such agreement.

To reflect the foregoing and certain adjustments agreed to by the parties,

*Decision will be entered under Rule 155.*